Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com

Andrew B. Clubok (admitted *pro hac vice*)
Susan E. Engel (*pro hac vice* application pending)
Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com

Attorneys for Defendant
*Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH DUGUID, *individually and on behalf of all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>        Defendant. | CASE NO.: 3:15-cv-00985-JST<br><br>**FACEBOOK, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) AND MEMORANDUM IN SUPPORT**<br><br>Complaint Filed Date: March 3, 2015<br><br>Judge: Hon. Jon S. Tigar<br>Hearing Date: July 30, 2015<br>Time: 2:00 p.m.<br>Courtroom: Courtroom 9, 19th Floor |

## NOTICE OF MOTION AND MOTION

To the Clerk of the Northern District of California and all parties and their attorneys of record:

Please take notice that on July 30, 2015 at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Jon S. Tigar, U.S. District Court Judge, U.S. District Court for the Northern District of California, Courtroom No. 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, defendant Facebook, Inc. ("Facebook") will and hereby does move this Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an Order dismissing the claims of plaintiff Noah Duguid ("Plaintiff") with prejudice, for failure to state a claim upon which relief may be granted.

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Declaration of Elizabeth L. Deeley and exhibits attached thereto, the pleadings on file with the Court, and such arguments and authorities as may be presented at or before the hearing.

## STATEMENT OF THE ISSUES

Pursuant to Fed. R. Civ. P. 12(b)(6), Facebook moves to dismiss Plaintiff's claims brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), on the following grounds:

1. Plaintiff fails to plausibly allege that the alleged login notifications were sent with an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), which is a necessary element of Plaintiff's TCPA claim.

2. The alleged login notifications are exempt from liability under the TCPA's exception for "emergency" texts, 47 U.S.C. § 227(b)(1)(A).

3. The First Amendment prohibits restricting the alleged login notifications because they are non-commercial security messages.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ......................................................................... i

STATEMENT OF THE ISSUES.............................................................................. i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 2

ARGUMENT ......................................................................................................... 7

I.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS THAT WOULD SHOW THE LOGIN NOTIFICATIONS WERE SENT USING AN ATDS. .............. 7

II.   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE ALLEGED LOGIN NOTIFICATIONS ARE SENT FOR EMERGENCY PURPOSES........................................................................................................ 12

III.  APPLYING THE TCPA TO THE ALLEGED LOGIN NOTIFICATIONS WOULD VIOLATE THE FIRST AMENDMENT. .................................................... 15

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU of Nev. v. City of Las Vegas*,
466 F.3d 784 (9th Cir. 2006).............................................................................. 16

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997) .............................................................................................. 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................ 6

*Baranski v. NCO Fin. Sys.*,
No. 13 CV 6349, 2014 WL 1155304 (E.D.N.Y. March 21, 2014) ...................... 7, 8

*Baranski v. NCO Fin. Sys.*,
No. 13 CV 6349, D.E. 41 (E.D.N.Y. April 18, 2014) .......................................... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 6

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011).............................................................................. 2

*Chesbro v. Best Buy Stores, L.P.*,
705 F.3d 913 (9th Cir. 2012).............................................................................. 14

*Chyba v First Fin. Asset Mgmt., Inc.*,
No. 12-cv-1721, 2014 WL 1744136 (S.D. Cal. April 30, 2014)......................... 14

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993) ............................................................................................ 16

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010)............................................................................ 3

*Desert Outdoor Advertising, Inc. v. City of Moreno Valley*,
103 F.3d 814 (9th Cir. 1996).............................................................................. 16

*Destination Ventures, Ltd. v. FCC*,
46 F.3d 54 (9th Cir. 1995)................................................................................... 16

*Foti v. City of Menlo Park*,
146 F.3d 629 (9th Cir. 1998)............................................................................... 15, 16, 17

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................................... 3

*Freidman v. Massage Envy Franchising, LCC*,
No. 3:12-CV-02962-L-RBB, 2013 WL 3026641 (S.D. Cal. June 13, 2013).......... 8, 14

*Glauser v. GroupMe, Inc.*,
No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) .......................................... 7, 9, 11

*Gomez v. Campbell-Ewald Co.*,
768 F.3d 871 (9th Cir. 2014) .......................................................................................... 15, 16, 17

*Gragg v. Orange Cab Co.*,
995 F. Supp. 2d 1189 (W.D. Wash. 2014) .............................................................................. 7, 8, 11

*Heinrichs v. Wells Fargo Bank, N.A.*,
No. C 13–05434, 2014 WL 2142457 (N.D. Cal. April 15, 2014) ........................................... 5

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) ......................................................................................................... 4

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
847 F. Supp. 2d 1253 (S.D. Cal. 2012) ........................................................................................ 15

*INS v. St. Cyr*,
533 U.S. 289 (2001) ................................................................................................................. 7, 18

*Joffe v. Acacia Mortgage Corp.*,
211 Ariz. 325 (Ct. App. 2005) ...................................................................................................... 15

*Jones v. FMA Alliance Ltd.*,
978 F. Supp. 2d 84 (D. Mass. 2013) ............................................................................................... 8

*Lozano v. Twentieth Century Fox Film Corp.*,
702 F. Supp. 2d 999 (N.D. Ill. 2010) .......................................................................................... 15

*Marks v. Crunch San Diego, LLC*,
55 F. Supp. 3d 1288 (S.D. Cal Oct. 23, 2014) .................................................................. 7, 9, 10, 11

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014) .................................................................................................................. 16

*McKenna v. WhisperText*,
No. 5:14–cv–00424–PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) ........................... 6, 7, 11, 12

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ..................................................................................................................... 17

*Mims v. Arrow Financial Services, LLC*,
132 S. Ct. 740 (2012) ................................................................................................................... 13

*Moser v. FCC*,
46 F.3d 970 (9th Cir. 1995) ......................................................................................................... 16

*Nadarajah v. Gonzales*,
443 F.3d 1069 (9th Cir. 2006) ..................................................................................................... 18

*Nat'l Adver. Co. v. City of Orange*,
861 F.2d 246 (9th Cir. 1988) ................................................................................................. 15, 17

*Olney v. Progressive Cas. Ins. Co.*,
  993 F. Supp. 2d 1220 (S.D. Cal. 2014) ................................................................... 5

*Pimental et al. v. Google, Inc.*,
  No, C-11-02585-YGR, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012) .......................... 9

*Robins v. Spokeo*,
  742 F.3d 409 (9th Cir. 2014) .................................................................................... 2

*Ryabyshchuck v. Citibank (S.Dakota) N.A.*,
  2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) .................................................... 13, 15

*Sams v. Yahoo, Inc.*,
  713 F.3d 1175 (9th Cir. 2013) .................................................................................. 15

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ............................................................................ passim

*Sepehry-Fard v. MB Fin. Servs.*,
  No. 13-CV-02784-BLF, 2014 WL 2191994 (N.D. Cal. May 23, 2014) ...................... 6

*Snyder v. Perry*,
  No. 14–CV–2090, 2015 WL 1262591 (E.D.N.Y. March 18, 2015) ............................ 9

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) .................................................................................... 12

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .................................................................................... 6

*Strickler v. Bijora, Inc.*,
  No. 11 CV 3468, 2012 WL 5386089 (N.D. Ill. Oct. 30, 2012) ................................. 15

*Thompson v. Permanente Med. Grp., Inc.*,
  No. 12-CV-01301-JST, 2013 WL 1808897 (N.D. Cal. Apr. 29, 2013) .................... 6, 7

*Turner Broad. Sys. v. F.C.C.*,
  512 U.S. 622 (1994) .................................................................................................. 16

*United States v. Kiewit Pac. Co.*,
  No. 12-CV-02698-JST, 2013 WL 5770514 (N.D. Cal. Oct. 24, 2013) ....................... 4

*Van Hook v. Curry*,
  No. C 06-3148 PJH (PR), 2009 WL 773361 (N.D. Cal. Mar. 23, 2009) .................... 6

*Yniguez v. Arizonans for Official English*,
  69 F.3d 920 (9th Cir. 1995) ...................................................................................... 17

**Statutes**

47 U.S.C. § 227 ...................................................................................................... passim

**Other Authorities**

FDIC, OCC and Board of Governors of the Federal Reserve's Interagency Guidance On
    Response Program For Information Security Breach, 2009 WL 2656073 ..................................... 12

*GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*,
    Declaratory Ruling, 29 F.C.C.R. 3442 (2014) ................................................................. 14

*In Re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*,
    Notice of Proposed Rulemaking and Memorandum Opinion and Order, 17 F.C.C.R. 17459
    (2002) ........................................................................................................................ 10

*In Re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*,
    Report and Order, 27 F.C.C.R. 15391 (2012) ................................................................. 8

*In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    Report and Order, 18 F.C.C.R. 14014 (2003) ......................................................... 7, 9, 10

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    Report and Order, 7 F.C.C.R. 8752 (1992) ............................................................... 12, 13

*In the Matter of the Tel. Consumer Prot. Act of 1991*,
    Notice of Proposed Rulemaking, 7 F.C.C.R. 2736 (1992) ........................................... 13, 15

National Credit Union Administration's Compl. Guide for Cr. Unions, NAFCUCG 33 Ex. 33.6 .... 13

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................. i, 6, 7, 18

**Regulations**

47 C.F.R. § 64.1200(f)(4) ................................................................................. 13, 16

# INTRODUCTION

This case is not about spam text messages that are sent to random phone numbers. Rather, Plaintiff is complaining about urgent, high-priority texts sent to warn Facebook users about a potential and imminent security breach on their accounts. As Plaintiff recognizes, the "login notifications" at issue here are an "extra security feature" that users choose to activate to provide additional security for their Facebook accounts, which may contain private information. (Compl. ¶ 4; Compl. Ex. A.) If login notifications are activated by the user, Facebook will send "an alert each time someone logs into [the user's] account from a new place," so the user can protect his or her account from a potential security breach by, among other options, immediately changing the account password. (Compl. ¶ 4; Compl. Ex. A.)

The security alerts challenged in the Complaint are a far cry from the type of impersonal, automated messages that are prohibited by the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and do not support a claim for three separate reasons. First, Plaintiff does not adequately allege that these login notifications were sent by an "automated telephone dialing system," or "ATDS," to phone numbers that are "random[ly] or sequential[ly] . . . generat[ed]"—a core element of Plaintiff's TCPA claim. 47 U.S.C. § 227(a)(1). Although Plaintiff alleges in conclusory fashion that "[t]he text messages sent to Plaintiff's cellular phone were made with an ATDS" (Compl. ¶ 29), his own allegations and description of login notifications show that allegation is implausible. Facebook users—not an automated number generator—are the ones to turn on login notifications and input the phone number to which notifications should be sent, and then notifications are only sent to that number when someone logs onto a Facebook account from a new place. Second, login notifications fall squarely within the TCPA's broad exception for any "call made for emergency purposes," 47 U.S.C. § 227(b)(1)(A), because the feature is activated by the user for the express purpose of obtaining immediate notice of a potential security breach. Third, login notifications cannot be restricted under the First Amendment because they are non-commercial security messages sent to protect individual consumers' privacy, the same interest that the TCPA seeks to protect.

Plaintiff's Complaint should be dismissed with prejudice for failure to state a claim under the TCPA.[1]

**STATEMENT OF FACTS**

Plaintiff alleges that Facebook "sen[t] unauthorized automated text messages to Plaintiff's cellular phone" using an "automated telephone dialing system" ("ATDS"), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). (Compl. ¶¶ 1, 29.) The TCPA makes it "unlawful . . . to make any call (*other than a call made for emergency purposes* or made with the prior express consent of the called party) using any *automatic telephone dialing system* . . . to any telephone number assigned to a . . . cellular telephone service . . . for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A) (emphasis added). Plaintiff further alleges that "[t]he telephone number messaged by Facebook was assigned to a cellular telephone service for which Plaintiff incurs charges for incoming messages" (Compl. ¶ 31), but does not allege that he was charged for any of the allegedly violating text messages. Congress passed the TCPA in 1991 in response to "increasingly intrusive automated telemarketing directed at individual consumers, particularly where the calls employed artificial or prerecorded messages." Paul F. Corcoran, Marc J. Rachman, David S. Greenberg, *The Telephone Consumer Protection Act: Privacy Legislation Gone Awry?*, 26 Intell. Prop. & Tech. L.J. 9, 11 (2014). According to Plaintiff, "spam texts," like telemarketing calls, are a "growing problem in the United States." (Compl. ¶ 2.)

---

[1] It is questionable whether Plaintiff has Article III standing for his TCPA claim at all. He alleges only an economic injury, namely, that "the telephone number messaged by Facebook was assigned to a cellular telephone service for which Plaintiff incurs charges for incoming messages pursuant to 47 U.S.C. § 227(b)(1)." (Compl. ¶ 31.) But Plaintiff does not allege that he pays incrementally for each text he receives or that he in fact paid for the alleged login notifications. Indeed, based on his boilerplate allegation, it is just as likely that he pays for unlimited text messages as part of his cell phone service. If Plaintiff's cell phone service includes unlimited texts, then he cannot have suffered the alleged economic injury, because he has not paid for any of the allegedly infringing text messages. Facebook is entitled to, and does not waive its right to, bring this standing argument at a later time. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) ("The existence of Article III standing is not subject to waiver."). The Supreme Court has recently granted certiorari to review the Ninth Circuit decision in *Robins v. Spokeo*, which held in a case involving the Fair Credit Reporting Act that a plaintiff who suffers a violation of a statutory right can have Article III standing even without suffering actual damages. 742 F.3d 409, 413-14 (9th Cir. 2014), *cert. granted*, No. 13-1339, 2015 WL 1879778 (U.S. Apr. 27, 2015). The Supreme Court's resolution of *Spokeo* will likely effect whether Plaintiff's allegations here are adequate.

But this case does not involve spam texts or telemarketing. Plaintiff's claims are based on "login notifications" that Facebook users can "turn on" as "an 'extra security feature.'" (Compl. ¶ 4.) That "extra security" is an important feature for Facebook. Facebook is a global online social network, with well over one billion people using its services worldwide. (Compl. ¶ 3.) As Plaintiff acknowledges, Facebook users enter "private information" into their Facebook accounts. (Compl. ¶ 4.) That "private information" may include personal identifying information, and can also include financial information, such as stored credit card data. (*See* Deeley Decl. Ex. 3 (instructions on how to store or remove stored credit card information from your Facebook account; noting also the availability of "extra security features"—including login notifications—"to make your account even more secure").)[2] Facebook therefore provides several security features, including the login notification feature at issue in Plaintiff's Complaint. (Compl. ¶ 4.)

---

[2] On a motion to dismiss, a court "may consider materials incorporated into the complaint or matters of public record." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). The "incorporation by reference" doctrine has been "extended . . . to consider documents in situations where the complaint necessarily relies upon" them, and their authenticity and relevancy are not disputed. *Id.* (finding billing agreement "integral" to the complaint where, although "not explicitly" referenced, document was necessary to determination of whether statute of limitations had run on plaintiff's claim and plaintiff's allegations supported its existence); *cf. Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 795 (N.D. Cal. 2011) (rejecting request for judicial notice where Facebook Help Center webpages were not attached to complaint and plaintiff only cited one excerpt from one such webpage in complaint). Here, Plaintiff explicitly refers to and relies on the discussion of the login notification process in Facebook Help Center webpages. He quotes from and attaches Help Center webpages that discuss two steps in the process: how to "turn on" login notifications (Compl. ¶ 4; Compl. Ex. A) and how to "deactivate" login notifications (Compl. ¶ 6 and Ex. B). Despite alleging that login notifications "can be sent to mobile phones" and that these alerts are "often sent to the cellular telephones of people who have not authorized Facebook to contact them on their cell phones," Plaintiff does not include information regarding how to "add a mobile number" to a Facebook account. (Compl. ¶¶ 4, 5; Compl. Ex. A.) Facebook has attached as Exhibit 1, the Facebook Help Center webpage describing how to add and verify a mobile phone number, an integral step in "turn[ing] on" the login notifications as text alerts. (*See* Deeley Decl. Ex. 1; *see also* Compl. Ex. A (Help Center webpage instructing that "You need to add a mobile phone number to your account to receive text message alerts"). Facebook has also attached its terms of service, which include a provision relating to "Mobile . . . Devices" that conditions service on keeping the user's mobile phone number up to date. (*See* Deeley Decl. Ex. 2.) And because Plaintiff also refers to the "private information" that users store on their Facebook accounts (Compl. ¶ 4), Facebook has also attached a webpage from Facebook's Help Center explaining that this "private information" includes financial information. (*See* Deeley Decl. Ex. 3.) Each of these attached webpages are publicly available at the URL address appearing at the bottom of each webpage. (*See* Deeley Decl. Exs. 1-3.)

Login notifications "send [a user] an alert each time someone logs into [that user's] account from a new place." (Compl. Ex. A (Facebook Help Center page titled "What are login notifications").) To activate login notifications, a Facebook user must log into his account, access the "Security Settings" section, and navigate to the "Login Notifications" section. (Compl. Ex. A.) Next, the user must "check the box next to the type of alerts [the user would] like to receive"—*i.e.*, login notifications by email or text message—and then select "Save Changes." (Compl. Ex. A, Ex. B.) But before the user can receive login notifications via text message, the user must "add a mobile number to [his] account" (Compl. Ex. A.), and verify that mobile number. (Deeley Decl. Ex. 1; *see also* footnote 2, *supra*.) A user must also "keep [his] contact information accurate and up-to-date" and must agree that, "[i]n the event [he] change[s] or deactivate[s] [his] mobile telephone number, [he] will update [his] account information on Facebook within 48 hours to ensure that [his] messages are not sent to the person who acquires [his] old number." (Deeley Decl. Ex. 2, § 6.2.)

If someone later tries to access the person's Facebook account from a new place, the person immediately receives a text warning that someone is trying to access the account from an "unfamiliar device or location." (Compl. Ex. A.) The text identifies where the account was accessed from and the precise time of access. (Compl. ¶ 22; *see also* Compl. Ex. D (attaching cell phone screenshots of login notifications).) The user then can log in and "reset [the] password and secure [the] account." (Compl. Ex. A.) Login notifications thus protect users from potential compromise of their accounts by hackers and others. (*See, e.g.*, Deeley Decl. Ex. 5 (Sharon Profis, *Find out if someone's logging in to your Facebook account*, CNET (Dec. 10, 2011) (explaining that Facebook's login notifications allow users to "[k]eep tabs on hackers").)[3]

Plaintiff alleges that he has no Facebook account (Compl. ¶¶ 25, 27, Ex. E at p. 1), and that he received text messages after sending an "off" text message. (Comp. ¶ 28.) He concedes,

---

[3] As discussed further in Facebook's Request for Judicial Notice, this Court can take judicial notice of news articles discussing the indisputable facts that the hacking of websites in order to steal financial and personal information is a widely reported danger of Internet use, as well as the fact that recycled phone numbers are a reported reason for parties being called unintentionally. *United States v. Kiewit Pac. Co.*, No. 12-CV-02698-JST, 2013 WL 5770514, at *5 (N.D. Cal. Oct. 24, 2013) (taking judicial notice of media reports); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (same).

however, that his cell phone number is associated with someone else's Facebook account (someone who necessarily elected to receive login notifications), and he thus received login notifications about *that* account being accessed. (Compl. ¶ 22 (alleging that Plaintiff received login notifications about "[y]our Facebook account [being] accessed").). As noted above, login notifications are sent only to a mobile number that has been previously verified by the user. (Deeley Decl. Ex. 1; *see also* footnote 2, *supra*.) Despite this verification process, Plaintiff complains about login notifications sent to a "phone number . . . [that has] been used before[] by [a Facebook user] who wanted" login notifications.[4] (Compl. Ex. C, at p. 16.)

Although Plaintiff alleges that the login notifications he received "were made with an [automated telephone dialing system]," without Plaintiff's prior written consent, and "were not placed for emergency purposes," (Compl. ¶¶ 26, 29, 32), he alleges no facts that support these conclusory allegations. Rather, Plaintiff describes no more than ten login notifications that Facebook allegedly sent to his cell phone between January 2014 and March 2015, warning of a potential breach of a Facebook account. (*See* Compl. ¶ 20 (referencing a first message on Jan. 25, 2014); *id.* at ¶ 22 (showing screenshots of text messages sent on Feb. 9, Feb. 10, April 9, and Oct. 18); *id.* at ¶ 28 (referencing three text messages sent on Oct. 18); *see also* Compl. Ex. D (showing the same text messages as in ¶¶ 22 and 28 and three additional text messages without dates).) Each of the login notifications contained security alerts and informed Plaintiff that "Your Facebook account has been accessed" at a specific time, and most notifications identified the browser and operating system on which the login took place. (*See, e.g.*, Compl. ¶ 22 (Oct. 18 text message states

---

[4] According to the Wall Street Journal, nearly 37 million phone numbers have "been used before," in the sense that numbers are reassigned to different subscribers each year. (Deeley Decl. Ex. 6 (Alyssa Abkowitz, *Wrong Number? Blame Companies' Recycling*, Wall Street Journal (Dec. 1, 2011).) Reassigned phone numbers have become increasingly prevalent in TCPA actions, in part because the TCPA exempts from liability calls made with the "prior express consent" of the "called party," *see* 47 U.S.C. § 227(b)(1)(A). *See, e.g.*, *Heinrichs v. Wells Fargo Bank, N.A.*, No. C 13–05434, 2014 WL 2142457, at *1 (N.D. Cal. April 15, 2014) (noting that the problem of whether "called party" means current subscriber or intended recipient "arises when a cell phone number is reassigned from someone who gave consent to someone who did not without notice to the caller"). Neither this Court nor the Ninth Circuit have addressed whether the definition of "called party" means the ***intended*** recipient of the number (who may have consented to receive calls or texts) or the current subscriber of a reassigned number (who may not have consented). *See id. But cf. Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d 1220, 1223–24 (S.D. Cal. 2014) (rejecting the "intended recipient" definition).

"Your Facebook account was accessed from Chrome on Windows at 8:15 am. Log in for more info."); *see also id.* (Feb. 10 text message states "Your Facebook account was accessed from an unknown browser at 3:34 pm. Log in for more info."); Compl. Ex. D.) Plaintiff purports to bring his claims on behalf of classes of persons who received text messages from Facebook (Compl. ¶ 34), but he does not allege any basis for identifying who else received login notifications on a recycled cell phone number, nor does he allege that anyone else received the login notifications alleged in the Complaint.

## **STANDARD OF REVIEW**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim is facially plausible 'when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McKenna v. WhisperText*, No. 5:14–cv–00424–PSG, 2015 WL 428728, at *2 (N.D. Cal. Jan. 30, 2015) (quoting *Iqbal*, 556 U.S. at 663). A complaint that provides no more than a "formulaic recitation of the elements of a cause of action" will not suffice on a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "'To be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.'" *Thompson v. Permanente Med. Grp., Inc.*, No. 12-CV-01301-JST, 2013 WL 1808897, at *2 (N.D. Cal. Apr. 29, 2013) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). Furthermore, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. In evaluating a complaint's allegations on a motion to dismiss, a court may also "consider exhibits attached to the complaint, documents incorporated by reference into the complaint, and judicially noticeable facts." *Sepehry-Fard v. MB Fin. Servs.*, No. 13-CV-02784-BLF, 2014 WL 2191994, at *2, n.1 (N.D. Cal. May 23, 2014); *see also Van Hook v. Curry*, No. C 06-3148 PJH (PR), 2009 WL 773361, at *3 (N.D. Cal. Mar. 23, 2009) ("When an attached exhibit contradicts the allegations in the pleadings, the contents of the exhibits trump the pleadings."). Dismissal is

appropriate "where the complaint lacks . . . sufficient facts to support a cognizable legal theory." *Thompson*, 2013 WL 1808897, at *2; *see also WhisperText*, 2015 WL 428728, at *2.

## ARGUMENT

The Complaint should be dismissed for three independent reasons. First, Plaintiff alleges no plausible set of facts showing that the login notifications were sent using an ATDS, which is a required element of his TCPA claim. Second, the alleged login notifications fall within the scope of the TCPA's explicit exceptions for "emergency" texts.[5] Finally, construing the TCPA to prohibit login notifications would violate the First Amendment, and the Court should either construe the TCPA as not prohibiting the alleged login notifications, *see INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001), or hold that the TCPA violates the First Amendment as applied. Because Plaintiff cannot cure these defects simply by repleading—since he cannot change the fundamental nature of the alleged login notifications—the Court should dismiss the Complaint with prejudice. *See, e.g.*, *Baranski v. NCO Fin. Sys.*, No. 13 CV 6349, 2014 WL 1155304 (E.D.N.Y. March 21, 2014) (dismissing TCPA action under Rule 12(b)(6)); *Baranski*¸ No. 13 CV 6349, D.E. 41, at 3 (E.D.N.Y. April 18, 2014) (confirming dismissal was with prejudice).

## I.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS THAT WOULD SHOW THE LOGIN NOTIFICATIONS WERE SENT USING AN ATDS.

Because Plaintiff claims a violation of the automated call provision of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), he must allege that the system used to send the alleged text messages is an ATDS; otherwise, "the TCPA does not apply." *Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1291 (S.D. Cal. 2014); *see also Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014); *Glauser v. GroupMe, Inc.,* No. C 11-2584 PJH, 2015 WL 475111, at *5 (N.D. Cal. Feb. 4, 2015). Plaintiff's Complaint fails to adequately allege "the use of an ATDS." *WhisperText*, 2015 WL 428728, at *3; *see also Baranski*, 2014 WL 1155304, at *6.

---

[5]    The FCC has interpreted the term "call" in the TCPA to include text messages. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Report and Order, 18 F.C.C.R. 14014, 14115 (2003); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (affording *Chevron* deference to the FCC's interpretation of "call" as including text messages).

The TCPA expressly defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).  The use of a "random or sequential number generator" is—based on the "clear and unambiguous" statutory language—an essential part of an ATDS.  *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (finding statutory definition of ATDS "clear and unambiguous.").  "'Random number generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111–1111, (111) 111–1112, and so on."  *Gragg*, 995 F. Supp. 2d at 1193 (internal quotations and citations omitted).

To allege adequately that calls were made using an ATDS, a complaint must do more than "parrot the statutory language."  *Baranski*, 2014 WL 1155304, at *6.  "[T]he vast majority of courts to have considered the issue have found that a bare allegation that defendant used an ATDS is not enough."  *Id.* (collecting cases) (internal citations and quotations omitted).  But that is all Plaintiff offers here:  the bare allegation that the login notifications "were made with an ATDS" and the parroted statutory language that the alleged ATDS "has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator."  (Compl. ¶¶ 29-30.)  Plaintiff alleges no facts that would plausibly satisfy the statutory ATDS requirement.  47 U.S.C. § 227(a)(1); *see also Jones v. FMA Alliance Ltd.*, 978 F. Supp. 2d 84, 87 (D. Mass. 2013) (dismissing complaint where "the sole reference . . . in the complaint as to the use of ATDS" stated that "'Defendant used an [ATDS] as defined by 47 U.S.C. § 227(a)(1) when it made each and every call to Plaintiff's wireless number'"); *Freidman v. Massage Envy Franchising, LCC*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *2 (S.D. Cal. June 13, 2013) (dismissing complaint where text messages sent were "similar in content, but differ enough to make it appear as if an ATDS was not utilized").  Nor does Plaintiff allege any facts that would plausibly show that Facebook's equipment has the capacity to "generate numbers and dial them without human intervention," *In Re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, Report and Order, 27 F.C.C.R. 15391, 15392, n.5 (2012), which the FCC has ruled may also qualify equipment as an ATDS even in the absence of a random or sequential number generator.  *See Baranski*, 2014 WL 1155304, at *6 (holding the

allegations failed to support a plausible inference that "the calls could be made without human intervention").[6]

In fact, Plaintiff's other allegations and the exhibits attached to his Complaint "tend[] to **refute** the claim that Defendant[] [was] using an ATDS." *Snyder v. Perry*, No. 14–CV–2090, 2015 WL 1262591, at *8 (E.D.N.Y. March 18, 2015) (dismissing complaint for failure to allege ATDS) (emphasis added). Far from alleging en masse distribution to randomly or sequentially generated numbers, Plaintiff plainly alleges that Facebook sent him informational security alerts on an individual basis, not randomly, but in response to specific instances of potentially unauthorized account access. He alleges that the login notifications related to specific attempts to log into a Facebook account associated with his phone number, and the texts allegedly informed Plaintiff that a Facebook account had been accessed at a specific time on a specific browser. (*See* Compl. ¶ 22; *see also* Compl. Ex. D.) These facts do not plausibly show that others received the same texts at the same time. *Cf. Pimental et al. v. Google, Inc.*, No, C-11-02585-YGR, 2012 WL 691784, at *2 (N.D. Cal. Mar. 2, 2012) (allegations "plausibly suggested the use of an ATDS" where defendants

---

[6] Notwithstanding the unambiguous definition of an ATDS, in a 2003 ruling that sought to include within the definition of an ATDS "predictive dialers"—which the FCC explained were "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call," *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 18 F.C.C.R. 14014 n.31 (2003)—the FCC opined that the ATDS definition "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." 27 F.C.C.R. at 15392, n.5 (discussing the 2003 FCC ruling). Some courts within the Ninth Circuit have held that the FCC's interpretation is not binding, and that an ATDS must, as the statute requires, include a random or sequential number generator. *See Marks*, 55 F. Supp. 3d at 1291 (holding that courts are not bound by the FCC's interpretation because the FCC "does not have the statutory authority to change the TCPA's definition of an ATDS"). Other courts in the Ninth Circuit have held that, "under the Hobbs Act, [they are] bound by those FCC rulings." *GroupMe, Inc.*, 2015 WL 475111, at *5. While the Ninth Circuit has not specifically addressed the FCC's predictive dialer ruling, it has ruled that the statutory ATDS definition is "clear and unambiguous." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d at 951. Accordingly, this Court need not defer to the FCC's expansion of the ATDS definition. *See Marks*, 55 F. Supp. 3d at 1291. But regardless of the validity of the FCC's "human intervention" definition of an ATDS, Plaintiff pleads only that the equipment used to send him texts was an ATDS under the statutory definition, *i.e.*, that it has the capacity to randomly or sequentially generate numbers; he does not plead that it was a "predictive dialer" or otherwise sent messages without human intervention. Moreover, as discussed *infra*, Plaintiff's own pleading shows that the alleged texts were sent **with** human intervention.

"harvested phone numbers" and sent impersonal, advertisement texts "en masse" to "every member of the [group texting service] group instantly").

Not only were the log in notifications sent individually, but the facts alleged and the Help Center webpages attached to the Complaint also show that login notifications were sent to phone numbers that were not randomly or sequentially generated but were obtained ***and*** triggered by human intervention. For a login notification to be sent, Plaintiff's own pleading makes clear that a Facebook user must affirmatively opt to receive login notifications and enter and confirm a specific phone number, and then someone must access the Facebook account associated with that number from an unrecognized device. (Compl. ¶¶ 4-5, 22, Ex. A.)

To begin with, a multi-step process is required to obtain phone numbers that might receive login notifications. A user first activates login notifications. (Compl. ¶ 4, Ex. A.) The user logs in to a Facebook account, accesses the "Security Settings" section, clicks on the "Login Notifications" section, "check[s] the box next to the type of alerts [the user would] like to receive," and then "save[s] changes." (Compl. Ex. A.) Next, the user designates which devices to save on a "list of recognized devices." (*Id.*) Then, to receive login notifications via text message, the user "add[s] a mobile number to [the] account." (*Id.*)[7] Login notifications are thus not sent to phone numbers that are randomly or sequentially generated. *Cf. In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 18 F.C.C.R. 14014, 14092 (2003) (describing, as an example of an ATDS, "telemarketers [who] use[] dialing equipment to create and dial 10-digit telephone numbers arbitrarily."); *see also In Re Rules & Regulations Implementing Tel. Consumer Prot. Act of 1991*, Notice of Proposed Rulemaking and Memorandum Opinion and Order, 17 F.C.C.R. 17459, 17465 (2002) (noting that "[a]utodialers permit telemarketers to deliver prerecorded messages to thousands of potential customers every day"). Rather, they are sent only to phone "[n]umbers [that] enter the system through . . . human curation and intervention." *Marks*, 55 F. Supp. 3d at 1292 (holding alleged promotional texts were not sent by an ATDS where the phone

---

[7]  As Facebook explains on its Help Center webpage, to add a mobile phone number, a user must "[e]nter [his] mobile number," receive "a confirmation code as a text message," and "[e]nter this code into the space provided to verify [the user's] account." (*See* Deeley Decl. Ex. 1; *see also* footnote 2, *supra*.)

numbers dialed were entered into web-based equipment by a user or employee manually entering phone numbers or a user responding to a marketing campaign by text message); *see also GroupMe*, 2015 WL 475111, at *6 (finding "Welcome Texts" were not sent by an ATDS where defendant's equipment obtained phone numbers of members of a text messaging group "through the actions of the group's creator").

Moreover, even after a Facebook user requests login notifications by text message and inputs the phone number, login notifications will only be sent to that specific phone number if and when a person logs into an account associated with that phone number from an unrecognized device. (Compl. Ex. A.) The login attempt is yet additional "human intervention" that "is essential" to trigger transmission of a login notification. *Gragg*, 995 F. Supp. 2d at 1194. In *Gragg*, the court examined the human intervention involved in receiving text messages through a taxi dispatching program, noting that the text messages at issue required a customer to first provide information to the dispatcher, who then had to press "enter" to transmit that information to the program and the nearest available taxi driver, who then had to press "accept." 995 F. Supp. 2d at 1193-94. The court "followed the Ninth Circuit's 'common sense' approach to TCPA claims" and held that the "level of human agency involved in transmitting the text dispatch notifications [was] sufficient to qualify as 'human intervention,'" removing the equipment at issue from the definition of an ATDS. *Id.* at 1194. Likewise, in *WhisperText*, the court noted that the plaintiff alleged that a Whisper App user "ha[d] the opportunity to invite all contacts," which were then uploaded and sent automated text message invitations. 2015 WL 428728, at *2-4. The court held that this alleged "need for human intervention by a Whisper App user when sending an SMS invitation" precluded the plaintiff from showing the use of an ATDS; *see also GroupMe*, 2015 WL 475111, at *6 (Welcome Texts not sent by an ATDS where transmission was triggered by the actions of the group's creator, i.e., human intervention.)

Because Plaintiff's own pleading, taken as true, establishes that human intervention is required at every stage of the login notification process, and the phone numbers are not randomly or sequentially generated, Plaintiff's allegations cannot plausibly show that login notifications were sent using an ATDS. *See Marks*, 55 F. Supp. 3d at 1292; *GroupMe*, 2015 WL 475111, at *6. This

"preclude[s] the need for discovery to address whether [Plaintiff] has alleged the use of an ATDS." *WhisperText*, 2015 WL 428728, at *4 & n.36 (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988-89 (9th Cir. 2001) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim[.]")).

## II.  PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE ALLEGED LOGIN NOTIFICATIONS ARE SENT FOR EMERGENCY PURPOSES.

Beyond Plaintiff's failure to plead the use of an ATDS, his claims fail for the independent reason that the alleged login notifications are "made for emergency purposes."  In enacting the TCPA, Congress provided an express exception for calls "made for emergency purposes."  47 U.S.C. § 227(b)(1)(A).  Plaintiff alleges in conclusory fashion that the login notifications "were not made for emergency purposes."  (Compl. ¶ 32.)  But that allegation is not plausible.  It is belied by Plaintiff's own allegations and attached exhibits, which explain that login notifications are "an extra security feature" and even include links to "Security Tips" and "Hacked Accounts."  (Compl. ¶ 4, Ex. A; *see also* Compl. Ex. D (informing Plaintiff of the various times and locations from which "[y]our Facebook account" was suspiciously accessed by unrecognized devices).)

The FCC has already ruled that the emergency exception applies to calls made by utility companies to alert customers about service outages, interruptions, or the possibility that delinquent billing could lead to a service outage.  *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Report and Order, 7 F.C.C.R. 8752, 8777-78 (1992).  Because service outages and interruptions pose public health and safety risks, the Commission explained that "the use of prerecorded message calls could speed the dissemination of information regarding service interruptions or other potentially hazardous conditions to the public."  *Id.*  Similarly, companies in the financial sector routinely maintain sensitive personal and financial information about consumers.  Federal agencies have explained that calls that would otherwise be prohibited under the TCPA, but are made to warn consumers of potential identity theft fall within the TCPA's emergency exception.  *See* FDIC, OCC and Board of Governors of the Federal Reserve's Interagency Guidance On Response Program For Information Security Breach, 2009 WL 2656073, ¶¶ 100-259 ("Financial institutions will give customer notice under the final Guidance for a public

safety purpose, namely, to permit their customers to protect themselves where their sensitive information is likely to be misused, for example, to facilitate identity theft. Therefore, the Agencies believe that the exemption for emergency purposes likely would include customer notice that is provided by telephone using an artificial or prerecorded voice message call."); *see also* National Credit Union Administration's Compl. Guide for Cr. Unions, NAFCUCG 33 Ex. 33.6 (stating the same with respect to credit unions). The same reasoning applies to Facebook's login notifications. They are calls made for an emergency purpose, because they "speed the dissemination of information" to Facebook users about possible unauthorized access to the private information in their accounts. 7 F.C.C.R. at 8777-78.

The conclusion that login notifications are "made for emergency purposes," 47 U.S.C. § 227(b)(1)(A), is consistent with Congress's and the FCC's admonition that the term "emergency" should be interpreted "broadly rather than narrowly," and "to include situations in which it is in the public interest to convey information to consumers concerning health or safety, whether or not the event was anticipated or could have been anticipated." *In the Matter of the Tel. Consumer Prot. Act of 1991*, Notice of Proposed Rulemaking, 7 F.C.C.R. 2736, 2738 (1992) (emphasis added). The FCC has also ruled that "[t]he term emergency purposes means calls [or text messages] made necessary in ***any situation*** affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4) (emphasis added).

That conclusion is also consistent with the Ninth Circuit's conclusion that "the purpose and history of the TCPA indicate that Congress was trying to prohibit use of Automatic Telephone Dialing Systems in a manner that would be an invasion of privacy." *Satterfield*, 569 F.3d at 954. Thus, courts in this circuit "broadly recognize that not every text message or call constitutes an actionable offense; rather, the TCPA targets and seeks to prevent 'the proliferation of intrusive, nuisance calls.'" *Ryabyshchuck v. Citibank (S.Dakota) N.A.*, 2012 WL 5379143, at *2 (S.D. Cal. Oct. 30, 2012) (quoting *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 744 (2012)). Accordingly, these courts have declared that "[c]ontext is indisputably relevant to determining whether a particular call is actionable [under the TCPA]," *Ryabyshchuck*, 2012 WL 5379143 at *3, and that application of statutory liability for any given call or text must be done with a "'common

sense' approach." *Freidman*, 2013 WL 3026641, at *4 (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

Common sense dictates that login notifications are not within the scope of the invasive calls Congress sought to curtail. *See, e.g.*, *Satterfield*, 569 F.3d at 954 (explaining that the TCPA was originally "enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls"). As Plaintiff's own pleading makes clear, login notifications are designed to ***prevent*** invasions of privacy such as hacking, which is a widely recognized Internet risk.[8] Indeed, recently, Slate reported that Venmo, a popular application that links users' bank accounts and allows them to quickly send money to one another, has experienced problems with hackers. One user reportedly became aware that his account was hacked only when his financial institution sent him a notification that his account "had a pending transaction involving a large sum of money."[9]

As the FCC has stated, "Congress did not expect the TCPA to be a barrier to normal, expected, and desired business communications." *GroupMe, Inc./Skype Communications S.A.R.L. Petition for Expedited Declaratory Ruling*, Declaratory Ruling, 29 F.C.C.R. 3442, 3444 (2014). Facebook's login notifications are a "normal, expected, and desired business communication," with

---

[8] To further protect against invasions of privacy, Facebook's terms of service direct users to update their account information within 48 hours of "chang[ing] or deactivat[ing] [their] mobile telephone number . . . to ensure that [their] messages are not sent to the person[s] who acquire[] [their] old number." (Deeley Decl. Ex. 2, § 6.2.) As such, Facebook has taken steps to offer privacy protections to consumers while attempting to prevent the dissemination of notifications to reassigned phone numbers, and it should not be punished for its good-faith efforts. At least one court in this circuit has held that "it would be incongruous with the larger statutory and regulatory scheme to interpret the TCPA to require that a [defendant] be liable for acting where it had a good-faith basis for doing so." *Chyba v First Fin. Asset Mgmt., Inc.*, No. 12-cv-1721, 2014 WL 1744136, at *11 (S.D. Cal. April 30, 2014). In *Chyba*, the defendant "produced undisputed evidence that it had a good-faith belief that Plaintiff had given her consent," and the court held that the defendant "[was] not liable for acting in good faith upon the information provided to it." *Id.* at *12. Although *Chyba* was decided on summary judgment, Plaintiff's allegations and exhibits show that login notifications are only sent when a Facebook user manually inputs and verifies a mobile phone number and affirmatively requests to receive them. (Compl. Ex. A; Deeley Decl. Ex. 1.) Thus, Facebook should not be held liable for its good-faith efforts to protect the people who use its service while simultaneously attempting to respect the privacy of those who may acquire users' reassigned phone numbers.

[9] (*See* Deeley Decl. Ex. 4 (Alison Griswold, *Venmo is Trendy, Easy to Use, and Growing Fast. But are Its Mobile Payments Safe?*," Slate (Feb. 25, 2015, 8:10 PM).)

the urgent purpose of warning users that their financial instruments and personal information may be at risk and rapid action required. They do not include any solicitations or advertisements; they provide expedited, valuable information—that consumers have affirmatively requested—aimed at protecting consumers' privacy. Construing Plaintiff's allegations as stating a claim against Facebook for violations of the TCPA on the basis of the login notifications would fly in the face of the TCPA's "broad" emergency exception, 7 F.C.C.R. 2736, and produce an "absurd and unforeseen result" that Congress did not intend. *Ryabyshchuck*, 2012 WL 5379143 at \*4.

## III. APPLYING THE TCPA TO THE ALLEGED LOGIN NOTIFICATIONS WOULD VIOLATE THE FIRST AMENDMENT.

Imposing liability on Facebook for sending non-commercial, privacy-protective login notifications is not only inconsistent with the plain meaning of the ATDS and emergency exception provisions, but would also violate the First Amendment.[10]

In contrast to many other TCPA cases involving First Amendment challenges, the "calls" at issue here are not commercial speech.[11] (Compl. ¶¶ 4–5, 22; Ex. A, B.) They are emergency messages that "alert users when their account is accessed from a new device." (Compl. ¶ 4; *see also id.* ¶ 22.) This distinction matters because the First Amendment affords greater protection to noncommercial speech than it does to commercial speech. *See Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988). The government cannot selectively prohibit ***noncommercial*** speech ***based on its content.*** *See id.* A content-based regulation of noncommercial speech is "presumptively unconstitutional." *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) (emphasis added). It can survive only if it is the least

---

[10] A defendant has the right to attack defects apparent on the face of a complaint through a motion to dismiss. *See, e.g.*, *Sams v. Yahoo, Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("[T]he assertion of an affirmative defense may be considered properly on a motion to dismiss where the allegations in the complaint suffice to establish the defense.").

[11] *See, e.g.*, *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 873 (9th Cir. 2014) (advertisement to join the Navy), *cert. granted* (May 18, 2015); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1255 (S.D. Cal. 2012) (advertisement for oil change); *Strickler v. Bijora, Inc.*, No. 11 CV 3468, 2012 WL 5386089, at \*1 (N.D. Ill. Oct. 30, 2012) (advertisements for products, goods, and/or services); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1001 (N.D. Ill. 2010) (advertisement for film); *Joffe v. Acacia Mortgage Corp.*, 211 Ariz. 325, 327 (Ct. App. 2005) (advertisement for mortgage rates).

restrictive means to achieve a compelling government interest. *See ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 797 (9th Cir. 2006).

The automated call provision of the TCPA, 47 U.S.C. § 227(b)(1)(A), is precisely such a content-based regulation of noncommercial speech, because it "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broad. Sys. v. F.C.C.,* 512 U.S. 622, 643 (1994). In *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 & n.3 (9th Cir. 2014), *cert. granted* (May 18, 2015), the Ninth Circuit assumed that the automated call provision of the TCPA was content-neutral because it does not distinguish between commercial and noncommercial speech—it regulates both. However, the Ninth Circuit observed that the defendant in that case had "not argue[d]" that ***exceptions*** to the automated call provision made it a content-based regulation, and the Ninth Circuit noted that like the junk-fax provision of the TCPA, 47 U.S.C. § 227(b)(1)(C), the automated call provision in fact has content-based exceptions. *See id.* (citing *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995), which held that the junk-fax provision is content-based).[12]

One such exception is for calls "made for emergency purposes," § 227(b)(1)(A)—which the FCC has ruled includes any calls made "in any situation affecting the health and safety of consumers," 47 C.F.R. § 64.1200(f)(4). This exception is content-based, because it "requires a court to "examine the content of the message that is conveyed to determine whether a [TCPA] violation has occurred." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (internal quotation marks omitted); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993). Moreover, where an exception to a restriction on commercial speech is content-based, "***the restriction itself*** is based on content." *Foti*, 146 F.3d at 636 (emphasis added); *see also Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996) (finding content-based a sign ordinance that required examination of the content of signs to determine

---

[12] The Ninth Circuit had previously rejected the argument that the artificial pre-recorded message provision of the TCPA, 47 U.S.C. § 227(b)(1)(B), is content-based, but again it did so only on the ground that that provision does not "distinguish between commercial and noncommercial speech." *Moser v. FCC*, 46 F.3d 970, 973 (9th Cir. 1995). The parties in that case did not raise, and the Ninth Circuit has not addressed, whether an exception renders that provision content-based.

whether an exemption applied); *Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) (same).

Not only is the automated call provision content-based, but it also is not "the least restrictive means to further a compelling interest," as applied to Facebook's alleged conduct of sending the login notifications. *Foti*, 146 F.3d at 637; *see also Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22 (1984) ("The fact that the ordinance is capable of valid applications does not necessarily mean that it is valid as applied to these litigants. We may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity."). Even assuming for purposes of this motion a compelling or significant interest in privacy, *see Gomez*, 768 F.3d at 876, and that the TCPA furthers that interest when it imposes liability on companies that send spam text advertisements, *see id.* at 873, *Satterfield*, 569 F.3d at 949, imposing statutory damages on Facebook for login notifications does not. After all, login notifications *themselves* promote privacy. (Compl. ¶¶ 4–5, 22, Exs. A, B.)

Although Plaintiff alleges that he received these texts instead of a user who requested them—because the cell number was reassigned (and the user failed to change the number as required under Facebook's terms of service)—this allegation does not alter the constitutional analysis. Imposing liability on Facebook for speech made in response to user requests that, unbeknownst to Facebook became erroneous once the number changed hands, would turn the provision of security services that themselves *protect consumer privacy* into a risky endeavor for companies like Facebook, chilling a wide range of constitutionally-protected communications. *Cf. Yniguez v. Arizonans for Official English*, 69 F.3d 920, 931 (9th Cir. 1995) ("[A] party may challenge a law as facially overbroad that would be unconstitutional as applied to him so long as it would also chill the speech of absent third parties."), *vacated on other grounds sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997).

An equally effective and less restrictive alternative is readily apparent: exempting noncommercial texts like login notifications that alert users to potential compromise and fraudulent account activity. Far from diminishing the interest in protecting consumer's privacy, this alternative advances it. Although such alerts will occasionally make their way to an unintended recipient, that

fact alone does not bring these texts within the ambit of the law's legitimate reach. The emergency exception shows that Congress has already determined that the occasional misdirection of critical alerts does not give rise to liability under the TCPA. After all, a misdirected "emergency" text would arguably not invade (and would enhance) the privacy of an intended recipient, even if it might invade the privacy of an actual recipient. The existence of such less restrictive alternatives means that the TCPA cannot survive First Amendment scrutiny as applied to the alleged login notifications.

Given the First Amendment problems with Plaintiff's construction of the TCPA, and the fact that login notifications advance the government's interest in protecting consumer privacy, this Court should construe the TCPA as not applying to the alleged login notifications either because the notifications fall within the emergency exception or because Plaintiff has not adequately alleged the notifications were sent using an ATDS. *See INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006) ("In construing the applicable statutes, we are governed by the canon of constitutional avoidance, which requires a statute to be construed so as to avoid serious doubts as to the constitutionality of an alternate construction.").

## CONCLUSION

For all the foregoing reasons, the Court should grant Facebook's motion to dismiss under Rule 12(b)(6) with prejudice.

Dated: May 18, 2015

Respectfully submitted,
KIRKLAND & ELLIS LLP


*/s/ Elizabeth L. Deeley*
Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com
        kristin.sheffield-whitehead@kirkland.com

Andrew B. Clubok  (admitted *pro hac vice*)
Susan E. Engel

Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com
          seengel@kirkland.com
          carrie.bodner@kirkland.com

*Attorneys for Defendant Facebook, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

Trinette G. Kent, Esq. (Bar No. 222020)
Of Counsel in Arizona and California
LEMBERG LAW LLC
10645 North Tatum Blvd.
Suite 200-192
Phoenix, AZ 85028
Tel: (855) 301-2100 ext. 5533
Fax: (203) 653-3424
Email: tkent@lemberglaw.com

Sergei Lemberg (*pro hac vice forthcoming*)
Stephen Taylor (*pro hac vice forthcoming*)
LEMBERG LAW LLC
1100 Summer Street
Stamford, CT 06905
Tel: (203) 653-2250
Fax: (203) 653-3424
Email: slemberg@lemberglaw.com
Email: staylor@lemberglaw.com

*Attorneys for Plaintiff*
*Noah Duguid*

/s/ Sarah Farley
Sarah Farley