TRINETTE G. KENT (State Bar No. 222020)
10645 North Tatum Blvd., Suite 200-192
Phoenix, AZ 85028
Telephone: (480) 247-9644
Facsimile: (480) 717-4781
E-mail: tkent@lemberglaw.com

Of counsel to

Lemberg Law, LLC
1100 Summer Street
Stamford, CT 06905
Telephone: (203) 653-2250
Facsimile: (203) 653-3424

Attorneys for Plaintiff,
Noah Duguid

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Noah Duguid, *on behalf of himself and all others similarly situated* | Case No.: 3:15-cv-00985-JST |
| Plaintiff, | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS** |
| vs. | |
| Facebook, Inc., | Hearing Date: September 3, 2015 |
| Defendant. | Time: 2:00 PM |
| | Court: Courtroom 9 |
| | Judge: Hon. Jon S. Tigar |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ...........................................................................................1

STATEMENT OF FACTS ...............................................................................2

      I.     Plaintiff Received Illegal Automated Text Messages from Facebook .2

      II.    Plaintiff Had No Way to Stop Facebook's Text Messages ..................3

      III.   Facebook's Text Messages Were Sent From an Automatic Telephone Dialing System Without Human Intervention .......................................4

STANDARD OF REVIEW ..............................................................................5

ARGUMENT .................................................................................................6

      I.     Plaintiff Pays for His Cell Phone Plan and Has Economic Injury and Standing Under the TCPA ......................................................................6

      II.    Facebook's Login Notification System is an Automatic Telephone Dialing System That Stores Telephone Numbers then Sends Text Messages Automatically Without Human Intervention.......................7

      III.   Facebook's Messages Address No Emergency Situation And Are Not Exempt From TCPA Liability.............................................................13

      IV.   The TCPA is a Constitutional Content-Neutral Time/Place/Manner Speech Restriction................................................................................17

CONCLUSION..............................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Agne v. Papa John's Intern., Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) ................................................................................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................5

*Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698 (S.D.N.Y. 2013) ...................................................................................7

*CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443 (7th Cir. 2010) ....................................................................................8

*Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242 (9th Cir. 1990) ...............................................................6

*Derby v. AOL, Inc.*, 2015 WL 3477658 (N.D. Cal. June 1, 2015) .......................................................................................10, 11

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ........................................17

*F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 104 S. Ct. 3106 (1984) ..................................................................20

*Glauser v. GroupMe, Inc.*, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) .................................................................................7, 8, 12

*Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014) ......................17, 18, 21

*Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014) ..................................................................................11, 12

*Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011) .........................................................................10

*Hernandez v. Collection Bureau of America, Ltd.*, 2014 WL 4922379 (C.D. Cal. Apr. 16, 2014) ..............................................8

*Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125 (W.D. Wash 2012) .......................................................................................9

*Hill v. Colorado*, 530 U.S. 703, 120 S. Ct. 2480 (2000) ..........................17, 18, 19, 20

*Hovila v. Tween Brands, Inc.*, 2010 WL 1433417 (W.D. Wash. Apr. 7, 2010) ................................................................................18

*In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) ...................................................................9

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ............................................5

*Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010) .............................................................................................10

*Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409 (E.D.N.Y. 2013) ...........................................................................6

*Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. Appx. 444 (6th Cir. 2013) ..............................................................................8

*Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010) ..................................................................6

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) .............................................................................8

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008) ...............................................................................5

*Marks v. CrunchSan Diego, LLC*, 55 F. Supp. 3d 1288 (S.D. Cal. 2014) ...................................................................................12

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ...........................................18, 20

*McKenna v. WhisperText*, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) ........................................................................................11

*Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) .................................................................................8

*Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639 (N.D.W. Va. 2014) ............................................................................8, 10, 11

*Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995) ......................................18, 19, 21

*Nack v. Walburg*, 715 F.3d 680 (8th Cir. 2013) ............................................................8

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL
   5694452, at *8 (N.D. Cal. Oct. 18, 2013)....................................................5

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir.
   2009) ...............................................................15, 18, 19, 21

*Sterk v. Path, Inc.*, 46 F. Supp. 3d 813 (N.D. Ill. 2014)....................................7, 10, 13

*Vaccaro v. CVS Pharmacy, Inc.*, 2013 WL 3776927 (S.D. Cal.
   July 16, 2013) ...............................................................9

*W. Min. Council v. Watt*, 643 F.2d 618 (9th Cir. 1981) ............................................6

*Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746
   (1989)...............................................................17

**Statutes**

28 U.S.C. 2342(1) ...............................................................8

47 U.S.C. § 227(a)(1) ...............................................................7

47 U.S.C. § 227(b)(1)(A)...............................................................13, 18, 19, 21

47 U.S.C. § 227(b)(2) ...............................................................15

47 U.S.C. § 227(b)(3) ...............................................................17

47 U.S.C. § 227, *et seq.* ...............................................................7

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...............................................................5

**Rules**

47 C.F.R. § 64.1200(f)(4) ...............................................................passim

**Treatises**

https://www.fcc.gov/guides/wireless-emergency-alerts-wea ...............................14

*In the Matter of Implementation of the Middle Class Tax Relief
& Job Creation Act of 2012*, 27 F.C.C.R. 13615 (2012).........................................16

*In the Matter of Tel. Consumer Prot. Act of 1991*, Notice of
Proposed Rulemaking, 7 F.C.C.R. 2736 (1992).......................................16

*Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991,* CG Docket No. 02–278, Report and
Order, 18 FCC Rcd. 14014 (2003) ...................................................6, 7, 8

*Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991,* CG Docket No. 02–278, Report and
Order, 27 FCC Rcd. 15391 (2012) ..............................................7, 14, 15

*Rules and Regulations Implementing the Telephone Consumer
Protection Act of 1991*, Report and Order, 7 F.C.C.R. 8752
(1992)..........................................................................14, 16, 19

Warning, Alert and Response Network ("WARN") Act, H.R.
5556, 109th Cong. (2006) ...........................................................14

MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS

# **INTRODUCTION**

Facebook operates a broken, robotic text messaging system that – in violation of federal law – leaves thousands of U.S. consumers utterly helpless to stop Facebook's automated messages from gumming up their cellular phones. These are the consumers Plaintiff seeks to represent. Class members either (1) "did not provide their cellular telephone number to Defendant," or else (2) notified "Defendant that it no longer wished to receive text messages," "receive[d] a confirmation from Defendant to that effect," and nonetheless "received one or more text messages" from Defendant thereafter. (Complaint ¶ 34).

Facebook tried, and failed, to implement a text message-based system to allow consumers like Plaintiff to opt out. Indeed, here Plaintiff repeatedly texted, "Off" and "All off" to Facebook's text messages, to which Facebook responded "Facebook texts are now off." But the texts were not off. They persisted and rained on Plaintiff by the dozens. Facebook's failed system resulted in thousands, if not millions, of unwanted and illegal text messages to American consumers.

Facebook claims its text messages fall under the "emergency purposes" exception to TCPA liability, burying in its argument the actual definition of "emergency purposes" under the TCPA. "The term emergency purposes means calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). Examples of automated calls qualifying for the emergency purposes exception include warnings of power outages, alerts from the President of the United States, alerts regarding terrorist threats and AMBER alerts. Facebook cannot plausibly claim its text messages were made necessary by a situation affecting life or limb.

Finally, Facebook argues that the very "emergency purposes" exception it seeks to assert renders the entire TCPA unconstitutional as a content-based restriction on speech. Facebook's argument turns First Amendment law on its head. The emergency purposes exception exempts some automated messages based on their

"purpose." It says nothing about the content of the messages themselves. Thus, the TCPA and Congress did not regulate the content of any call or text through the TCPA while providing an exemption from liability for where exigent circumstances actually exist totally independent of the content of the messages themselves. As the Ninth Circuit has repeatedly held, the TCPA is a content-neutral statute that easily passes intermediate scrutiny.

## STATEMENT OF FACTS

### I. Plaintiff Received Illegal Automated Text Messages from Facebook

Plaintiff has never had a Facebook account and never provided his cell phone number to Facebook. (Complaint ¶¶ 23-27). Nonetheless, in January, 2014, Facebook began placing automated text messages to Plaintiff's cellular telephone. (Complaint ¶ 20). Facebook's messages were sent "from number 326-65 (spelling FBOOK), an abbreviated telephone number known as an SMS short code licensed and operated by Defendant or one of its agents on its behalf." (Complaint ¶ 21). The messages followed the same pre-loaded template, stating: "Your Facebook account was accessed from <internet browser> at <time>. Log in for more info." (Complaint ¶¶ 5, 22, Ex. E).

Plaintiff repeatedly requested that the texts stop. He did so through the texts themselves and by email. (Complaint ¶¶ 22-28). In response to the text, Plaintiff responded "Off", Facebook responded that the texts "are now off" yet the texts continued:



(Complaint Ex. D).  By email, Plaintiff told Facebook that he was receiving unwanted messages and could not make them stop. (Complaint Ex. E).  Facebook did not honor Plaintiff's request or respond in any meaningful manner.   Instead, Facebook sent Plaintiff an email telling him how to report unwanted content on a Facebook page. *Id*. As Plaintiff told Facebook, the stock, automated email response "missed the point of [Plaintiff's] original abuse report entirely." *Id*.

## II.   <u>Plaintiff Had No Way to Stop Facebook's Text Messages</u>

Facebook provides no way for Plaintiff and similarly situated consumers to stop its aggravating and invasive text messages.  According to Facebook, Plaintiff's phone number was associated with some other person's Facebook account. (Doc. No. 24

("Motion") p. 4:22-5:3).[1]  Facebook contends that the other person agreed to receive Facebook's automated text messages by entering Plaintiff's number into his or her account and activating the "Login Notifications" setting.  (MTD p. 4).  Presumably, that other person agreed to keep his or her account information up to date "to ensure that [his or her] messages are not sent to the person who acquires [his or her] old number." (Deeley Decl. Ex. 2, § 6.2).  Whatever that other person did or did not do, it is clear that Plaintiff did not do it. He did not provide Facebook his number or activate Login Notifications.

Facebook provides instructions on its website to deactivate the login notification feature by accessing the subject Facebook account and changing the account settings. (Complaint ¶ 6).  These instructions are irrelevant to consumers like Plaintiff who do not have access to the Facebook account.  Facebook offers no solution for these consumers, *i.e.* the Plaintiff and class members. (Complaint ¶¶ 6 & 34 (class members either (1) did not provide Facebook their number, or (2) were unsuccessful in opting out by responding to Facebook's text messages).

### III.  Facebook's Text Messages Were Sent From an Automatic Telephone Dialing System Without Human Intervention

As of September, 2014, Facebook had 864 million daily users and 1.35 billion monthly users. (Complaint ¶ 3).

Facebook's text messages are fully automated.  No human is deciding to

---

[1] Facebook takes liberties with Plaintiff's allegations and what he "concedes." (*See* Motion p. 4:23-5:4 (citing Complaint ¶ 22)).  Contrary to Facebook's assertions, Plaintiff does not know why he received Facebook's messages.  Plaintiff can only guess why he was receiving the text messages based on his experience, other consumers' complaints, and information provided on Facebook's website.  Discovery is needed to determine the actual cause of the messages received by Plaintiff.  Further, Facebook's suppositions are matters outside the pleadings and should not be considered in deciding the motion to dismiss. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001) (in a motion to dismiss, materials outside the pleadings cannot be considered).

send—or effectuate sending—any text message. Rather, the messages are automatically sent when the subject Facebook account is accessed from an unknown device. (Complaint ¶ 4, Ex. A; Motion p. 4:13-15 ("If someone later tries to access the person's Facebook account from a new place, the person immediately receives a text warning that someone is trying to access the account from an 'unfamiliar device or location.'")). No one is writing a text message, no one is pressing send, and no one is deciding to send any specific message.

According to Facebook, its login notification system was created as an "extra security feature" from "potential compromise of [Facebook] accounts by hackers and others." (Motion pp. 3:1, 4:18). Only an account holder has knowledge of his or her Facebook account settings, including whether login notifications are turned on. But such account holder has no knowledge of or control over, whether the security is tripped and a message is sent.

**STANDARD OF REVIEW**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *see Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *8 (N.D. Cal. Oct. 18, 2013). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005). A complaint may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement," *id.*

(quotation marks and brackets omitted), and the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations," *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## ARGUMENT

### I. Plaintiff Pays for His Cell Phone Plan and Has Economic Injury and Standing Under the TCPA

As an initial matter, Facebook suggests Plaintiff lacks standing if he does not "pay[] incrementally for each text he receives" because then, it says, he would have no economic injury. (Motion p. 2 n.1). Facebook is wrong, as the FCC has specifically stated:

> The [FCC] has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

*See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02–278, Report and Order, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003) (the "2003 TCPA Order"). The FCC's ruling "encompasse[d] both voice calls and text calls to wireless numbers including, for example, short messages service (SMS) calls." *Id.*

Here, Plaintiff pays for his cell phone plan (Complaint ¶ 31), which establishes his standing. *See Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010) (denying motion to dismiss TCPA class action, in part, because "the plain language of the TCPA does not require Plaintiff to allege that he was charged for receipt of the text message that forms the basis of his complaint."); *see also Levy v. Receivables Performance Mgmt., LLC*, 972 F. Supp. 2d 409, 423 (E.D.N.Y. 2013); *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 721

(S.D.N.Y. 2013); *Agne v. Papa John's Intern., Inc.*, 286 F.R.D. 559, 570 (W.D. Wash. 2012).

## II. Facebook's Login Notification System is an Automatic Telephone Dialing System That Stores Telephone Numbers then Sends Text Messages Automatically Without Human Intervention

Plaintiff plausibly pleads, and Facebook's motion makes clear, that the system delivering Facebook's text message login notifications is an automatic telephone dialing system ("ATDS") within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). The TCPA defines ATDS as "equipment which has the capacity—(A) to store **or** produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). This definition contemplates "autodialing equipment that either stores or produces numbers." 2003 TCPA Order, at ¶ 132. Thus, a capacity to produce random or sequential numbers is not a necessary capacity of an ATDS if the system (1) stores then (2) dials numbers (3) without human intervention. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02–278, Report and Order, 27 FCC Rcd. 15391, 15392 n.5 (2012) (the "2012 TCPA Order"); *Glauser v. GroupMe, Inc.*, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (citing FCC's 2008 and 2012 TCPA rulings and concluding that "while the capacity for random/sequential dialing is not required for TCPA liability, the capacity to dial numbers without human intervention is required."); *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (collecting cases and stating: "the [FCC] has issued decisions stating that an ATDS may include equipment that automatically dials numbers from a stored list without human intervention, even when the equipment lacks the capacity to store or produce

telephone numbers to be called, using a random or sequential number generator.").[2] As the Ninth Circuit set forth in *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012) it is the "capacity" of the system used which brings it under the TCPA. *Id*. at 1043. (quoting 2003 TCPA Order).

"Human intervention" means significant human involvement in the *dialing* of a number, and any human involvement with phone number compilation is irrelevant. *See* 2003 TCPA Order, at ¶ 132 ("The basic function of [ATDS], however, has not changed—the capacity to *dial* numbers without human intervention.") (emphasis added and omitted); *Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639, 654 (N.D.W. Va. 2014) ("[I]t is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software.").

Plaintiff's complaint and reasonable inferences taken therefrom compel the conclusion that Facebook's system (1) stores then (2) dials numbers (3) without human intervention, and is therefore an ATDS. Once a Facebook account's login

---

[2] The district court is without power to rule against the FCC on this point. *See Glauser v. GroupMe, Inc.*, 2015 WL 475111, at *5 (N.D. Cal. Feb. 4, 2015) ("[T]he FCC has issued regulations . . . and under the Hobbs Act, the court is bound by those FCC rulings."); *Hernandez v. Collection Bureau of America, Ltd.*, 2014 WL 4922379, *3 (C.D. Cal. Apr. 16, 2014) (quoting 28 U.S.C. 2342(1)) ("Under the Administrative Orders Review Act, known more informally as the Hobbs Act, the Court of Appeals is vested with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—all final orders of the [FCC] made reviewable by section 402(a) or title 47.'"); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) (overruling district court's holding that it had jurisdiction to review 2008 FCC ruling); *Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. Appx. 444, 454-455 (6th Cir. 2013) (finding that FCC's 2003 TCPA Order required deference under Hobbs Act); *Nack v. Walburg*, 715 F.3d 680, 685-86 (8th Cir. 2013) (FCC regulation required deference under Hobbs Act); *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 446-47 (7th Cir. 2010) (holding district court lacked jurisdiction to consider FCC's regulation of TCPA regarding "established business relationship" defense).

notifications are activated, Facebook sends an alert each time someone logs into that account from a new place.[3] (Complaint ¶ 4). On or around January 25, 2014, Facebook began placing text messages to Plaintiff's cellular telephone number. (Complaint ¶ 20). Facebook's messages follow the same pre-loaded template, stating: "Your Facebook account was accessed from <internet browser> at <time>. Log in for more info." (Complaint ¶¶ 5, 22, Ex. E). Facebook's text messages can come "at all hours of the night." (Complaint ¶ 8, Ex. C). Further, upon responding "off" to Facebook's messages to opt out, Facebook generically responds, "Facebook texts are now off. Reply on to turn them back on." (Complaint ¶¶ 22, 28, Ex. E). There is no doubt that an individual is not deciding to write these messages or deciding to send them and there is no one "dialing" Plaintiff's number sufficient to show human intervention as contemplated by the FCC. Construed in the light most favorable to Plaintiff, these facts more than raise a plausible claim that Facebook's messages are fully automated. *See, e.g.*, *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash 2012) (plaintiff stated a claim where the plaintiff alleged "that Voxer transmit[ted] automated text messages to lists of cell phone numbers that Voxer [was] given access to," and "the generic form of the message"); *In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1260 (S.D. Cal. 2012) (class action plaintiffs sufficiently alleged use of ATDS where plaintiffs "stated that they received a text message from an SMS short code and that the message was sent by a machine with the capacity to store or produce random telephone numbers."); *Vaccaro v. CVS Pharmacy, Inc.*, 2013 WL 3776927, at *2 (S.D. Cal. July 16, 2013) ("In addition to the direct allegation of ATDS use, it is reasonable to infer from the number of calls, the use of an artificial or prerecorded voice, and the commercial nature of the calls,

---

[3] Discovering the number of Facebook accounts with activated 'login notifications' would aid Plaintiff in proving that no human is initiating Facebook's messages. Given the millions of Facebook accounts, common sense requires the conclusion that no human is deciding to send these text messages.

that Defendant used an ATDS in calling Plaintiff."); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010).

If that is not enough, Facebook gives away the game in its Motion by conceding that its system stores then dials cell phone numbers without human intervention. (*See* Motion p. 3 n.3). Facebook acquires the cell phone numbers from its users, storing the information until a user updates it with new information. (Motion p. 4:7-12). Once an account's login notifications are activated and a cell phone number is stored, a text message is immediately" triggered "[i]f someone later tries to access the person's Facebook account from a new place." (Motion p. 4:13-15). These facts are consistent with cases finding on summary judgment that defendants operated ATDS. *See, e.g.*, *Moore*, 57 F. Supp. 3d at 655 (finding use of ATDS on summary judgment because "lists of numbers [were] transferred from the Campaign Manager to the dialer hardware without human intervention, and the dialer hardware automatically dial[ed] numbers from those lists"); *Sterk*, 46 F. Supp. 3d at 820 (summary judgment because "evidence show[ed] that the equipment used by Path's agent made calls from the list without human intervention"); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011) (summary judgment because "the dialer automatically dial[ed] numbers stored in the Logical View File"). Indeed, in all these cases humans were certainly involved in creating the machinery and software and setting the parameters for when a system would initiate a call. However, the actually dialing was done automatically by the machine, pursuant to instructions created by the users.

Here, Facebook claims its system requires "human intervention" because humans provide the cell phone numbers for the login notification text messages. (Motion p. 10:10-16). But "human intervention" refers to human involvement in the *dialing* of cell phone numbers. Thus, how Facebook acquired the cell phone numbers is irrelevant. As this Court set forth in *Derby v. AOL, Inc.*, 2015 WL 3477658 (N.D. Cal. June 1, 2015) while discussing *Sterk*, *supra*:

> *Sterk* involved the following system: Path *prompted users of the Path service to upload their contacts upon joining the service*, and would add these numbers to a list. Path would then use automated equipment to make calls from that list. The court found that the equipment used by Path, which made calls from a stored list without human intervention, was comparable to the predictive dialers that the FCC has found to qualify as an ATDS. The court noted that "the uploading of call lists from Path users is essentially the same as when a call list is entered by a telemarketer in a database. It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA." The court *rejected Path's argument that a user's decision to upload their contacts constituted human intervention so as to disqualify the system as an ATDS.*

*Derby*, 2015 WL 3477658, at *3 (emphasis added) (citations omitted)[4]; *see also Moore*, 57 F. Supp. 3d at 654 ("[I]t is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software.").  That a human is the source of the number or provided it to the system does not constitute human intervention.

Moreover, Facebook's login notification system employs no human intervention in the actual dialing of cell phone numbers.  Human intervention means a human is determining to send each message.  *See Derby v. AOL, Inc.*, 2015 WL 3477658, at *3 ("[T]his case involves personalized text messages, composed by individual AIM users, sent to numbers chosen and manually inputted by the users."); *McKenna v. WhisperText*, 2015 WL 428728, at *3 (N.D. Cal. Jan. 30, 2015) ("McKenna's allegations make clear that the Whisper App can send SMS invitations only at the user's affirmative direction to recipients selected by the user."); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014) ("In order for

---

[4] *Derby* distinguished *Sterk* on the facts which showed an individual was composing and sending the pertinent texts: "Whereas *Sterk* involved the sending of promotional text messages to numbers in a Path database populated by Path users who elected to upload their contact lsits to Path, this case involves personalized text messages, composed by individual AIM users, sent to numbers chosen and manually inputted by the users." *Derby*, 2015 WL 3477658, at *3.

a text dispatch notification to be sent to a customer, the customer must have first provided some amount of information to the dispatcher, the dispatcher must have pressed 'enter' to transmit that information to both the TaxiMagic program and the nearest available driver, and the driver must have pressed 'accept' on his or her Mobile Data Terminal."); *Glauser*, 2015 WL 475111, at *6 (group text messages at issue "were either sent by group members themselves, and merely routed through defendant's application, or in the case of the Welcome Texts, triggered by the group creator's addition of plaintiff to the group.").

Here, it is not the case that a person decides to send the message (or any message) to Plaintiff's number or even that the entering of the number prompts a template text message. Rather, as conceded by Facebook, the numbers are stored and then automatically dialed when some person, somewhere, attempts to access from a new location a Facebook account for which "login notifications" are turned on. (Motion p. 11:13-15, 18:6-8). Such a person has no intention of sending anyone a text message. Further, if the person is indeed a "hacker" as Facebook anticipates, that person has no knowledge that a text message will be sent upon his login attempt.[5] Here, it is clearly <u>Facebook itself</u> that is robotically <u>sending</u> the text messages. No human intervention is occurring in the actual sending of the message.

Next, Facebook argues its system is not an ATDS if it does not randomly or sequentially generate numbers to be dialed. (Motion pp. 8:1-9, 10:3-9, 11:25-28 (citing *Gragg*, 995 F. Supp. 2d at 1193 (noting that plaintiff "failed to provide the Court with any evidence that either TaxiMagic or the modem has the capacity to randomly or sequentially generate telephone numbers to be stored, produced, or called"), and *Marks v. CrunchSan Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014)). First, these cases are summary judgment cases. Plaintiffs there lacked the

---

[5] Indeed, that the text message is sent is against that hacker's direct interest: successful, undetected hacking.

evidence, after discovery, needed to show the systems' capacities. Defendant's argument here, that Plaintiff cannot allege every aspect of Facebook's dialing system, is misplaced at the pleading stage. Second, Plaintiff more than satisfactorily alleges a plausible claim that the Facebook system has the requisite capacity to dial at random, in sequential order or from a database of numbers without human intervention. *Meyer*, 707 F.3d at 1043.

Finally, Facebook asserts that to be an ATDS, equipment must send the same message to multiple people at the same exact time. (Motion p. 9:12-10:2). The TCPA has no such requirement. Rather, the TCPA and FCC make clear that an ATDS is "equipment that automatically dials numbers from a stored list without human intervention." *Sterk*, 46 F. Supp. 3d at 819 (citing 2003 TCPA Order). The foregoing establishes that Facebook's system so qualifies.

## III. Facebook's Messages Address No Emergency Situation and are Not Exempt From TCPA Liability

Facebook erroneously claims its unwanted messages at issue qualify for the "emergency purposes" exception to the TCPA. *See* 47 U.S.C. § 227(b)(1)(A) (outlawing the making of "any call (*other than a call made for emergency purposes* or made with the prior express consent of the called party) using any [ATDS] or an artificial or prerecorded voice") (emphasis added). The emergency purposes exception neither applies nor justifies Facebook's failure to heed consumers' requests to simply stop its text messages.

The FCC defines "emergency purposes" as "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). In its original 1992 ruling implementing the TCPA, the FCC ruled that the emergency exception could apply to utility companies' calls to customers regarding service outages and interruptions:

> Service outages and interruptions in the supply of water, gas or electricity could in many instances pose significant risks to public health and safety, and the use of prerecorded message calls could speed the

dissemination of information regarding service interruptions or other potentially hazardous conditions to the public.

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 F.C.C.R. 8752, 8777-78 ¶ 51 (1992) (the "1992 TCPA Order"). In 2012, the FCC ruled that calls made pursuant to the Warning Alert and Response Network ("WARN") Act are made for "emergency purposes" and meet the exemption. 2012 TCPA Order, at ¶ 17. Congress established WARN as a "unified national hazard alert system" to "alert the public to any imminent threat that presents a significant risk of injury or death to the public." *See* Warning, Alert and Response Network ("WARN") Act, H.R. 5556, 109th Cong. § 2(b)(1) (2006) (enacted).[6] Messages sent pursuant to WARN include Wireless Emergency Alerts ("WEA") used to "send emergency alerts regarding public safety emergencies, such as evacuation orders or shelter in place orders due to severe weather, a terrorist threat or chemical spill." *See* https://www.fcc.gov/guides/wireless-emergency-alerts-wea (last visited June 4, 2015). WEA covers "only critical emergency situations" and are sent only as (1) alerts "issued by the President," (2) "alerts involving imminent threats to safety or life," or (3) AMBER alerts. *Id.*

Conversely in 2012, the FCC refused to exclude non-telemarketing, informational only, calls from TCPA liability:

> None of our actions change requirements for prerecorded messages that that are nontelemarketing, informational calls, such as calls by or on behalf of tax-exempt non-profit organizations, calls for political purposes, and calls for other noncommercial purposes, including those that deliver purely informational messages such as school closings. Such calls continue to require some form of prior express consent under the TCPA and the Commission's rules, if placed to wireless numbers and other specified recipients.

---

[6] For the Court's convenience, the document is attached to the Declaration of Trinette Kent as <u>Exhibit A</u>.

2012 TCPA Order, at 1831 ¶ 3. The FCC's ruling affirmed that automated calls are subject to the TCPA even if they have a hypothetical usefulness to the consumers.

Here, Facebook's login notification text messages were non-telemarketing, informational calls subject to TCPA liability. Far from addressing a "situation affecting the health and safety of consumers," Facebook's messages were meant to notify consumers when access to their Facebook account was attempted from a new location. Moreover, Facebook's calls were not "necessary." 47 C.F.R. § 64.1200(f)(4). Indeed, the Plaintiff has no Facebook account, thus the messages were not only unnecessary they were completely irrelevant and harassing. The same is true for the class members, who, like Plaintiff, received Facebook's messages despite (1) never giving Facebook their cell phone number, or (2) specifically requesting that Facebook's messages stop. (Complaint ¶ 34).

Facebook cobbles together out-of-context citations into an argument that greatly expands the actual bounds of the emergency purposes exception. First, the FCC is the only federal agency authorized to implement the TCPA, *see* 47 U.S.C. § 227(b)(2); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009). Thus, what other federal agencies "believe" to fall under the emergency purposes exception is irrelevant. (*See* Motion p. 12:23-13:6). Next, Facebook cites the FCC's 1992 "Notice of Proposed Rulemaking" as gold. (*See* Motion p. 13:10-15 ("[T]hat login notifications are 'made for emergency purposes,' is consistent with Congress's and the FCC's admonition that the term 'emergency' should be interpreted 'broadly rather than narrowly,' and 'to include situations in which it is in the public interest to convey information to consumers concerning health or safety, whether or not the event was anticipated or could have been anticipated.") (citation omitted)). In reality, Facebook's citation is to the oral statement of one member of Congress before any official FCC action had been taken. *See In the Matter of Tel. Consumer Prot. Act of*

*1991*, Notice of Proposed Rulemaking, 7 F.C.C.R. 2736, 2738 ¶ 17 (1992).[7]  When the FCC's actual ruling was released 6 months after the Notice of Proposed Rulemaking, it contained no such expansive language concerning the emergency exception. *See* 1992 TCPA Order, at ¶¶ 49-51 (discussing emergency exception only in the context of public utility companies).  Rather, the FCC has "emphasize[d] the limited nature of this [emergency purposes] exception," and stated its intention to "be vigilant in monitoring and taking enforcement action against [ATDS operators] who attempt to use it for calls that are not for emergency purposes." *In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*, 27 F.C.C.R. 13615, 13628–29 ¶ 28 (2012).[8]  The few circumstances affirmatively ruled by the FCC to trigger the emergency purposes—power outages, alert from the President, alerts of terrorist attacks, AMBER alerts—demonstrate that Facebook's messages do not belong in this discussion.

As an add-on to its 'emergency purposes' exception argument, Facebook argues it cannot possibly be liable under the TCPA because, consistent with the purpose of the TCPA, its login notifications were designed to protect consumers' privacy, not invade it. (Motion p. 13:19-15:7).  Facebook's pattern of conduct in this case says otherwise; the notifications were sent to a non Facebook user whose privacy was invaded and who could not stop the texts. Regardless of what was intended, Facebook's messages invaded his privacy, and indeed consumers complain on the internet of being hounded by the same messages "at all hours of the night." (Complaint ¶ 8, Ex. C).  Furthermore, consumers like Plaintiff have no means of stopping Facebook's invasions because they have no access to the Facebook account

---

[7] For the Court's convenience, a copy of the Notice of Proposed Rulemaking is attached to the Declaration of Trinette Kent as <u>Exhibit B</u>.

[8] For the Court's convenience, a copy of the document is attached to the Declaration of Trinette Kent as <u>Exhibit C</u>.

triggering the messages, and Facebook's automated opt-out system is broken. (Complaint ¶ 6-7, 28, Ex. D).  Regardless, intent is an issue of TCPA damages inappropriate on a motion to dismiss. *See* 47 U.S.C. § 227(b)(3) (providing for treble damages "[i]f the court finds that the defendant willfully or knowingly violated" the TCPA).

## IV.    The TCPA is a Constitutional Content-Neutral Time/Place/Manner Speech Restriction

This Court should reject Facebook's well-worn argument that the TCPA unconstitutionally restrains speech.  The TCPA exempts emergency calls based on the **purpose** for which the calls are made, not on **content**.  Therefore the TCPA is a content-neutral restriction.  Moreover, the Ninth Circuit has repeatedly held that the TCPA passes the intermediate scrutiny test applied to content-neutral time/place/manner speech restrictions.

"The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided that the restrictions 'are justified without reference to the content of the restricted speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014) *cert. granted*, No. 14-857, 2015 WL 246885 (U.S. May 18, 2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989)); *see also Doe v. Harris*, 772 F.3d 563, 577-78 (9th Cir. 2014) (citing *Ward*).

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719, 120 S. Ct. 2480 (2000) (quoting *Ward*, 491 U.S. at 791).  To that end, a time/place/manner restriction does not become content-based if the contents of the speech are examined to determine the speaker's purpose. *See Hill*, 530 U.S. at 721 ("It is common in the law to examine the content of

a communication to determine the speaker's purpose. . . . We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct.").

As the Ninth Circuit has repeatedly ruled, the TCPA is a content-neutral time/place/manner restriction. *See Gomez*, 768 F.3d at 876-77 (extending *Moser v. FCC*, 46 F.3d 970, 973-74 (9th Cir. 1995)).  Far from regulating the dissemination of any particular viewpoint or ideal, the TCPA outlaws making "**any call** (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2532 (2014) ("The broad reach of a statute can help confirm that it was not enacted to burden a narrower category of disfavored speech.").  Indeed, Congress passed the TCPA for the content-neutral purpose of protecting consumers' privacy. *See Satterfield*, 569 F.3d at 954 ("The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy."); *see also Hovila v. Tween Brands, Inc.*, 2010 WL 1433417, at *9 & n.3 (W.D. Wash. Apr. 7, 2010) (stating privacy purpose and listing Congress' findings).

At issue in *Hill v. Colorado*, was a Colorado statute which made it "unlawful for any person within 100 feet of a health care facility's entrance to knowingly approach within 8 feet of another person, without that person's consent, in order to pass a leaflet or handbill to, displa[y] a sign to, or engag[e] in oral protest, education, or counseling with [that] person." 530 U.S. at 703 (alterations in original) (internal quotation marks omitted).  In ruling the statute constitutional, the Supreme Court first found that the statute was not a "regulation of speech" itself, but a time/place/manner restriction. *Id.* at 719.  The Court next found that the statute was not adopted "because of a disagreement with the message [the speech] conveys," supported by "the Colorado courts' interpretation of legislative history" and "the State Supreme Court's

- 18
-

unequivocal holding that the statute's 'restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech.'" *Id.* Third, the Court found that Colorado's interest in passing the statute—"protecting access and privacy [at health care facilities], and providing the police with clear guidelines"—were unrelated to the content of any speech. *Id.* at 719-20.

Likewise, here, the TCPA is a time/place/manner restriction in that it regulates how an ATDS may be used to communicate. Second, the TCPA targets no particular message, viewpoint or ideal—rather it applies generally to "any call . . . using an [ATDS] or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A), *see Moser*, 46 F.3d at 974 ("The ban on automated, prerecorded calls is not an attempt to favor a particular viewpoint."). And third, the TCPA was passed for the content-neutral purpose of protecting consumers' privacy. *Satterfield*, 569 F.3d 954; *Moser*, 46 F.3d at 974.

Facebook argues the TCPA's "emergency purpose" exception renders the TCPA a content-based restriction on speech. Facebook's argument conflates the content of an automated call with the purpose for which it is made. "The term *emergency purposes* means calls made necessary in any <u>situation</u> affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4) (underline added). Thus it is the situation in which a message is sent that determines whether the exception applies, and the actual content of the speech is not determinative.

To illustrate, faced with power outages, a utility company might send automated messages to its customers stating: "Power outages expected for the next 2 days." The utility company would not be liable for this message because it would have been sent to its customers to address an emergency situation affecting the health and safety of consumers. *See* 1992 TCPA Order, at ¶ 51. Meanwhile, if Facebook sent this very same message through its login notification system, unrelated to any actual power outage, the emergency purpose exception would certainly not apply.

Conversely, if the utility company, again faced with power outages, attempted to send the same emergency warning but through some error sent nonsensical, indecipherable automated messages, the utility company would not be liable because the messages would still have been sent for emergency **purposes**. Thus, liability is not a function of the content of the message, but rather the overall context in which that message is sent.

Similarly, the statute in *Hill* was deemed a content-neutral restriction, because it applied not based on the speech's content, but whether the speech was made "within 100 feet of a health care facility." 530 U.S. at 730. So too in *McCullen*, that statute was content-neutral because its application depended not on *what* was said, but whether it was said at a "reproductive health care facility." 134 S. Ct. at 2530; *cf. F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 383, 104 S. Ct. 3106 (1984) (ruling unconstitutional an act proscribing television and radio stations receiving federal funds from engaging in "editorializing," because "enforcement authorities must necessarily examine the content of the message that is conveyed to determine" whether message lawful).

Moreover, the Supreme Court made clear in *Hill* that the TCPA is not rendered a content-based restriction though viewing the contents of an automated message might aid in determining that it was indeed sent for emergency purposes. *See Hill*, 530 U.S. at 721 ("It is common in the law to examine the content of a communication to determine the speaker's purpose. . . . We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) ("The Act would be content based if it *required* enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred. But it does not. Whether petitioners violate the Act depends not on what they say, but simply on where they say it.") (emphasis added) (citations omitted) (internal quotation marks omitted). Under the

TCPA, whether an emergency purpose exists is determined by whether the precipitating "situation affect[s] the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4). In all hopefulness, there are better ways to determine whether an emergency situation exists than by reviewing the content of an after-the-fact automated text message.

Not only is the TCPA (1) content-neutral, it is also (2) "narrowly tailored to serve a significant governmental interest" and (3) "leave[s] open ample alternative channels for communication of the information,'" *Gomez*, 768 F.3d at 876. The significant governmental interest is the protection of consumers' privacy. *Satterfield*, 569 F.3d 954; *Moser*, 46 F.3d at 974. The TCPA is narrowly tailored to decrease automated call intrusions. *Moser*, 46 F.3d at 974-975. Finally, the TCPA leaves open ample alternative channels for communication—indeed it only prohibits automated calls made without the called party's consent. 47 U.S.C. § 227(b)(1)(A); *see also Moser*, 46 F.3d at 975 ("The restrictions . . . leave open many alternative channels of communication, including the use of taped messages introduced by live speakers or taped messages to which consumers have consented, as well as all live solicitation calls. That some companies prefer the cost and efficiency of automated telemarketing does not prevent Congress from restricting the practice."). As such, the TCPA is a constitutional content-neutral time/place/manner restriction on speech.

## CONCLUSION

For the foregoing, Plaintiff respectfully requests the Court deny Facebook's Motion to Dismiss.

DATED: June 26, 2015

By: __/s/ Trinette G. Kent__
TRINETTE G. KENT (State Bar No. 222020)
10645 North Tatum Blvd., Suite 200-192
Phoenix, AZ 85028
Telephone: (480) 247-9644
Facsimile: (480) 717-4781

E-mail: tkent@lemberglaw.com

Of counsel to
Lemberg Law, LLC
1100 Summer Street
Stamford, CT  06905
Telephone:  (203) 653-2250
Facsimile:  (203) 653-3424

*Attorneys for Plaintiff, Noah Duguid*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

       Elizabeth L. Deeley
       Kristin I Sheffield-Whitehead
       Kirkland & Ellis LLP
       555 California Street, Suite 2700
       San Francisco, CA 94104
       Tel: (415) 439-1400
       Tel: (415) 439-1420
       Fax: (415) 439-1500
       edeeley@kirkland.com
       kwhitehead@kirkland.com

       Andrew B. Clubok
       Carrie J Bodner
       Kirkland & Ellis LLP
       601 Lexington Avenue
       New York, NY 10022
       Tel: (212) 446-4800
       Tel: (212) 446-5912
       Fax: (212) 446-6460
       Andrew.clubok@kirkland.com
       Carrie.bodner@kirkland.com

       Susan E. Engel
       Kirkland & Ellis LLP
       655 Fifteenth Street, N.W.
       Washington, DC 20005-5793
       Tel: (202) 879-5000
       seengel@kirkland.com

                                            */s/ Trinette Kent*
                                        Trinette Kent