Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (SBN 304635)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com

Andrew B. Clubok (admitted *pro hac vice*)
Susan E. Engel (admitted *pro hac vice*)
Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Tel:  (212) 446-4800
Fax:  (212) 446-6460
Email:  andrew.clubok@kirkland.com

Attorneys for Defendant
*Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH DUGUID, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | CASE NO.: 3:15-cv-00985-JST<br><br>**FACEBOOK, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Complaint Filed Date:  March 3, 2015<br><br>Judge:          Hon. Jon S. Tigar<br>Hearing Date:   September 3, 2015<br>Time:           2:00 p.m.<br>Courtroom:      Courtroom 9, 19th Floor |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.      PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS THAT WOULD SHOW FACEBOOK SENT THE LOGIN NOTIFICATIONS USING AN ATDS. .......................................................................................................... 2

II.      THE ALLEGED LOGIN NOTIFICATIONS ARE SENT FOR EMERGENCY PURPOSES. ................................................................................................... 9

III.      THE TCPA CANNOT SURVIVE STRICT SCRUTINY AS APPLIED TO THE LOGIN NOTIFICATIONS. ................................................................. 12

CONCLUSION ................................................................................................................. 15

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ......................................................................................................... 14

5

6

*Coto Settlement v. Eisenberg*,
    593 F.3d 1031 (9th Cir. 2010) ....................................................................................... 8

7

*Derby v. AOL, Inc.*,
    No. 15–cv–00452–RMW, 2015 WL 3477658 (N.D. Cal. June 1, 2015) ................ passim

8

9

*Flores v. Adir Int'l, LLC*,
    No. CV 15–00076–AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015) ............. 1, 3, 4, 5

10

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) ............ 14

11

12

*Glauser v. GroupMe, Inc.*,
    No. C 11–2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) .......................... passim

13

*Gomez v. Campbell-Ewald Co.*,
    768 F.3d 871 (9th Cir. 2014) ....................................................................................... 15

14

15

*Gragg v. Orange Cab Co.*,
    995 F. Supp. 2d 1189 (W.D. Wash. 2014) ................................................................ 4, 6

16

*Griffith v. Consumer Portfolio Serv., Inc.*,
    838 F. Supp. 2d 723 (N.D. Ill. 2011) ........................................................................ 7, 8

17

18

*Hickey v. Voxernet LLC*,
    887 F. Supp. 2d 1125 (W.D. Wash. 2012) .................................................................... 5

19

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................................................................... 13

20

21

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) ........................................................................ 5

22

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ................................................................................. 9, 10

23

24

*Kramer v. Autobytel, Inc.*,
    759 F. Supp. 2d 1165 (N.D. Cal. 2010) ........................................................................ 5

25

*Marks v. Crunch Gym San Diego, LLC*,
    55 F. Supp. 3d 1288 (S.D. Cal. 2014) ....................................................................... 3, 6

26

27

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ................................................................................................. 12

28

**TABLE OF AUTHORITIES (CONT'D)**

Page(s)

*McKenna v. WhisperText*,
    No. 5:14-cv-00424-PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) ................................ 3, 6, 7, 8

*Moore v. Dish Network*,
    57 F. Supp. 3d 639 (N.D. W.Va. 2014) ......................................................................... 7, 8

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015) ........................................................................................ 13, 14, 15

*Robins v. Spokeo*,
    742 F.3d 409 (9th Cir. 2014), *cert. granted*, No. 13-1339, 2015 WL 1879778
    (U.S. Apr. 27, 2015) ................................................................................................... 9

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ...................................................................................... 2

*Sterk v. Path*,
    46 F. Supp. 3d 813 (N.D. Ill. 2014) ........................................................................ 6, 7, 8

*Vaccaro v. CVS Pharmacy, Inc.*,
    2013 WL 3776927 (S.D. Cal. July 16, 2013) .............................................................. 5

**Statutes**

47 U.S.C. § 227 ................................................................................................... passim

**Rules**

Rule 12(b)(6) ......................................................................................................... 15

**Regulations**

47 C.F.R. § 64.1200(f)(4) ...................................................................................... 9, 10

**Other Authorities**

*In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*,
    27 F.C.C.R. 13615 (2012) ........................................................................................ 9

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, —*
    F.C.C.R. —, 2015 WL 4387780 (July 10, 2015) ................................................. passim

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18*
    F.C.C.R. 14014 (2003) ...................................................................................... 1, 3, 8

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27*
    F.C.C.R. 15391 (2012) ............................................................................................ 3

*In the Matter of the Tel. Consumer Prot. Act of 1991*, 7 F.C.C.R. 2736 (1992) ..................... 9, 10, 11

## **INTRODUCTION**

Plaintiff seeks to hold Facebook liable for tailored and reactive "login notifications" that are sent to a single phone number in order to warn a person who has a Facebook account that the account may have been hacked.  These individualized messages are not covered by the prohibitions of the TCPA, but in any event they are precisely the type of urgent security warnings that the TCPA *exempts* from liability.  No court has ever come close to holding that the TCPA bans an individualized text message just because equipment allegedly was used to *dial* a phone number in reaction to another person's potentially unauthorized account access.

The TCPA prohibits only text messages that are akin to "robocalls."  FCC Declaratory Ruling and Order, — F.C.C.R. —, 2015 WL 4387780, at ¶ 1 (July 10, 2015) (hereinafter "2015 FCC Order").  It does not, as Plaintiff claims, reach all "unwanted" text messages (Opp. at 3), but only unauthorized text messages that are sent en masse using an automated telephone dialing system or "ATDS."  An ATDS is defined by having the capacity to dial numbers that are generated randomly or sequentially.  47 U.S.C. § 227(a)(1).  The FCC also has included within that definition equipment that has the capacity to dial numbers generated from a pre-programmed call list.  FCC Report and Order, 18 F.C.C.R. 14014, 14092-93 (2003) (hereinafter "2003 FCC Order").  The FCC has made clear, however, that the "basic functions" of an ATDS continue to be dialing numbers "without human intervention" **and** dialing "thousands of numbers in a short period of time."  2015 FCC Order ¶ 17; *see Flores v. Adir Int'l, LLC*, No. CV 15–00076–AB, 2015 WL 4340020, at *4 (C.D. Cal. July 15, 2015) ("[A]utomation alone is not enough to satisfy the definition of an ATDS under the TCPA.").

Nothing in Plaintiff's allegations plausibly suggests that Facebook's login notifications are sent to numbers generated in any of these ways, nor do Plaintiff's allegations suggest that login notifications are sent to thousands of numbers at a time.  Rather, as alleged, each specific, highly individualized login notification is sent to a single particular number (which had to be inputted by the person who requested login notifications), only after further human intervention (an attempt by someone to access that specific person's Facebook account).  (*See* Compl. ¶¶ 4, 5, 22; Compl. Ex. A; *see also* Opp. at 9.)  This is not sufficient to impose liability under the TCPA, and Plaintiff's claim

should be dismissed.  *See, e.g.*, *Derby v. AOL, Inc.*, No. 15–cv–00452–RMW, 2015 WL 3477658, at *4 (N.D. Cal. June 1, 2015) (no ATDS where "recipient's number does not come from a list, but rather is provided by the [] user who directs [defendant] to send the text in the first place"); *see also* 2015 FCC Order ¶¶ 31-32 (granting YouMail's petition for a declaratory ruling of no liability where "YouMail does not make or initiate a call" under the TCPA because "YouMail is a reactive and tailored service; in response to a call made to the app user, YouMail simply sends a text message to that caller, and only to that caller").

## ARGUMENT

### I.   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS THAT WOULD SHOW FACEBOOK SENT THE LOGIN NOTIFICATIONS USING AN ATDS.

Plaintiff fails to allege any plausible set of facts showing that Facebook sent him login notifications using equipment that qualifies under the TCPA as an ATDS.

To begin, Plaintiff ignores the clear and unambiguous statutory definition of an ATDS: "equipment which has the capacity—(A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1)[1]; *see Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (finding the statutory definition clear and unambiguous).  Under that definition, Plaintiff does not plausibly allege an ATDS, because he does not allege the use of a "random or sequential number generator."  (*See, e.g.*, Opp. at 7, 12.)  Indeed, Plaintiff concedes that Facebook does not generate any of the telephone numbers to which login notifications are sent; rather, the numbers are inputted and verified by individual Facebook users.  (*See* Opp. at 11 ("a human is the source of the number or provided it to the system").)  Nor is there otherwise anything random or sequential about the sending of the login notifications:  each login notification is linked to a specific Facebook user account and describes a specific attempt to log in to that account from a specific browser at a specific time.  (*See* Compl. ¶¶ 4, 5, 22; Compl. Ex. A; *see also* Opp. at 9.)  This "direct targeting [] is inconsistent with the sort of random or sequential number generation required for an ATDS."  *Flores*, 2015 WL 4340020, at *4.

---

[1]   Unless otherwise noted, all emphasis is added and all internal quotations, citations, and alterations are omitted.

Because Plaintiff's own allegations "weigh against the inference of an ATDS," his TCPA claim must be dismissed.  *Id.* at *5 (dismissing complaint with prejudice); *see also McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 WL 428728, at *4 (N.D. Cal. Jan. 30, 2015) (dismissing TCPA claim where "affirmative allegations" refuted the use of an ATDS); *Marks v. Crunch Gym San Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014) (defendant's system lacked the "capacity to store or produce numbers to be called, using a random or sequential number generator," because the phone numbers "only enter[ed] the system through one of three methods," "[n]one [of which] could reasonably be termed a random or sequential number generator").

Plaintiff insists that notwithstanding this unambiguous statutory language, his allegations fall within the FCC's guidance on what equipment qualifies as an ATDS.[2]  Specifically, he argues that a system qualifies as an ATDS under the FCC's interpretation whenever it "(1) stores then (2) dials numbers (3) without human intervention."  (Opp. at 7 (citing FCC Report and Order, 27 F.C.C.R. 15391, 15392 n.5 (2012) (hereinafter "2012 FCC Order")).)  But the FCC did not go as far as Plaintiff would have the Court believe.  In a 2003 Order, the FCC interpreted the phrase "using a random or sequential number generator" to include equipment having the capacity to store and dial numbers en masse from a preprogrammed calling list (so-called "predictive dialers").  2003 FCC Order, 18 F.C.C.R. at 14091-93; *see also Glauser v. GroupMe, Inc.*, No. C 11–2584 PJH, 2015 WL 475111, at *6 n.5 (N.D. Cal. Feb. 4, 2015) ("In other words, the FCC held that the words 'using a random or sequential number generator' *included* the use of a calling list.") (emphasis in original); *Derby*, 2015 WL 3477658, at *2 (same).  But nothing in that order concerning predictive dialers modified or eliminated what the FCC has recently confirmed are the basic functions of an ATDS: "to dial numbers without human intervention" ***and*** to "dial thousands of numbers in a short period of time."  2015 FCC Order ¶ 17.  Plaintiff fails to allege either that Facebook sent login notifications to thousands of numbers in a short period of time, or that it sent them without human intervention.

---

[2]   Plaintiff asserts that this Court is "without power to rule against" the expanded definition of an ATDS that the FCC set forth in its predictive dialer ruling.  (Opp. at 8 n.2.)  As noted in Facebook's Motion, the Court need not defer to the FCC's interpretation of an ATDS (Mot. at 9 n.6), but it ultimately is of no import:  as discussed here and in Facebook's opening brief, Plaintiff's allegations do not plausibly suggest that messages were sent using an ATDS under either the statutory or the predictive dialer definition.

First, nothing in Plaintiff's allegations plausibly suggests that login notifications are sent en masse.  All Plaintiff says on this score is that Facebook's messages supposedly "follow the same pre-loaded template" and come "at all hours of the night,"[3] and are thus "fully automated."  (Opp. at 9.)  But even if login notifications share a common template, each login notification described in the Complaint was sent to a *single* phone number and each was unique, alerting the recipient of a login attempt to a specific Facebook account associated with that phone number at a specific time, generally from a specific browser.  (*See* Compl. ¶ 22 ("Your Facebook account was accessed from Chrome on Windows at 8:15am."; "Your Facebook account was accessed from an unknown browser at 3:34pm."); Compl. Ex. D.)

Other courts in this Circuit have held that systems were not ATDSs where, as here, the text messages shared a common template but were customized to a particular recipient and thus not sent en masse.  For example, in *Gragg v. Orange Cab Co.,* the system sent unique cab dispatch text message notifications to individual customers in response to each customer's request for a cab.  *See Gragg*, 995 F. Supp. 2d 1189, 1191 (W.D. Wash. 2014).  Similar to the individualized login notifications Plaintiff describes (*see, e.g.*, Compl. ¶¶ 5, 22; Compl. Ex. D), the cab dispatch notifications contained specific information relevant to that specific person.  *See Gragg*, 995 F. Supp. 2d at 1191 (each taxi dispatch notifications identified the cab number and the precise time it was dispatched).  In *Flores*, the district court noted that "the content of the [text] messages, even if drawn from a template, included a unique reference number that remained consistent in every text message." 2015 WL 4340020, at *5.  Such specificity, the district court concluded, "belies Plaintiff's claims of randomness" and "does not . . . support a reasonable inference that Defendant used an ATDS," but rather, "only supports the inference that Defendant expressly targeted Plaintiff."  *Id.*; *see also Glauser*, 2015 WL 475111, at *1 (Welcome Texts included recipient's name, sender's name,

---

[3] Plaintiff includes the additional fact that Facebook "generically responds" to opt-out texts.  But this fact does not help him either.  Courts and the FCC agree that a text message in response to an opt-out request is not actionable under the TCPA.  *See, e.g.*, *Derby*, 2015 WL 3477658, at *6 (opt-out text message did not "constitute the sort of automated and intrusive telemarketing communications the TCPA was enacted to combat"); *see also* 2015 FCC Order ¶ 57 (the FCC has "concluded that a one-time text confirming a consumer's request to opt out of future calls did not violate the TCPA").

and name of group to which recipient was added).  Moreover, that the login notifications come "at all hours of the night" underscores that they are only sent when someone, somewhere, attempts to log in to the Facebook account associated with that phone number, which can happen at any time. (*See*, *e.g.*, Compl. ¶ 22 (login notifications received at various times, from 8:15 am to 4:34 pm).)  Far from claiming liability based on texts sent to numbers on a preprogrammed calling list, Plaintiff seeks to impose the harsh penalties of the TCPA for sending a tailored message to a single phone number that a person inputted into a Facebook account in order to be warned whenever someone accessed the account from an unrecognized device.  That is not what the statute prohibits.[4]  *See Flores*, 2015 WL 4340020, at *4 (rejecting Plaintiff's "argument that alleging *any measure of automation* is sufficient to allege the *specific form of automation* necessary to sustain a claim under the TCPA" as an "inference . . . that Rule 8 simply cannot bear") (emphasis in original).

Second, nothing in Plaintiff's allegations suggests that numbers are stored, generated, or dialed without human intervention.  Plaintiff admits that "Facebook acquires the cell phone numbers *from its users*," and that login notifications must be "*activated*."  (Opp. at 10.)  But he claims that "how Facebook acquired the cell phone numbers is irrelevant" and that the only "human intervention" that matters is "human involvement in the *dialing* of cell phone numbers."  (Opp. at 10-11 (emphasis in original).)  That assertion is entirely unsupported.  Courts in this Circuit agree that an ATDS is not used where numbers are *obtained* with human intervention akin to that alleged here—i.e., where an individual person provides the number to be associated with that individual's

---

4    The other cases Plaintiff cites from this Circuit further support this point.  In each of those cases, the text messages' promotional content and lack of any personalization suggested the text messages were sent en masse, raising a plausible inference that the phone numbers were generated at random, sequentially, or from calling lists.  *See Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1167-68 (N.D. Cal. 2010) (describing a text message, which read: "NEED SOME EXTRA CASH FOR YOU [*sic*] NEW EDUCATION?  GET A CASH ADVANCE OF UP TO $1500! GO TO WWW.CASHPOTUSA.COM"); *see also In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1255 n.1 (S.D. Cal. 2012) (six named plaintiffs alleged receipt of an identical text message offering "JIFFY LUBE CUSTOMERS [a] 1 TIME OFFER . . . FOR 45% OFF A SIGNATURE SERVICE OIL CHANGE!"); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1128 (W.D. Wash. 2012) (allegations of unsolicited advertisements via text message telling the plaintiff to "Get on Voxer" and providing a link to download Voxer); *Vaccaro v. CVS Pharmacy, Inc.*, 2013 WL 3776927, at *2 (S.D. Cal. July 16, 2013) ("[I]t is reasonable to infer from the number of calls, the use of an artificial or prerecorded voice, and the commercial nature of the calls, that Defendant used an ATDS").

account and affirmatively sets the account's security settings to send login notifications.  *See Derby*, 2015 WL 3477658, at *4 (no ATDS where text "recipient's number [did] not come from a list, but rather [was] provided by the [] user who directed AOL to send the text in the first place"); *Glauser*, 2015 WL 475111, at *6 ("Welcome Texts" were not sent by an ATDS where defendant's equipment obtained phone numbers "through the actions of the group's creator"); *Marks*, 55 F. Supp. 3d at 1289, 1292 (defendant's system lacked the "capacity to store or produce numbers to be called, using a random or sequential number generator," because the phone numbers "only enter[ed] the system through one of the three methods"—by an individual manually inputting a phone number onto the platform or into a form on defendant's website, or by an individual sending a text message to the defendant—"[n]one [of which] could reasonably be termed a random or sequential number generator"); *Gragg*, 995 F. Supp. 2d at 1193 (finding "no evidence that the [system] can autonomously randomly or sequentially generate numbers to be dialed as required to fulfill the statutory definition of an ATDS," where the "telephone numbers utilized by the system" were either "provided directly by customers or captured using Caller ID and inputted by the dispatcher").[5]

Likewise, courts in this Circuit agree that an ATDS is not used where numbers are ***dialed*** with human intervention akin to that alleged here, namely only after "some person, somewhere, attempt[ed] to access from a new location a Facebook account for which 'login notifications' are turned on." (Opp. at 12.)  *See Gragg*, 995 F. Supp. 2d at 1193-94 (system was not an ATDS where a text message could not be sent unless a customer provided information to the dispatcher, the dispatcher transmitted that information to the TaxiMagic program and the nearest driver, and the driver pressed "accept"); *WhisperText*, 2015 WL 428728, at *4 (plaintiff's "affirmative allegations of the need for human intervention by a Whisper App user when sending an SMS invitation preclude[d] the need for discovery to address whether [plaintiff] ha[d] alleged the use of an ATDS").

Plaintiff contends that human intervention is inadequate where the person accessing the account "has no intention of sending" the Facebook user a text message.  (*See* Opp. at 12.)  But that

---

[5]  Plaintiff's attempt to distance himself from the legal holdings of *Gragg* and *Marks*—by noting they are "summary judgment cases" (Opp. at 12) —is superficial at best, particularly in light of Plaintiff's substantial reliance on summary judgment opinions that are not even from this Circuit, such as *Sterk v. Path*.  (*See, e.g.*, Opp. at 10-11.)

interpretation has no support in the statute, FCC rulings, or case law.  *Glauser*, 2015 WL 475111, at *6 (rejecting argument that "[g]roup creators never asked GroupMe to send the [Welcome Texts], did not send the messages themselves, and were never informed that the messages would be sent").  Here, the fact is that a login notification will never be sent *unless and until* someone attempts to log in to the Facebook account associated with that phone number from an unrecognized device.  (Compl. Ex. A.)  Thus, despite what Plaintiff says, "human intervention is occurring in the actual sending of the message."  (Opp. at 12.)  In fact, human intervention more than "occurs" when a message is sent—it is *required*.  (*See* Compl. ¶¶ 4, 22; Compl. Exs. A, D; Mot. at 5, 10-11 (all discussing the substantial degree of human intervention required for a login notification to be sent).)

Plaintiff cannot escape this result by claiming that the human intervention must occur "in the *dialing* of cell phone numbers," as though only the physical act of "dialing" matters.  (Opp. at 10-11 (citing *Derby*, 2015 WL 3477658, at *3).)  Indeed, it is bizarre that Plaintiff relies on *Derby* in making this argument, because the *Derby* court refused to draw a distinction "between 'conduct that triggers dialing' of a mobile phone number, and 'the actual act of dialing' that number," noting that the plaintiff there cited "no authority for the distinction."  2015 WL 3477658, at *3.  And as Plaintiff acknowledges, in *WhisperText* and *Glauser*, the app—not a human—actually dialed the numbers, but those courts held that plaintiffs still failed to allege the use of an ATDS.  (Opp. at 11 (quoting *WhisperText*, 2015 WL 428728, at *3); Opp. at 12 (describing *Glauser*, 2015 WL 475111, at *6).)

Ultimately, Plaintiff relies on out-of-circuit cases for his watered down interpretation of ATDS, but those cases offer him no better refuge than this Circuit's ample case law.  *Griffith v. Consumer Portfolio Serv., Inc.* and *Moore v. Dish Network* involved debt collection calls made on predictive dialers precisely like those the FCC described in its orders and which, it is undisputed, are not at issue here.[6]  In *Sterk v. Path*—which is in any event "in conflict with rulings from this

---

[6]   In *Moore*, an employee imported lists of phone numbers into a "Campaign Manager" software program, after which the numbers were automatically transferred into the dialer hardware and dialed in the order they appeared on the list.  *See* 57 F. Supp. 3d 639, 654-55 (N.D. W.Va. 2014).  In *Griffith*, a computer program, preparing for a "dialing campaign," would review customer information and identify customers eligible for debt collection calls.  838 F. Supp. 2d 723, 724 (N.D. Ill. 2011).  That same program then copied the customer's telephone numbers into a new "Dialer file."  *See id.*  A supervisor would input additional criteria into the system, and the program would narrow the list of telephone numbers.  *See id.*  The dialer hardware called

District," *Derby*, 2015 WL 3477658, at *3 (noting that the court in *WhisperText*, 2015 WL 428728, held that a system similar to that in *Sterk* did "not qualify as an ATDS because it was the product of human intervention")—users uploaded their contact lists, and "the equipment . . . made calls from the list without human intervention" in a manner "essentially the same as when a call list is entered by a telemarketer in a database."  46 F. Supp. 3d 813, 819 (N.D. Ill. 2014).  The facts Plaintiff alleges are nothing like the number-mining and indiscriminate dialing from call lists that occurred in *Moore*, *Griffith* or *Sterk*:  a person using Facebook can only activate login notifications for a phone number that the individual can (or already has) verified and login notifications for that account will only be sent when someone attempts to log in from an unknown device.   (*See* Mot. at 4 (citing Compl. Ex. A and Deeley Decl. Ex. 1).)[7]  In this regard, the text messages at issue here are like those in *Derby*, in that the "recipient's number does not come from a list, but rather is provided by the [] user who directs [Facebook] to send the text in the first place."  *Derby*, 2015 WL 3477658 at *4.  In *Derby*, the court held that such facts show that no ATDS was used and, therefore, that the plaintiff failed to state a TCPA claim.  *Id.*

Where, as here, a human directs a system to transmit text messages to a phone number provided by that human, the system is merely a conduit for such text messages and not an ATDS. *See* (Opp. at 11-12); *WhisperText*, 2015 WL 428728, at *3; *Glauser*, 2015 WL 475111, at *6; *Derby*, 2015 WL 3477658, at *4; *see also* 2015 FCC Order ¶ 32 (granting YouMail's petition for a declaratory ruling:  "YouMail does not make or initiate a call" under the TCPA because "YouMail is

---

numbers from the resulting list and routed those calls that were answered to a live debt collector. *See id.*  These systems fall squarely into the FCC's description of predictive dialers, which it found to constitute ATDSs.  *See* 2003 FCC Order, 18 F.C.C.R. at 14092.

[7]   Plaintiff argues that this Court should not consider the exhibits Facebook submitted in support of the Motion because they are outside the pleadings.  (Opp. at 4 n.1).  But Plaintiff does not dispute the authenticity or relevancy of those exhibits or that they are incorporated by reference, nor could he, given that Plaintiff himself attached several pages from Facebook's website to his Complaint.  (*See* Compl. Exs. A-B; Mot. at 3 n.2.)  Accordingly, the Court may properly consider them.  *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("incorporation by reference" doctrine has been "extended . . . to consider documents in situations where the complaint necessarily relies upon" them, and their authenticity and relevancy are not disputed).

a reactive and tailored service; in response to a call made to the app user, YouMail simply sends a text message to that caller, and only to that caller").[8]

## II.    THE ALLEGED LOGIN NOTIFICATIONS ARE SENT FOR EMERGENCY PURPOSES.

The TCPA's "broad exemption for emergency calls," FCC Report and Order, 7 F.C.C.R. 8752, 8778 ¶ 51 (1992) (hereinafter "1992 FCC Order"), does not impose liability for calls conveying information relating to "the health and safety of consumers," 47 C.F.R. § 64.1200(f)(4).[9] Login notifications—which Plaintiff alleges convey information that protects users from potential compromise of their accounts by hackers and others (Compl. ¶ 4, Compl. Exs. A, D)—fall squarely within the scope of this exemption.  A straightforward application of the TCPA's emergency exception requires dismissal of Plaintiff's complaint, and Plaintiff's attempt to narrow its reach fails.

First, Plaintiff would rewrite the TCPA by supplanting the statutory phrase "calls made for emergency purposes" with the much more limited "[calls] made necessary by a situation affecting life or limb."  (Opp. at 1.)  But Plaintiff's "life and limb" reimagining of the emergency exception appears nowhere in the statute, implementing rules, or any FCC decision.  Plaintiff asks this Court to eschew standard principles of statutory construction and ignore the statute's plain meaning.  *See, e.g.*, *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1105 (9th Cir. 2014) ("We start with the plain language of the statutes.").  Congress did not limit the definition of "emergency" in any way.  Thus,

---

[8]   Plaintiff argues that he has standing to assert a claim under the TCPA because he "pays for his cell phone plan," but avoids addressing whether that cell phone plan includes unlimited text messages or if he pays incrementally for each text he receives.  (Opp. at 6.)  As noted in its Motion, Facebook does not waive its right to challenge Plaintiff's Article III standing once the Supreme Court has issued its decision in *Robins v. Spokeo*, 742 F.3d 409, 413-14 (9th Cir. 2014), *cert. granted*, No. 13-1339, 2015 WL 1879778 (U.S. Apr. 27, 2015).  (Mot. at 2 n.1.)

[9]   Plaintiff claims "the FCC has 'emphasize[d] the limited nature of this [emergency purposes] exception.'"  (Opp. at 16 (quoting *In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*, 27 F.C.C.R. 13615, 13628–29 ¶ 28 (2012).)  But the cited FCC ruling does not purport to interpret the TCPA at all.  It sought to "implement a feature of the 'Middle Class Tax Relief and Job Creation Act of 2012' by establishing a Do-Not-Call registry for telephone numbers used by Public Safety Answering Points (PSAPs), and prohibiting the use of automatic dialing equipment to contact those registered numbers for non-emergency purposes."  27 F.C.C.R. at 13615-16 ¶ 1.  The paragraph Plaintiff cites addresses this PSAP registry, where the FCC notes that it will strictly construe the types of automated calls that can be made to registered numbers in light of the particular statutory policies emphasized in the Middle Class Tax Relief and Job Creation Act.  *Id.* at 13628–29 ¶ 28.  Nowhere did the FCC purport to overrule its prior ruling that the TCPA's emergency exception is broad.

1  this Court should consider "the ordinary meaning" of the term, "including [its] dictionary

2  definition." *Id.*  The plain meaning of "emergency" is an "urgent . . . unexpected occurrence

3  requiring immediate action" or "a situation requiring help or relief, usu[ally] created by an

4  unexpected event." *Random House Webster's College Dictionary* 431 (2d ed. 2000).  The FCC has

5  similarly interpreted the emergency exception to extend to information "affecting the health and

6  safety of consumers."  47 C.F.R. § 64.1200(f)(4).  Urgent circumstances created by unexpected

7  events and the "health and safety of consumers" include situations beyond the life-and-death

8  scenarios to which Plaintiff would limit the exception.

9       For example, consistent with the plain meaning of the statute—and as Plaintiff acknowledges

10  (Opp. at 13-14)—the FCC has exempted from TCPA liability messages concerning utility service

11  outages and interruptions.  *See* 1992 FCC Order, 7 F.C.C.R. at 8777 ¶ 49.  The FCC has also touted

12  the urgent nature of messages just like the login notifications alleged here:  messages that convey

13  critical information designed to minimize the risk of fraud or identity theft.  In a recent ruling, the

14  FCC agreed with the American Bankers Association ("ABA") that messages about "a risk of fraud

15  or identity theft" or "possible breaches of the security of customers' personal information" deserve

16  protection from TCPA liability because they "address exigent circumstances in which a quick,

17  timely communication with a consumer could prevent considerable consumer harms from

18  occurring."  2015 FCC Order ¶¶ 127, 132.[10]  In doing so, the FCC acknowledged "the urgency

19  associated with these calls" and "the unpredictable timing of the underlying problems."  *Id.* ¶ 132.

20  Just like the information conveyed by financial institutions, login notifications protect against "fraud

21  or identity theft" or "possible breaches of the security of customers' personal information" and are

22  "intended to address exigent circumstances in which a quick, timely communication with a

23

24  _____

25  [10]   The FCC extended protection to certain messages from financial institutions in response to the
     ABA's request for an exemption pursuant to § 227(b)(2)(C) of the TCPA.  That section
26   authorizes the FCC to exempt from the TCPA's consent requirement certain privacy-promoting
     calls made without charge to the consumer.  Although not asked to construe the emergency
27   exception, the FCC's justification for extending protection applies equally here under the plain
     meaning of the emergency exception.  Indeed, the FCC expressly acknowledged that the
     messages from the financial institutions, akin to login notifications, are urgent and conveyed in
28   exigent circumstances, terms synonymous with an emergency.  *Id.* at ¶ 132.

1    consumer could prevent considerable consumer harms from occurring." *Id.*  Plaintiff's Complaint

2    concedes as much.  (Compl. ¶ 4; Compl. Ex. A.)

3         Second, ignoring his own allegations, Plaintiff mischaracterizes the fundamental nature of

4    login notifications.  Plaintiff claims they are "informational" texts that are "unwanted" and have only

5    a "hypothetical usefulness."  (Opp. at 13-15.)  As a threshold matter, although Plaintiff insists that

6    the FCC has ruled that "informational" texts fall outside the emergency exception (Opp. at 14–15), it

7    has done no such thing.  That a text conveys information certainly does not disqualify it for the

8    emergency exception; instead, the exception turns on the content of the information conveyed.  *See*

9    1992 FCC Order, 7 F.C.C.R. at 8778 ¶ 51 (permitting under emergency exception the "dissemination

10   of information regarding service interruptions").  And Plaintiff's claim that the texts are "unwanted"

11   by some consumers—who, like him, allegedly receive them through a reassigned phone number—

12   may be relevant to consent, but not to the emergency exception.  The TCPA's emergency exception

13   exempts calls from liability regardless of whether the recipient gave prior consent.  That reflects

14   Congress's determination that this type of information is so important that consumers would want it

15   absent consent.  *See, e.g.*, 2015 FCC Order ¶¶ 129–34 (rejecting argument that consent should be

16   required before messages concerning identity theft and fraud can be sent because "obtain[ing] prior

17   express consent could make it impossible for effective communications of this sort to take place").

18        Contrary to Plaintiff's assertion, the information conveyed in login notifications is important

19   to consumers and has much more than "hypothetical usefulness."  (Opp. at 15.)  As Plaintiff himself

20   admits, login notifications protect "against [a] hacker's direct interest:  successful, undetected

21   hacking."  (Opp. at 12 n.5.)  Hacking may lead to data breaches and identify theft, among other

22   privacy invasions, and being swiftly alerted to potential hacking enables a consumer to take

23   immediate action.  *See* 2015 FCC Order ¶ 129 (acknowledging agreement among commentators that

24   "[s]econds count in these situations and immediate notifications can help contain any potential

25   damage that might result from a fraudulent transaction"); *see also* Ann Carrns, *Steps to Guard*

26   *Against   Identity   Fraud*,   The   New   York   Times,   Feb.   21,   2013,

27   http://bucks.blogs.nytimes.com/2013/02/21/steps-to-guard-against-identity-fraud/?ref=topics

28   (describing need to respond swiftly to potential identity theft); Ellen Nakashima, *Hacks of OPM*

*Databases Compromised 22.1 Million People, Federal Authorities Say*, The Washington Post, July 9, 2015, http://www.washingtonpost.com/blogs/federal-eye/wp/2015/07/09/hack-of-security-clearance-system-affected-21-5-million-people-federal-authorities-say/. In light of those consequences, alerting a Facebook user to a potential hacker is more than "hypothetically useful" and easily fits the plain meaning of an "emergency."

Other federal agencies have recognized that the emergency exception, by its terms, extends to calls informing individuals about potential unauthorized access. (*See* Mot. at 12–13.) Rather than acknowledge the weight of authority supporting Facebook's straightforward interpretation of the exception, Plaintiff asks this Court to ignore the considered views of these agencies as "irrelevant," since they are not formally tasked with implementing the TCPA. (Opp. at 15.) Yet many of these agencies are tasked with helping consumers combat fraud and theft, and their considered views on the necessary scope of the emergency exception dovetail with the FCC's recent ruling recognizing that messages about potential identity theft and fraud are made in exigent circumstances.[11] In short, there is ample support for applying the emergency exception to login notifications.

## III.   THE TCPA CANNOT SURVIVE STRICT SCRUTINY AS APPLIED TO THE LOGIN NOTIFICATIONS.

The TCPA's "emergency" exception is a classic example of a provision where the government endorses certain speech as good and beneficial (calls conveying emergency information) but restricts other speech that it deems unnecessary or bothersome (messages conveying non-emergency information).[12] Statutes that make such content-based distinctions are subject to strict scrutiny and must be narrowly tailored to serve a compelling government interest. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014). Plaintiff's own pleading makes clear that, if applied to the alleged login notifications, which themselves are designed to protect users from

---

[11] Plaintiff also suggests that the emergency exception turns off or on depending on the context, not the content, of the message. (Opp. at 1, 16, 19.) But Plaintiff's interpretation makes no sense. Under his "situation in which a message is sent" formulation (Opp. at 19), any message sent during an earthquake would qualify for the emergency exception, regardless of whether the message conveyed critical safety information or a joke.

[12] The TCPA provision at issue is not limited to prohibiting commercial speech alone, *compare* 47 U.S.C. §§ 227(b)(1)(C), 227(b)(2)(B)(i), but extends to "any call" made with an ATDS other than calls "made for emergency purposes," *id.* § 227(b)(1)(A).

potential compromise of their accounts, the statute would not be narrowly tailored to serve a compelling government interest.  These First Amendment concerns are added reason for this Court to construe the TCPA as not reaching the alleged login notifications, either because they are targeted messages that are not sent using an ATDS or because they fall within the TCPA's emergency exception; alternatively, the Court should hold that the TCPA violates the First Amendment as applied to the alleged login notifications.

Plaintiff does not even argue that as applied to login notifications the TCPA provision at issue would survive strict scrutiny.  To the contrary, he insists that it is a content-neutral restriction that is not subject to strict scrutiny because it supposedly regulates based on the **purpose** for which the calls are made, not based on **content**.  (Opp. at 17.)  The Supreme Court's recent ruling in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), squarely rejects that argument.  In *Reed*, the Supreme Court addressed the constitutionality of a local sign ordinance that prohibited all outdoor signs with twenty-three exemptions.  *Id.* at 2225.  Each exemption corresponded with a particular subject matter (*e.g.*, political or directional signs), and each exemption involved different restrictions, such as the size, shape, and number of the signs.  *Id.* at 2225–26.  Relying extensively on *Hill v. Colorado*, 530 U.S. 703 (2000), as Plaintiff does here (Opp. at 18–20), the Ninth Circuit determined that the statute was content-neutral and upheld the ordinance against a First Amendment challenge. *Reed*, 135 S. Ct. at 2226.  The Ninth Circuit held that "even though an enforcement officer would have to read the sign to determine what provisions of the Sign Code applied to it, the kind of cursory examination that would be necessary for an officer to classify it as a temporary directional sign was not akin to an officer synthesizing the expressive content of the sign." *Id*.  And because "the distinctions between" the categories of signs were "based on objective factors" and did "not otherwise consider the substance of the sign," the Ninth Circuit held the statute to be "content-neutral as that term [has been] defined by the Supreme Court." *Id*.

The Supreme Court reversed, holding that the statute was content-based on its face.  *Id.* at 2227.  The Court made clear that the "commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.*  It recognized that "[s]ome facial distinctions based on a

message . . . are more subtle, defining regulated speech by its function or purpose," but held that those distinctions are still "drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.*

The Supreme Court in *Reed* rejected each of the arguments that Plaintiff raises here, (Opp. at 19–20), for treating the regulation as content neutral.  It does not matter whether "Congress passed the TCPA for a content-neutral purpose."  (Opp. at 18.)  A restriction that draws distinctions based on "communicative content" is subject to strict scrutiny, "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228.  Nor does it matter that the emergency exception regulates based on the purpose of the speech. *See also id.* at 2228 ("[S]trict  scrutiny applies ***either*** when a law is content based on its face ***or*** when the purpose and justification for the law are content based.").  Banning informational calls and exempting ones that convey specific emergency information "may seem like a perfectly rational way to regulate [calls], but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'" *Id.* at 2231 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)).  However laudable Congress's purpose behind this provision of the TCPA may have been, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 135 S. Ct. at 2228.  Nor does it matter that "the TCPA targets no particular message, viewpoint, or ideal." (Opp at 19.)  "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 135 S. Ct. at 2230.

Plaintiff does not contest the well-established fact that "when exceptions to [a] restriction on noncommercial speech are based on content, the restriction itself is based on content." *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998).  Indeed, *Reed* itself involved a general ordinance that was rendered content-based by exceptions. *Reed*, 135 S. Ct. at 2227.  The TCPA, like the sign ordinance in *Reed*, generally prohibits an entire manner of communication, but then creates an exception for a category of speech based on its content (directional signs in *Reed*, emergency messages here). *Id.*  In other words, the TCPA, like

the sign ordinance in *Reed*, requires government officials to examine the content of the speech to determine whether the speaker should be penalized.  *Id.*   As a result, the TCPA, like the sign ordinance in *Reed*, is "subject to strict scrutiny."  *Id.*

The Ninth Circuit's decision in *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), expressly left the door open to exactly the argument Facebook makes here: a content-based challenge to the TCPA based on its exceptions.  *See id.* at 876 & n.3 (observing that the defendant in that case had "not argue[d]" that exceptions to the automated call provision made it a content-based regulation, and noting that, like the junk-fax provision of the TCPA, 47 U.S.C. § 227(b)(1)(C), the automated call provision in fact has content-based exceptions).  Plaintiff cannot escape the fact that the TCPA regulates speech on the basis of its content and is therefore subject to strict scrutiny.  And Plaintiff does not contest that the statute is not narrowly tailored to serve the government's interest in privacy as applied to Facebook's privacy-protective messages.  Accordingly, the Court should either construe the statute not to reach the alleged login notifications (because they are either targeted messages not sent using an ATDS or they fall within the emergency exception) or the Court should strike it down as applied.

## CONCLUSION

For all the foregoing reasons, the Court should grant Facebook's motion to dismiss under Rule 12(b)(6) with prejudice.

Dated:  July 31, 2015

Respectfully submitted,
KIRKLAND & ELLIS LLP


*/s/ Elizabeth L. Deeley*

Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (SBN 304635)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com
        kristin.sheffield-whitehead@kirkland.com

Andrew B. Clubok  (admitted *pro hac vice*)
Susan E. Engel (admitted *pro hac vice*)
Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com
          seengel@kirkland.com
          carrie.bodner@kirkland.com

*Attorneys for Defendant Facebook, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 31, 2015, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

Trinette G. Kent, Esq. (Bar No. 222020)
Of Counsel in Arizona and California
LEMBERG LAW LLC
10645 North Tatum Blvd.
Suite 200-192
Phoenix, AZ 85028
Tel: (855) 301-2100 ext. 5533
Fax: (203) 653-3424
Email: tkent@lemberglaw.com

Sergei Lemberg (*pro hac vice forthcoming*)
Stephen Taylor (*pro hac vice forthcoming*)
LEMBERG LAW LLC
1100 Summer Street
Stamford, CT 06905
Tel: (203) 653-2250
Fax: (203) 653-3424
Email: slemberg@lemberglaw.com
Email: staylor@lemberglaw.com

*Attorneys for Plaintiff*
*Noah Duguid*

  /s/ *Sarah Farley*
Sarah Farley