BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
ERIC R. WOMACK
Assistant Branch Director
BAILEY W. HEAPS (CA Bar No. 295870)
AIMEE WOODWARD BROWN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, D.C.  20530
Telephone:  (202) 514-1280
Facsimile:  (202) 616-8470
Email: Bailey.W.Heaps@usdoj.gov

*Attorneys for the United States of America*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH DUGUID, *individually and on behalf of all others similarly situated,* | Case No.:  3:15-cv-00985-JST |
| Plaintiff, | **UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF THE CONSTITUTIONALITY OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991** |
| v. | |
| FACEBOOK, INC., | |
| Defendant. | Complaint Filed: March 3, 2015 |
| | Judge: Hon. Jon S. Tigar |
| | Hearing Date: January 7, 2016 |
| | Time: 2 p.m. |
| | Courtroom: Courtroom 9, 19th Floor |

1

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ............................................................................................................................... 5

I.  THE COURT SHOULD RESOLVE ALL NONCONSTITUTIONAL
    ARGUMENTS PRIOR TO ADDRESSING THE CONSTITUTIONALITY
    OF THE TCPA ................................................................................................................ 5

II. BINDING NINTH CIRCUIT PRECEDENT REQUIRES THIS COURT TO
    UPHOLD THE TCPA AS A VALID CONTENT-NEUTRAL RESTRICTION .............. 5

    A.  The Ninth Circuit Has Already Rejected Identical First Amendment
        Challenges to the TCPA ...................................................................................... 6

    B.  Nothing in *Reed* Requires This Court To Adopt the Radical Reconception
        of First Amendment Jurisprudence That Facebook Urges ..................................... 8

III. AS APPLIED, THE TCPA IS A VALID RESTRICTION OF COMMERCIAL
     SPEECH ........................................................................................................................ 16

IV.  EVEN IF VIEWED AS A CONTENT-BASED REGULATION OF
     NON-COMMERCIAL SPEECH, THE TCPA SATISFIES STRICT
     SCRUTINY ................................................................................................................... 20

CONCLUSION .......................................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

3

**CASES**                                                         **PAGE(S)**

4

*Abbas v. Selling Source, LLC*,
   No. 09 CV 3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009) ............................................. 8, 22

5

6

*Agostini v. Felton*,
   521 U.S. 203 (1997) ................................................................................................................... 6

7

8

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ........................................................................................................... 16, 20

9

10

*Bernard v. Donat*,
   No. 11-CV-03414-RMW, 2012 WL 525533 (N.D. Cal. Feb. 16, 2012) .................................. 19

11

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) ....................................................................................................... 2, 17, 18

12

13

*Brown v. City of Pittsburgh*,
   586 F.3d 263 (3d Cir. 2009) ................................................................................................... 24

14

15

*Cahaly v. Larosa*,
   796 F.3d 399 (4th Cir. 2015) ..................................................................................... 15, 16, 23

16

17

*Cal. Outdoor Equity Partners v. City of Corona*,
   No. CV 15-03172 MMM AGRX, 2015 WL 4163346 (C.D. Cal. July 9, 2015) ....................... 17

18

*Carey v. Brown*,
   447 U.S. 455 (1980) ..................................................................................................... 9, 15, 22

19

20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ............................................................................................................... 16

21

22

*Charles v. City of Los Angeles*,
   757 F. Supp. 2d 989 (C.D. Cal. 2010), *aff'd*, 697 F.3d 1146 (9th Cir. 2012) ........................... 19

23

24

*Chiropractors United for Research & Educ., LLC v. Conway*,
   No. 3:15-CV-00556-GNS, 2015 WL 5822721 (W.D. Ky. Oct. 1, 2015) .................................. 17

25

*Citizens for Free Speech, LLC v. Cty. of Alameda*,
   No. C14-02513 CRB, 2015 WL 4365439 (N.D. Cal. July 16, 2015) ........................................ 15

26

27

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) ................................................................................................................... 7

28

*City of Los Angeles v. Alameda Books, Inc.*,
   535 U.S. 425 (2002) ........................................................................................ 16

*Contest Promotions, LLC v. City & Cty. of S.F.*,
   No. 15-CV-00093-SI, 2015 WL 4571564 (N.D. Cal. July 28, 2015) ........................................ 17

*Coyote Publ'g, Inc. v. Miller*,
   598 F.3d 592 (9th Cir. 2010) ........................................................................... 16

*CTIA-The Wireless Ass'n v. City of Berkeley, Cal.*,
   — F. Supp. 3d —, No. C-15-2529 EMC, 2015 WL 5569072 (N.D. Cal. Sept. 21, 2015) .......... 17

*Dana's R.R. Supply v. Attorney Gen., Fla.*,
   — F.3d —, —, No. 14-14426, 2015 WL 6725138 (11th Cir. Nov. 4, 2015) ............................. 17

*Dex Med. W. Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012) ........................................................................... 17

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) ................................................................................. 14, 15

*First Resort, Inc. v. Herrera*,
   80 F. Supp. 3d 1043 (N.D. Cal. 2015) .................................................................... 19

*Fraley v. Facebook, Inc.*,
   830 F. Supp. 2d 785 (N.D. Cal. 2011) .................................................................... 19

*Frisby v. Schultz*,
   487 U.S. 474 (1988) ..................................................................................... 14

*Gomez v. Campbell-Ewald Co.*,
   768 F.3d 871 (9th Cir. 2014) ....................................................................... *passim*

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ........................................................................................ 5

*Hagans v. Lavine*,
   415 U.S. 528 (1974) ...................................................................................... 1

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*,
   No. C 14-0437 CW, 2014 WL 5812294 (N.D. Cal. Nov. 7, 2014) ......................................... 19

*Hill v. Colorado*,
   530 U.S. 703 (2000) ................................................................................. 11, 14

*Hynes v. Mayor of Borough of Oradell*,
   425 U.S. 610 (1976) ..................................................................................... 13

*Joffe v. Acacia Mortgage Corp.*,
    121 P.3d 831 (Ariz. Ct. App. 2005) ................................................................. 3, 8, 22

*Klein v. City of Laguna Beach*,
    533 F. App'x 772 (9th Cir. 2013) ................................................................. 13

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
    — F. Supp. 3d —, No. 15-CV-01257-JST, 2015 WL 4397706 (N.D. Cal. July 17, 2015) ... 18, 19

*Lehman v. City of Shaker Heights*,
    418 U.S. 298 (1974) ................................................................. 14

*Mais v. Gulf Coast Collection Bureau, Inc.*,
    768 F.3d 1110 (11th Cir. 2014) ................................................................. 12

*Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469 (9th Cir. 1994) ................................................................. 5

*Miller v. Gammie*,
    335 F.3d 889 (9th Cir. 2003) ................................................................. 8, 11

*Mims v. Arrow Fin. Servs., LLC*,
    132 S. Ct. 740 (2012) ................................................................. 2

*Moran v. HSBC Bank USA, N.A.*,
    No. 14-CV-00633-LHK, 2015 WL 139705 (N.D. Cal. Jan. 9, 2015) ................................ 18

*Moser v. FCC*,
    46 F.3d 970 (9th Cir. 1995) ................................................................. *passim*

*Nat'l Coal. of Prayer, Inc. v. Carter*,
    455 F.3d 783 (7th Cir. 2006) ................................................................. 22

*Norton v. City of Springfield, Ill.*,
    612 F. App'x 386 (7th Cir. 2015) ................................................................. 15

*Occupy Sacramento v. City of Sacramento*,
    878 F. Supp. 2d 1110 (E.D. Cal. 2012) ................................................................. 13

*Oster v. Standard Ins. Co.*,
    768 F. Supp. 2d 1026 (N.D. Cal. 2011) ................................................................. 18

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1222 (N.D. Cal. 2014) ................................................................. 19

*Police Dep't of City of Chicago v. Mosley*,
    408 U.S. 92 (1972) ................................................................. 9

*Proctor & Gamble Co. v. Haugen*,
  222 F.3d 1262 (10th Cir. 2000) ................................................................................ 19

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1992) ................................................................................................. 13

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ................................................................................... *passim*

*Rideout v. Gardner*,
  — F. Supp. 3d —, No. 14-CV-489-PB, 2015 WL 4743731 (D.N.H. Aug. 11, 2015) ............... 15

*Roberts v. Paypal, Inc.*,
  — F. App'x —, 2015 WL 6524840 (9th Cir. Oct. 29, 2015) ..................................... 12

*Rowan v. U.S. Post Office Dept.*,
  397 U.S. 728 (1970) ....................................................................................... 14, 15, 22

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ........................................................................................ 3

*Simopoulos v. Virginia*,
  462 U.S. 506 (1983) ................................................................................................. 24

*Sorrell v. IMS Health, Inc.*,
  131 S. Ct. 2653 (2011) ............................................................................................... 9

*Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986) ................................................................................................. 15

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ..................................................................................................... 15

*Strickler v. Bijora, Inc.*,
  No. 11 CV 3468, 2012 WL 5386089 (N.D. Ill. Oct. 30, 2012) ............................... 8, 22

*United States v. Lafley*,
  656 F.3d 936 (9th Cir. 2011) ..................................................................................... 24

*Walters v. Nat'l Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985) ................................................................................................... 6

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................................ 6, 13, 22

*Williams-Yulee v. Florida Bar*,
  135 S. Ct. 1656 (2015) ...................................................................................... 20, 23

page

*Wreyford v. Citizens for Transp. Mobility, Inc.*,
   957 F. Supp. 2d 1378 (N.D. Ga. 2013)...................................................... 7, 22

*Wynn v. Chanos*,
   75 F. Supp. 3d 1228 (N.D. Cal. 2014)........................................................ 18

*Yeager v. Cingular Wireless LLC*,
   673 F. Supp. 2d 1089 (E.D. Cal. 2009) ...................................................... 18

*Yniguez v. Arizonans for Official English*,
   69 F.3d 920 (9th Cir. 1995) ........................................................................ 25

**STATUTES**

28 U.S.C. § 2342(a)............................................................................................... 12
47 U.S.C. § 227 ............................................................................................. *passim*
47 U.S.C. § 227(b)(1)(A) ............................................................................. *passim*
47 U.S.C. § 227(b)(1)(B)......................................................................................... 6
Pub. L. No. 102–243.................................................................................. 21, 22, 24
Pub. L. No. 114-74 ................................................................................................... 3

**ADMINISTRATIVE MATERIALS**

47 C.F.R. § 64.1200............................................................................................... 12
47 C.F.R. § 64.1200(f)(4)......................................................................................... 3
*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot.*
   *Act of 1991*, 30 F.C.C. Rcd. 7961 (2015) ............................................ 12, 23
*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
   18 F.C.C. Rcd. 14014 (2003) ...................................................................... 3

**MISCELLANEOUS MATERIALS**

Fed. R. Civ. P. 5.1 .................................................................................................... 4
S. Rep. No. 102-178 ...................................................................................... *passim*
H.R. Rep. No. 102-317, at 18 (1991) .............................................................. 21, 23
*Computerized Telephone Sales Calls and 900 Service: Hearings Before*
   *the S. Comm., on Commerce, Science, and Transportation*, 102d Cong. (1991) ....................... 13

1

**INTRODUCTION**

2

Defendant Facebook, Inc., has raised an as-applied First Amendment challenge to the

3

constitutionality of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA").

4

As relevant here, § 227(b)(1)(A)(iii) of the TCPA generally prohibits the use of automated dialing

5

systems to make a call or send a text message to a cellphone user without the user's prior express

6

consent, unless the call or message is initiated for an emergency purpose.   47 U.S.C.

7

§ 227(b)(1)(A)(iii).  Plaintiff claims that Facebook violated the Act by sending him automated text

8

messages, without his consent, notifying him that someone had logged into a Facebook account

9

(which he alleges is not his and he did not create).  In response, Facebook claims that because of

10

the emergency-purposes exception, and after the Supreme Court's recent decision in *Reed v. Town*

11

*of Gilbert*, 135 S. Ct. 2218 (2015), § 227(b)(1)(A)(iii) must be viewed as content-based speech

12

regulation and therefore subjected to strict scrutiny, which, as applied to the text messages in this

13

case, Facebook contends it cannot pass.

14

As a threshold matter, this Court should resolve all nonconstitutional issues before

15

addressing the constitutionality of the TCPA.  Facebook has moved to dismiss the Complaint on

16

various nonconstitutional grounds.  Although the United States takes no position on those issues,

17

their resolution may obviate the need to reach the constitutional question.  Accordingly, the Court

18

"should not decide federal constitutional questions where a dispositive nonconstitutional ground is

19

available." *Hagans v. Lavine*, 415 U.S. 528, 547 (1974).

20

If the Court does reach the constitutional challenge, it should be rejected for at least three

21

reasons.  First, the Ninth Circuit has already upheld against a First Amendment challenge the very

22

provision of the TCPA at issue in this case, *see Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th

23

Cir. 2014), *cert. granted on other grounds,* 135 S. Ct. 2311 (2015), as well as another TCPA

24

provision that is not meaningfully different, *see Moser v. FCC*, 46 F.3d 970, 972–74 (9th Cir.

25

26

27

28

1995).  Each time, the Ninth Circuit reasoned that the Act is a permissible content-neutral, time, place, and manner restriction.  *Reed* does not permit (much less require) this Court to revisit that conclusion.  *Reed* applied longstanding First Amendment principles to a local sign ordinance that bears no resemblance to the TCPA.  The ordinance at issue in *Reed* distinguished between numerous forms of constitutionally protected speech for no apparent reason; it does not permit or compel the upending of well-settled Ninth Circuit case law that Facebook seeks.  Intermediate scrutiny remains appropriate, and the Ninth Circuit has already sustained the constitutionality of the TCPA using that standard of review.

Second, even assuming that *Reed* requires revisiting binding circuit precedent, the Act as applied to the notifications in this case should nonetheless be upheld as a permissible regulation of commercial speech.  The messages Facebook allegedly sent to Plaintiff in this case comfortably satisfy the Supreme Court's three-factor test for determining whether speech is commercial, *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), and commercial speech is reviewed under intermediate scrutiny, which — as the Ninth Circuit has already held — § 227(b)(1)(A)(iii) easily overcomes.

Finally, even if the Court concludes that strict scrutiny ought to apply, the narrow statutory provision at issue should be upheld.  Congress made extensive findings about the Act's purpose of protecting consumer privacy, an interest the Ninth Circuit has already acknowledged as weighty.  Section 227(b)(1)(A)(iii) is narrowly tailored to protect that interest, prohibiting only the sorts of automated communications that Congress found most problematic and no more.

**BACKGROUND**

"Voluminous consumer complaints about abuses of telephone technology — for example, computerized calls dispatched to private homes — prompted Congress to pass the TCPA."  *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).  The ubiquity of cell phones only aggravates

such problems. *See Campbell-Ewald Co.*, 768 F.3d at 876–77. "People keep their cellular phones on their person at nearly all times: in pockets, purses, and attached to belts. Unlike other modes of communication, the telephone commands our instant attention." *Joffe v. Acacia Mortgage Corp.*, 121 P.3d 831, 842 (Ariz. Ct. App. 2005), *cert. denied*, 549 U.S. 1111 (2007) (mem.). As pertinent here, the statute makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii).[1] The TCPA defines an "automatic telephone dialing system" ("autodialer" or "ATDS") as "equipment which has the capacity -- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* § 227(a)(1). The TCPA provides for a private right of action under which persons and entities may obtain injunctive or monetary relief for violations of the Act, including statutory damages of $500 per violation, with a possibility of trebling for knowing or willful conduct. *Id.* § 227(b)(3). The statute applies to both voice calls and text messages. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009).

The TCPA exempts calls made "for emergency purposes," 47 U.S.C. § 227(b)(1)(A), (B), which includes any calls "made necessary in any situation affecting the health and safety of consumers," 47 C.F.R. § 64.1200(f)(4); *see also* S. Rep. No. 102-178, at 10 (1991) ("In general, any threat to the health or safety of persons in a residence should be considered an emergency.").

---

[1] Section 227(b)(1)(A)(iii) was amended in November 2015 by the passage of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 587 (2015). That amendment exempts from liability calls "made solely to collect a debt owed to or guaranteed by the United States." *Id.* The amendment is not at issue in this case.

Examples of calls that might be made for emergency purposes include notifications of impending or current power outages, 137 Cong. Reg. H11310, H11313, S18784, or of natural disasters or health-related evacuations, 137 Cong. Rec. H11313.

The present case is a putative class action against Facebook seeking damages for alleged violations of the TCPA.  Plaintiff alleges that Facebook sent text messages to his cell phone alerting him that his Facebook account had been accessed from various web browsers, even though Plaintiff never joined Facebook, provided Facebook with his phone number, or otherwise consented to receive the text messages.  Compl. ¶¶ 20-26, ECF No. 1.  Plaintiff further alleges that he continued to receive the unwanted text messages even after he responded to the messages requesting that the automated alerts be shut off.  *Id.* ¶ 28.  Plaintiff argues that Facebook has therefore "negligently, knowingly, and/or willfully" violated the TCPA.  *Id.* ¶ 1.  Plaintiff seeks to represent two classes.  *See id.* ¶ 34.

Facebook has moved to dismiss.  *See* Def.'s Mot. to Dismiss, ECF No. 24.  Facebook contends, among other things, that, insofar as it would "impos[e] liability on Facebook for sending non-commercial, privacy-protective login notifications," the TCPA violates the First Amendment. *Id.* at 15.  Relying heavily on *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), Facebook argues that, because the TCPA distinguishes between messages sent for emergency purposes and those sent for other reasons, the Act "regulates speech on the basis of its content and is therefore subject to strict scrutiny," which in Facebook's view it cannot survive.  *See* Reply Br. 19, ECF No. 31. Plaintiff has filed an opposition to the Motion to Dismiss.  *See* ECF No. 30.

On August 28, 2015, Facebook filed a Notice of Constitutional Question pursuant to Federal Rule of Civil Procedure 5.1.  *See* ECF No. 24-2.  The Court then issued an order certifying the constitutional question and giving the United States until October 27, 2015 to intervene, which it later extended to December 11, 2015.  ECF No. 37.

**ARGUMENT**

## I.   THE COURT SHOULD RESOLVE ALL NONCONSTITUTIONAL ARGUMENTS PRIOR TO ADDRESSING THE CONSTITUTIONALITY OF THE TCPA.

As an initial matter, this Court should not address the constitutionality of the TCPA until it resolves all other issues in Facebook's Motion to Dismiss.  "[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1474 (9th Cir. 1994) ("[I]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (citation omitted)).   In addition to its constitutional arguments, Facebook has moved to dismiss the Complaint on various nonconstitutional grounds.  Facebook has argued that (1) Plaintiff has failed adequately to allege the use of an automatic telephone dialing system, as required by the statute; and (2) that its text messages fall within the TCPA's exception for messages sent for emergency purposes.  *See* Def.'s Mot. at 7–15.  In order to avoid unnecessary constitutional adjudication, the Court should first address these issues.[2]

## II.   BINDING NINTH CIRCUIT PRECEDENT REQUIRES THIS COURT TO UPHOLD THE TCPA AS A VALID CONTENT-NEUTRAL RESTRICTION.

The Ninth Circuit has twice addressed the constitutionality of this or an identical provision of the TCPA and twice rebuffed First Amendment challenges to the statute, holding each time that the Act withstands intermediate scrutiny.  *See Campbell-Ewald*, 768 F.3d 871; *Moser*, 46 F.3d 970.  That should be the beginning and the end of the Court's analysis, as that precedent remains binding on this Court.  Facebook nevertheless contends that the Supreme Court's recent decision in *Reed* represents a sea change in the Court's First Amendment jurisprudence and impliedly overturns this

---

[2] The United States has intervened solely for the purpose of defending the constitutionality of the TCPA and therefore this brief takes no position on the merits of these issues.

binding precedent.  *Reed* does not purport, however, to overturn the Supreme Court precedent that was the basis for the Ninth Circuit's decisions, let alone to overturn those decisions. *Reed*, 135 S. Ct. at 2226–28; *see also Agostini v. Felton*, 521 U.S. 203, 237 (1997) (advising lower courts to "leav[e] to this Court the prerogative of overruling its own decisions").  The Court in *Reed* confronted an ordinance markedly different from the statute in question here, and was not asked, as this Court is, to balance against the speaker's First Amendment rights an unwilling listener's interest in privacy.  Accordingly, *Reed* should not be read in such an expansive manner as to permit this Court to disregard Ninth Circuit precedent on this, or other, settled issues.

A.    The Ninth Circuit Has Already Rejected Identical First Amendment Challenges to the TCPA.

The constitutional challenge that Facebook presents is foreclosed by Circuit precedent.  In *Moser*, 46 F.3d 970, the Ninth Circuit rejected a First Amendment challenge to 47 U.S.C. § 227(b)(1)(B), an adjacent provision of the TCPA that makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party."  Like § 227(b)(1)(A)(iii), it contains an exception for a "call [that] is initiated for emergency purposes."  Section 227(b)(1)(B), the court of appeals held, is a content-neutral time, place, and manner restriction because it "regulates all automated telemarketing calls without regard to whether they are commercial or noncommercial." *Moser*, 46 F.3d at 973.  Applying intermediate scrutiny, as directed by Supreme Court precedent, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), the Ninth Circuit held that this provision is consistent with the First Amendment.

The court noted that there was "significant evidence before Congress of consumer concerns about telephone solicitation in general and about automated calls in particular," to which it owed a high degree of deference.  *Moser*, 46 F.3d at 974 (citing *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985)).  The court explained that "Congress held extensive

hearings on telemarketing" and based on evidence brought forth in those hearings and surveys of customers who had dealt with them, Congress "concluded that telemarketing calls to homes constituted an unwarranted intrusion upon privacy." *Id.* at 972.  In light of this evidence and the deference due it, the court held that "Congress accurately identified automated telemarketing calls as a threat to privacy" and that "Congress could regulate a portion of these calls without banning all of them." *Id.*  The court of appeals also rejected the contention that the statute was underinclusive. *Id.* at 974 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 50 (1994)).

More recently, in *Campbell-Ewald*, 768 F.3d 871, the Ninth Circuit reaffirmed its reasoning in *Moser* and upheld the constitutionality of § 227(b)(1)(A)(iii), the very provision at issue here. The court recognized that *Moser* had rightly treated the TCPA as a content-neutral time, place and manner restriction, 768 F.3d at 876, and further concluded that the Act serves a significant government interest, promoting, at a minimum, the government's interest in protecting privacy. *Id.* at 876–77.  The *Campbell-Ewald* court also found § 227(b)(1)(A)(iii) to be narrowly tailored and to leave open ample alternative channels for the communication of information.  768 F.3d at 876–77. Rejecting appellant's contention that "the government's interest only extends to the protection of residential privacy, and that therefore the statute is not narrowly tailored to the extent that it applies to cellular text messages," the court observed that "there [wa]s no evidence that the government's interest in privacy ends at home," but that, "to whatever extent the government's significant interest lies exclusively in residential privacy, the nature of cell phones renders the restriction of unsolicited text messaging all the more necessary to ensure that privacy." *Id.* at 876.

District courts around the country have unanimously upheld § 227(b)(1)(A)(iii) against First Amendment challenges, each time treating it as content neutral and finding that it addresses concerns about threats to consumer privacy, nuisance to call recipients, and potential costs associated with unsolicited calls made to cellular telephones. *See Wreyford v. Citizens for Transp.*

UNITED STATES' MEMORANDUM IN SUPPORT OF CONSTITUTIONALITY
CASE NO.  3:15-CV-00985-JST

*Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380 (N.D. Ga. 2013); *Strickler v. Bijora, Inc.*, No. 11 CV

3468, 2012 WL 5386089, at *5–6 (N.D. Ill. Oct. 30, 2012); *Abbas v. Selling Source, LLC*, No. 09

CV 3413, 2009 WL 4884471, at *7–8 (N.D. Ill. Dec. 14, 2009). *See also Joffe*, 121 P.3d at 841–43

(upholding the TCPA in state court).

B.    Nothing in *Reed* Requires This Court To Adopt the Radical Reconception of First Amendment Jurisprudence That Facebook Urges.

This Court may depart from *Moser* and *Campbell-Ewald* only if *Reed* "undercut[s] the

theory or reasoning underlying" these precedents "in such a way that the cases are clearly

irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  That is not so

here, because *Reed* dealt with a very different situation than the one presented in those cases and in

this case.  The Ninth Circuit's decisions in *Moser* and *Campbell-Ewald* remain binding.

Facebook argues that, in light of *Reed*, the TCPA is content based and unconstitutional.

Facebook points to the TCPA's exception for calls made "for emergency purposes," 47 U.S.C.

§ 227(b)(1)(A)(iii), and maintains that the TCPA "generally prohibits an entire manner of

communication, but then creates an exception for a category of speech based on its content,"

requiring "government officials to examine the content of the speech to determine whether the

speaker should be penalized," Reply Br. at 14–15.  According to Facebook, as with viewpoint

discrimination, the TCPA's purportedly content-based distinction between emergency and all other

calls triggers strict scrutiny.  *Id.* at 15.  To the contrary, *Reed* did not purport to overrule existing

precedent or radically alter First Amendment jurisprudence.

At issue in *Reed* was a municipal sign ordinance that "identifie[d] various categories of

signs based on the type of information they convey[ed], then subject[ed] each category to different

restrictions."  135 S. Ct. at 2224.  A church wishing to advertise the time and location of its

services, *id.* at 2225, challenged a provision of the ordinance aimed at "signs directing the public to

a meeting of a nonprofit group," *id.* at 2224.  The Supreme Court concluded that the ordinance was

content based and could not survive strict scrutiny.  *Id.*

The Supreme Court explained that, in view of its precedent, "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Id.* at 2227 (citing *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2663–64 (2011); *Carey v. Brown*, 447 U.S. 455, 462 (1980); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).  It noted that a reviewing court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Id.* (quoting *Sorrell*, 131 S. Ct. at 2664).  The Court observed that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose."  *Id.*  But, either way, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny."  *Id.*

The Town of Gilbert's sign code was facially content based, the Court reasoned, because whether a particular restriction applied "depend[ed] entirely on the communicative content of the sign."  *Id.*  Consequently, the government's justifications for the code did not alter the appropriate standard of review.  *Id.*  The Supreme Court dismissed as immaterial the fact that the municipality had not sought to silence disfavored messages, *id.* at 2227–28; emphasized that the viewpoint neutrality of the regulation did not affect the appropriateness of strict scrutiny, *id.* at 2229–30; and suggested in dicta that strict scrutiny may be appropriate even when an ordinance turns on the identity of the speaker or on "whether and when an event [wa]s occurring," *id.* at 2230–31.

In its application of strict scrutiny, the Court assumed for the sake of argument that the Town's two proffered interests — preserving aesthetic appeal and promoting traffic safety — were compelling, but it held that the ordinance failed the tailoring inquiry because its distinctions were "hopelessly underinclusive."  *Id.*  Justice Alito, joined by Justice Kennedy and Justice Sotomayor,

joined in the majority opinion but wrote separately to emphasize the narrowness of the Court's decision.  *Reed*, 135 S. Ct. at 2233–34 (Alito, J., concurring).  He explained that, although the Town of Gilbert's ordinance was "replete with content-based distinctions" and thus had to face strict scrutiny, which it could not satisfy, a great many alternatives remained available for municipalities hoping to regulate signs.  *Id.* at 2233.

Justice Kagan, joined by Justice Ginsburg and Justice Breyer, also wrote a separate opinion concurring only in the judgment.  *See id.* at 2236 (Kagan, J., concurring in the judgment).  She explained that the majority's two purported justifications for employing strict scrutiny — protecting the marketplace of ideas and ensuring the government has not acted to silence disfavored messages — were not implicated by the regulation in question.  *Id.* at 2237.  Finding that the sign code failed even "the laugh test," Justice Kagan would have decided the case by holding that, even under intermediate scrutiny, the ordinance foundered.  *Id.* at 2239.  Finally, Justice Breyer wrote separately as well, underscoring his belief that "[t]he First Amendment requires greater judicial sensitivity both to the Amendment's expressive objectives and to the public's legitimate need for regulation than a simple recitation of categories."  *Id.* at 2234 (Breyer, J., concurring in the judgment).

Although the concurring opinions expressed some uncertainty over the decision's precise reach, *compare id.* at 2233 (Alito, J., concurring), *with id.* at 2237 n.* (Kagan, J., concurring in the judgment), the Court made clear that it was only applying long-settled doctrine, not impliedly overruling generations of First Amendment jurisprudence.  *See Reed*, 135 S. Ct. at 2226–28 (opinion of the Court).  The ruling Facebook seeks, however, would fly in the face of that approach.  Its expansive interpretation of *Reed* would uproot decades of settled First Amendment case law that *Reed* did not purport to question, and it would unnecessarily threaten important statutes, like the TCPA, that have long been held to be constitutional under the First Amendment,

*see Campbell-Ewald Co.*, 768 F.3d; *Moser v. FCC*, 46 F.3d 970.  Nothing in *Reed* supports (much less compels) that result; *Reed* does not "undercut the theory or reasoning underlying [*Moser* and *Campbell-Ewald*] in such a way that the cases are clearly irreconcilable," *Miller*, 335 F.3d at 900, and thus the Act should continue to be subject to — and upheld under — intermediate scrutiny.

First, the lines drawn by the TCPA in no way resemble the lines drawn by the ordinance invalidated in *Reed*.  The sign code at issue in *Reed* purported to impose general limits on the display of outdoor signs, but was in fact riddled with twenty-three different exemptions.  *Reed*, 135 S. Ct. at 2224.  Ideological signs (other than political signs) were permitted "to be up to 20 square feet in area and to be placed in all 'zoning districts' without time limits."  *Id.*  Political signs, by contrast, could only measure sixteen square feet on residential property, but were allowed to reach up to thirty-two square feet when placed elsewhere.  *Id.* at 2224–25.  Political signs were also limited to the period of time running sixty days before a primary election through fifteen days after a general election. *Id.* at 2225.  By yet further contrast, "Temporary Directional Signs Relating to a Qualifying Event" faced their own size requirements, distinct from those imposed on political or ideological signs, and their own rigid temporal restrictions.  *Id.* at 2225.

Thus the ordinance in *Reed* was problematic, even under the Court's settled precedents, because it "distinguish[ed] among speech instances that are similarly likely to raise the legitimate concerns to which it responds," which the Supreme Court has taken as a sign that a statute is being put to an "invidious use," *Hill v. Colorado*, 530 U.S. 703, 723–24 (2000).  The ordinance aimed to maintain the town's aesthetic appeal and to promote traffic safety, *Reed*, 135 S. Ct. at 2231, but it distinguished between signs (political, ideological, etc.) that seemed equally likely to detract from the town's beauty or add to its traffic, *see, e.g.*, *id.* at 2231–32; *id.* at 2239 (Kagan, J., concurring in the judgment).    Under such circumstances, where "there is a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside

the statute's scope, while others fall inside," *Hill*, 530 U.S. at 723, the Supreme Court has ratcheted up its skepticism and, accordingly, its standard of review.

The TCPA operates in an entirely different fashion. Congress enacted the TCPA "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile . . . machines and automatic dialers." S. Rep. No. 102-178, at 1. As a result, as relevant here, the Act prohibits one narrow category of calls (including text messages) to wireless numbers: those made using an automatic telephone dialing system or an artificial or pre-recorded voice and directed at a cell phone belonging to a recipient who had not previously consented to receive the calls. 47 U.S.C. § 227(b)(1)(A)(iii). Although it permits the FCC to authorize additional exceptions through regulation, *see id.* § 227(b)(2)(C),[3] the statute, prior to amendment, exempts just one type of call or text from liability: those initiated for an emergency purpose. *Id.* Otherwise, all calls and texts are treated uniformly, regardless of whether they are ideological, political, or commercial in nature. *Id.* Unlike the ordinance at issue in *Reed*, the TCPA treats similarly all speech that Congress sought to address in passing the Act.

Indeed, the only automated calls that fall outside the statute's scope — those to which a recipient has consented and those that respond to an emergency — do not implicate the privacy interests Congress sought to protect. Where significant government interests permit a blanket prohibition, the Supreme Court has noted, it is not content-based discrimination to exempt from that prohibition a narrow band of speech that is unrelated to the significant government interest at

---

[3] The FCC has promulgated regulations, *see* 47 C.F.R. § 64.1200, and issued declaratory orders, *see In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 ("TCPA Omnibus Ruling")*, 30 F.C.C. Rcd. 7961 (2015), under this authority. The United States notes that the Hobbs Act deprives courts of jurisdiction to challenge the validity of any FCC order except on direct review. 28 U.S.C. § 2342(a); *Roberts v. Paypal, Inc.*, — F. App'x —, 2015 WL 6524840, at *1 (9th Cir. Oct. 29, 2015); *see also, e.g.*, *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119–26 (11th Cir. 2014).

stake.  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992); *see also Reed*, 135 S. Ct. at 2235 (Breyer, J., concurring in the judgment) (citing *R.A.V.* as continued exception to application of strict scrutiny).  That is exactly what has occurred in the context of the TCPA.  Congress sought to protect privacy, and so it banned the unsolicited, automated calls that its findings indicated tended to create an unwanted nuisance and an invasion of privacy.  *See* S. Rep. No. 102-178, at 2.  But such effects do not accompany emergency calls, which are likely to be rare and unobtrusive (and may be met by recipients with appreciation rather than annoyance), instead of repetitive and invasive.  *See, e.g.*, *Computerized Telephone Sales Calls and 900 Service: Hearings Before the S. Comm., on Commerce, Science, and Transportation*, 102d Cong. (1991) (statement of Senator Ernest F. Hollings) (explaining that the bill is "very measured" and would permit calls for emergency weather reports, such as hurricane evacuation notices).  Nothing about Congress's measured attempt at regulation should raise judicial skepticism in the same manner as the ordinance in *Reed*.

An example helps to illustrate the modesty of the provision at issue here.  It is well established that a municipality can prohibit individuals from ringing the doorbells of unconsenting residents (or using sound trucks to convey an amplified message) after a certain hour, even if that ban limited the hours available for First Amendment activity.  *See Hynes v. Mayor of Borough of Oradell*, 425 U.S. 610, 616–17 (1976) ("[T]he Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing."); *Ward*, 491 U.S. at 791; *Klein v. City of Laguna Beach*, 533 F. App'x 772, 774 (9th Cir. 2013) (concluding a city's ban on sound amplifications within a certain distance of the local high school for a short period of time following the school day was a valid time, place, and manner regulation); *Occupy Sacramento v. City of Sacramento*, 878 F. Supp. 2d 1110, 1117 (E.D. Cal. 2012) ("Here, § 12.72.090 does not make reference to prohibiting any kind of speech or

expression, its prohibition against remaining in the parks after certain hours merely regulates the hours that *anyone* can remain in City parks.").   A law of this sort would not be rendered unconstitutional or even constitutionally suspect simply because "emergency" communications (i.e. sirens or official responses to an emergency at a private residence) were excluded from the statute's reach.  The TCPA's reach is no different.[4]

Second, unlike in *Reed*, which involved speech in the most traditional public fora — the public streets — a court considering the constitutionality of the TCPA must balance an important countervailing factor against First Amendment concerns: the privacy of unwilling listeners. *See, e.g.*, *Hill*, 530 U.S. at 714–16; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208 (1975); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 320 (1974).  In *Hill*, the Supreme Court reviewed a Colorado statute prohibiting those attempting to pass out leaflets or handbills, or to otherwise "engag[e] in oral protest, educat[e], or counsel[]," to "knowingly approach within eight feet of another person."  530 U.S. at 707.  The Court highlighted "the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Id.* at 715–16.  It observed that "[t]he recognizable privacy interest in avoiding unwanted communication" is strongest "in the confines of one's own home, or when persons are powerless to avoid it." *Id.* at 716; *see also Rowan v. U.S. Post Office Dept.,* 397 U.S. 728, 736 (1970).  Indeed, the Court's solicitude for the privacy of unwilling recipients is at its apex when, as here, speech reaches into the home. *See, e.g.*, *Hill*, 530 U.S. at 717 ("The right to avoid unwelcome speech has special force in the privacy of the home."); *Frisby v. Schultz*, 487 U.S. 474,

---

[4] Facebook argues that, after *Reed*, it does not "matter that the emergency exception regulates based on the purpose of the speech."  Reply Br. at 14.  Prior to *Reed*, of course, no one would have thought that an exception for speech made "for emergency purposes" rendered a statute content based. *See Campbell-Ewald*, 768 F.3d at 876–77; *Moser*, 46 F.3d at 972–74.  Indeed, the application of the exception turns on the context of an emergency and the resulting urgency that creates the need for an emergency communication.   *Reed* should not be read to upset this commonsense understanding.

479 (1988).

In contrast to *Reed*, where countervailing concerns about unwilling listeners inside of the home were not present, *see Carey*, 447 U.S. at 460 ("Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." (citation and alteration omitted)), the privacy concerns here are significant.  The TCPA restricts only calls made and messages sent without consent, *see* 47 U.S.C. § 227(b)(1)(A), and it was enacted to address the same weighty interests that the Court has repeatedly seen fit to balance against a speaker's First Amendment rights, *see Erznoznik*, 422 U.S. at 208.  Although Facebook's "freedom to communicate is substantial, 'the right of every person to be let alone must be placed in the scales with the right of others to communicate.'" *Hill*, 530 U.S. at 718 (quoting *Rowan*, 397 U.S. at 736); *see also Campbell-Ewald Co.*, 768 F.3d at 876–77 (describing manner in which TCPA furthers residential privacy); *Moser*, 46 F.3d at 974 (same).  As such, concern for the rights of Plaintiff and others like him makes intermediate scrutiny appropriate here, as in *Hill*.  Importantly, *Reed* did not purport to overrule *Hill*.  *See Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421–24 (1986) (stating that the assumption that prior precedent has been overruled by implication is disfavored); *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (explaining that it is the Supreme Court's prerogative to overrule one of its prior decisions).

In short, *Reed* does not compel this Court to reach a conclusion contrary to existing Ninth Circuit case law.[5]  Intermediate scrutiny, to which the TCPA has traditionally been subjected, is

---

[5] Nor do post-*Reed* lower court decisions require a different approach.  To be sure, a smattering of courts has used *Reed* to invalidate or enjoin enforcement of various statutes.  *See, e.g.*, *Cahaly v. Larosa*, 796 F.3d 399, 402 (4th Cir. 2015) (South Carolina's anti-robocall statute, which singled out, among other things, calls "of a political nature"); *Norton v. City of Springfield, Ill.*, 612 F. App'x 386, 387 (7th Cir. 2015) (panhandling ordinance); *Rideout v. Gardner*, — F. Supp. 3d —, No. 14-CV-489-PB, 2015 WL 4743731, at *9–15 (D.N.H. Aug. 11, 2015) (a New Hampshire statute that prohibited photographing marked ballots).  *But see Citizens for Free Speech, LLC v. Cty. of Alameda*, No. C14-02513 CRB, 2015 WL 4365439, at *13 (N.D. Cal. July

properly employed here, and binding circuit precedent requires this Court to conclude that it can be satisfied, *see Campbell-Ewald Co.*, 768 F.3d at 876–77.

## III.    AS APPLIED, THE TCPA IS A VALID RESTRICTION OF COMMERCIAL SPEECH.

Even assuming that *Reed* calls into question the Ninth Circuit's reasoning in *Campbell-Ewald* and *Moser* regarding the content neutrality of the statutory provision at issue, it would not change the result because this case involves commercial speech. As the Ninth Circuit recognized in *Moser*, the standard of review for restrictions on commercial speech is "essentially identical" to the intermediate scrutiny standard that has previously been applied to uphold the constitutionality of the TCPA. 46 F.3d at 973; *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). And the Ninth Circuit has held that the TCPA easily satisfies that test.

"The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980). Courts employ a four-step test to evaluate the regulation of commercial speech. First, the court "must determine whether the expression is protected by the First Amendment," meaning that "it at least must concern lawful activity and not be misleading." *Id.* at 566. Second, the reviewing court is to "ask whether the asserted governmental interest is substantial." *Id.* Third, the court "must determine whether the regulation directly advances the governmental interest asserted." *Id.* Finally, the court must inquire whether the regulation "is not more extensive than is necessary to serve that interest." *Id.*; *accord Coyote Publ'g, Inc. v. Miller*,

---

16, 2015) (Breyer, J.) (suggesting *Reed*'s application is limited to ordinances that impose "temporal or geographic restrictions on different categories of . . . signs"). But, for the reasons set forth above, the TCPA context is distinct. Insofar as the statute at issue in *Cahaly* might at first glance seem similar to the TCPA, upon inspection the two bear little resemblance to one another. That statute "prohibit[ed] only those robocalls that [we]re for the purpose of making an unsolicited consumer telephone call or [we]re of a political nature including, but not limited to, calls relating to political campaigns." 796 F.3d at 402. So it too "raise[d] the specter of impermissible content discrimination," *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 449 (2002), in a manner quite unlike the TCPA.

UNITED STATES' MEMORANDUM IN SUPPORT OF CONSTITUTIONALITY
CASE NO.  3:15-CV-00985-JST

598 F.3d 592, 602 (9th Cir. 2010).

The Supreme Court's decision in *Reed* did not implicate commercial speech. *Reed* concerned signs directing parishioners to the location of a church service, 135 S. Ct. at 2225, and thus the Court had no reason to opine on the protection afforded commercial speech. Courts within and without the Ninth Circuit have recognized that "*Reed* does not concern commercial speech, and therefore does not disturb the framework which holds that commercial speech is subject only to intermediate scrutiny as defined by the *Central Hudson* test." *Contest Promotions, LLC v. City & Cty. of S.F.*, No. 15-CV-00093-SI, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015); *see also Dana's R.R. Supply v. Attorney Gen., Fla.*, — F.3d —, —, No. 14-14426, 2015 WL 6725138, at *6 (11th Cir. Nov. 4, 2015); *CTIA-The Wireless Ass'n v. City of Berkeley, Cal.*, — F. Supp. 3d —, No. C-15-2529 EMC, 2015 WL 5569072, at *10 (N.D. Cal. Sept. 21, 2015); *Cal. Outdoor Equity Partners v. City of Corona*, No. CV 15-03172 MMM AGRX, 2015 WL 4163346, at *9–10 (C.D. Cal. July 9, 2015); *Chiropractors United for Research & Educ., LLC v. Conway*, No. 3:15-CV-00556-GNS, 2015 WL 5822721, at *5 (W.D. Ky. Oct. 1, 2015).

The login notifications at issue here are properly considered commercial speech. Whether speech is commercial is a determination rooted in "commonsense," *Central Hudson*, 447 U.S. at 562, but the Supreme Court has set forth three factors instructive in answering that question where it is otherwise not readily apparent that the speech proposes a commercial transaction: (1) whether the speech in question was an advertisement; (2) whether it referenced a specific product; and (3) whether the speaker had an economic motive. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983). The Court made clear that no single factor was dispositive, *id.* at 66–67, but also emphasized that not all three factors must obtain before speech can be characterized as commercial, *id.* at 67 n.14. The Ninth Circuit has employed the *Bolger* factors to identify commercial speech. *See, e.g.*, *Dex Med. W. Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

Although Facebook's notification messages are not advertisements in the traditional sense, they plainly reference Facebook's most prominent product: a user account.  That the messages seek to notify a user about activity on that account does not alter the analysis, for even informative speech has been found to be commercial.  *See, e.g.*, *Bolger*, 463 U.S. at 66; *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1097 (E.D. Cal. 2009) (determining to be commercial speech a pamphlet alerting customers to defendant's emergency preparedness plans, notwithstanding that it did not propose a transaction or offer any particular product or service for sale, because, *inter alia*, its "central theme" was how the plan would improve its service and "the Publication did not seek to inform the reader about emergency preparedness generally").  The fact that the Facebook messages at issue in this case mention the product only in passing does not alter the commercial nature of the speech.  *See Bolger*, 463 U.S. at 66 n.13.

Facebook undeniably had an economic motivation for sending the messages.  Facebook has 864 million daily active users, 1.35 billion monthly active users, and a market value greater than $200 billion.  Compl. ¶ 3.  Facebook has made clear that the size of its user base contributes to its ability to generate revenue, stating in its 2014 annual report that its increased ad revenue is attributable in part to "an increase in user growth."  *See* Facebook, Inc., 2014 Form 10-K Annual Report, at 43 (2015).[6]  There is no doubt that user growth and satisfaction is tied to Facebook's ability to assure existing customers that its service is secure.  Indeed, Facebook contends that the entire purpose of the login notifications is to protect existing customers.  Courts within the Ninth Circuit have previously concluded that speech made for such a purpose can constitute commercial speech.  *See, e.g.*, *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, — F. Supp. 3d —, No. 15-CV-01257-JST, 2015 WL 4397706, at *8 (N.D. Cal. July 17, 2015) (Tigar, J.) (concluding information on a

---

[6] Publicly filed annual reports are properly the subject of judicial notice.  *See, e.g.*, *Moran v. HSBC Bank USA, N.A.*, No. 14-CV-00633-LHK, 2015 WL 139705, at *2 n.1 (N.D. Cal. Jan. 9, 2015); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1235 (N.D. Cal. 2014); *Oster v. Standard Ins. Co.*, 768 F. Supp. 2d 1026, 1033 n.4 (N.D. Cal. 2011).

receipt was commercial because it ultimately aimed to "influence[ them] to use the service again");

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. C 14-0437 CW, 2014 WL 5812294, at *6 (N.D. Cal. Nov. 7, 2014) (finding "monthly statements could induce merchants to continue using Mercury's services, and hence could be considered commercial speech designed to propose a continued business relationship"); *see also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1250–52 (N.D. Cal. 2014) (deciding that e-mails, which did not propose a particular transaction but referenced defendant's product, and were designed to increase defendant's user base, were economically motivated and commercial in nature); *Charles v. City of Los Angeles*, 757 F. Supp. 2d 989, 1003 (C.D. Cal. 2010) (explaining that billboard was commercial speech in part because it was designed to increase viewership, which boosted ratings and allowed for increased advertising prices), *aff'd,* 697 F.3d 1146 (9th Cir. 2012).   The fact that Facebook users are not charged for their accounts, *see Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 790 (N.D. Cal. 2011), does not eliminate that economic motivation.  *See First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1051 (N.D. Cal. 2015) (finding speech to be economically motivated where it was designed to increase a business's total number of clients, even where the clients did not pay for services, because the increased client base aided fundraising efforts).

Of the recent district court decisions analyzing whether speech is commercial, perhaps most instructive is this Court's decision in *L.A. Taxi Cooperative*, in which the Court made clear that statements made for the purpose of maintaining an existing business relationship can amount to commercial speech.[7]   At issue there were "statements made about Uber's 'Safe Rides Fee' on users' emailed receipts."  2015 WL 4397706, at *8.  Uber maintained that the receipts "relate[d] to transaction[s] that ha[d] already occurred, rather than proposing a transaction or influencing

---

[7] Although this case was decided in the context of the Lanham Act, the inquiry into whether speech is "commercial speech" is no different than the First Amendment inquiry.  *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000); *Bernard v. Donat*, No. 11-CV-03414-RMW, 2012 WL 525533, at *3 (N.D. Cal. Feb. 16, 2012) (same).

consumers to purchase Uber's services in the future." *Id.* Plaintiffs countered that, "because Uber relies on passengers repeatedly using its services, and because users receive a receipt including a link to the 'Safe Rides Fee' information each time they complete an Uber ride, it is plausible that passengers who use Uber and read the information about the 'Safe Rides Fee' are influenced to use the service again." *Id.* The Court sided with plaintiffs for reasons that are equally applicable here. Facebook's log-in notifications serve as an "extra security feature," Compl. ¶ 4, which, viewed in the light most favorable to Plaintiff, promote continued use of the social networking site.

In short, the speech at issue here should be deemed commercial speech reviewable under the *Central Hudson* framework. And the Ninth Circuit has already upheld § 227(b)(1)(A)(iii) using a form of scrutiny materially indistinguishable from the *Central Hudson* standard that is applied to commercial speech, *see Fox*, 492 U.S. at 477; *Moser*, 46 F.3d at 973.

## IV.   EVEN IF VIEWED AS A CONTENT-BASED REGULATION OF NON-COMMERCIAL SPEECH, THE TCPA SATISFIES STRICT SCRUTINY.

If the Court determines that strict scrutiny applies, it should nevertheless reject Facebook's constitutional challenge. Under strict scrutiny, the government bears the burden of showing that the Act furthers a compelling government interest and is narrowly tailored to that interest. *Reed*, 135 S. Ct. at 2231. The Supreme Court recently reaffirmed that strict scrutiny is *not* "strict in theory, but fatal in fact" and that a law regulating speech can be upheld, even under this most exacting form of review. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1666 (2015) (upholding state ban on campaign donation solicitation by candidates for judicial office).

Motivated by increasing consumer complaints about telemarketing calls, Congress enacted the TCPA "to protect the privacy interests of residential telephone subscribers." S. Rep. No. 102-178, at 1. The Senate Committee on Commerce, Science, and Transportation, in its report, explained that it "believe[d] that Federal legislation [wa]s necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate

commerce, and a disruption to essential public safety services." *Id.* at 7.  The House Committee on Energy and Commerce likewise concluded that "all too frequently [unsolicited telemarketing] represents more of a nuisance than an aid to commerce." H.R. Rep. No. 102-317, at 18 (1991).

Congress made extensive findings before it legislated and included those findings in the Act.  Congress explained that "[t]he use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques."  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394 (1991) (codified at 47 U.S.C. § 227 Note).  At the time, Congress explained, more than 30,000 businesses actively directed telemarketing to business and residential customers; more than 300,000 solicitors called over 18 million Americans daily; and total United States sales generated through telemarketing totaled $435 billion in 1990, more than four times the total for 1984.  *Id.* § 2(2)–(4).  Automated dialing and calling systems, combined with falling long distance telephone rates, made it inexpensive for companies to engage in these practices.  *See* S. Rep. No. 102-178, at 4.  But, Congress observed, unrestricted telemarketing could "be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety." Pub. L. No. 102-243, § 2(5).  Further, "[m]any consumers [we]re outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." *Id.* § 2(6).  And, although many states "ha[d] statutes restricting various uses of the telephone for marketing . . . telemarketers c[ould] evade their prohibitions through interstate operations," necessitating federal legislation.  *Id.* § 2(7).

Congress thus explained that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices."  *Id.* § 2(9).  Evidence compiled by Congress "indicate[d] that residential telephone subscribers consider[ed] automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an

invasion of privacy." *Id.* § 2(10). These automated calls were considered to be "more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." S. Rep. No. 102-178, at 4. Consequently, Congress determined that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L. No. 102-243, § 2(12). In keeping with its aim to limit calls that were considered a nuisance or invasion of privacy, Congress further concluded that "the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution." *Id.* § 2(13).

It is with good reason, therefore, that Facebook assumes for the sake of argument that the TCPA was motivated by a compelling government interest. Def.'s Mot. at 17. The Ninth Circuit, only asked to apply intermediate scrutiny, has already determined that, at a minimum, the TCPA is justified by the government's interest in protecting residential privacy. *Campbell-Ewald*, 768 F.3d at 876–77; *see also Wreyford*, 957 F. Supp. 2d at 1380; *Abbas,* 2009 WL 4884471, at \*7; *Strickler*, 2012 WL 5386089, at \*5; *Joffe*, 121 P.3d at 841–43.

Moreover, the Supreme Court has repeatedly emphasized that the government's profound interest "in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey*, 447 U.S. at 471; *see also Ward*, 491 U.S. at 796; *Rowan*, 397 U.S. at 738; *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 790 (7th Cir. 2006). And the Ninth Circuit has made clear that such an interest is served by the regulation of calls and texts directed at cell phones, reasoning in *Campbell-Ewald* that "the nature of cell phones

renders the restriction of unsolicited text messaging all the more necessary to ensure [residential] privacy." 768 F.3d at 876. After all, the court explained, most cellular users likely keep their phones with them at home, and, in fact, in many households have replaced landlines with cell phones. *Id.* at 876–77. "As a consequence, prohibiting automated calls to land lines alone would not adequately safeguard the stipulated interest in residential privacy." *Id.* at 877. The Court in this case should recognize that the government's interest in protecting residential privacy is not merely substantial, but is in fact compelling. *Cf. Cahaly*, 796 F.3d at 405 (assuming government interest in protecting residential privacy and tranquility is compelling).

Section 227(b)(1)(A)(iii) is also narrowly tailored. As with other provisions upheld under strict scrutiny, § 227(b)(1)(A)(iii) "restricts a narrow slice of speech." *Williams-Yulee*, 135 S. Ct. at 1670. It restricts only non-emergency calls and text messages to cell phones or similar devices using an autodialer or artificial voice, and only where the recipient has not consented to receive the communication. There is not a single message that a speaker is prohibited from disseminating; instead, only the manner in which a message is communicated is regulated. *Cf. id.* (Florida's "Canon 7C(1) leaves judicial candidates free to discuss any issue with any person at any time."). A message like Facebook's login notification could be communicated by live phone call, text sent by other means, or e-mail. Facebook could also send alerts through its mobile application. And insofar as issues arise where, as here, an individual that has consented to receive certain calls or texts allows his or her phone number to be reassigned, and the new owner of that phone number receives unwanted communications, there are numerous ways for a calling party to learn of reassigned numbers, as the FCC recently acknowledged. *See TCPA Omnibus Ruling*, 30 F.C.C. Rcd. at 8006–09. In regulating in this manner, Congress was careful to prohibit all calls and texts that raise its concern about the added intrusion and annoyance brought about by autodialed calls or texts, *see* H.R. Rep. No. 102-317, at 5, 10; S. Rep. No. 102-178, at 4–5, and no more.

Similarly, the emergency exception itself, which Facebook argues is the reason the TCPA must be considered content based, is also narrowly tailored to serve a compelling interest. Importantly, it was Congress's clear desire, *see* Pub. L. No. 102-243, § 2(12), to promote privacy, and minimize intrusion, in a manner that did not compromise "the health and safety of the consumer," *id*.  Few would argue that protecting health and safety is anything but a compelling interest.  *See Simopoulos v. Virginia*, 462 U.S. 506, 519 (1983) (recognizing a state's compelling interest in protecting a woman's health and safety); *United States v. Lafley*, 656 F.3d 936, 940–41 (9th Cir. 2011) (recognizing the government's compelling interest in protecting the health and safety of prison inmates).  And because the exception is limited only to calls or texts for emergency purposes, it is also narrowly tailored to ensure that Congress's precise aim is carried out.  *See, e.g.*, *Brown v. City of Pittsburgh*, 586 F.3d 263, 273–76 (3d Cir. 2009) (finding ordinance exempting emergency workers from ban on congregating within fifteen feet of hospital narrowly tailored).

Facebook nevertheless maintains that, even if a compelling government interest is furthered when the TCPA is used to impose liability for spam text advertisements, "imposing statutory damages on Facebook for login notifications does not" further the government's interest, as the "login notifications themselves promote privacy."  Def.'s Mot. at 17.  Facebook contends that holding it liable even where, as here, the notification is sent to a non-user, "would turn the provision of security services that themselves ***protect consumer privacy*** into a risky endeavor for companies like Facebook, chilling a wide range of constitutionally-protected communications."  *Id.* Facebook thus suggests that "[a]n equally effective and less restrictive alternative is readily apparent: exempting noncommercial texts like login notifications that alert users to potential compromise and fraudulent account activity."  *Id.* at 17–18.

Even setting to the side the inconsistency in arguing that the way to cure one supposedly content-based distinction is to create another, Facebook's argument is flawed on its own terms.

First, Facebook's argument rests on the mistaken assumption that its login notifications are non-commercial.  *See supra* at pp. 16–20.  Second, Facebook's suggestion that the statute fails because it may have a chilling effect is based on a case that concerns facial overbreadth, not an as-applied challenge, as is at issue here.  *See* Def.'s Mot. at 17 (citing *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 931 (9th Cir. 1995), *vacated on other grounds sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)).  Third, Facebook remains free to communicate the content of its login notifications by other means, like e-mail or live telephone call.  And finally, should the court determine that Facebook's notifications do not comport with what Congress intended to shield from liability when it crafted the emergency exception, then the court must also reject Facebook's argument for a further blanket exception for any notification of unfamiliar account use, which would, in this day and age, gut the privacy interests that Congress sought to protect.  Social networking sites, personal finance sites and apps, as well as other entities like shopping sites, news sources, and e-mail providers that allow users to create accounts and login would all have license to use autodialers to send messages or make calls anytime a user signed in from a new browser, and without regard to whether their communication was in fact being directed at the actual user.  In short, contrary to Facebook's suggestion, the Act as presently constituted goes exactly as far as necessary to serve Congress's purpose, and no further, and is therefore narrowly tailored to suit its congressional purpose.

## <u>CONCLUSION</u>

For the foregoing reasons, should the court reach the question, it should conclude that § 227(B)(1)(A)(iii) is constitutional.

1   DATED: December 11, 2015          Respectfully submitted,

2                                     BENJAMIN C. MIZER
3                                     Principal Deputy Assistant Attorney General

4                                     ERIC R. WOMACK
5                                     Assistant Director, Federal Programs Branch

6                                      _/s/ Bailey W. Heaps_
                                      BAILEY W. HEAPS (CA Bar No. 295870)
7                                     AIMEE WOODWARD BROWN
                                      Trial Attorneys
8                                     U.S. Department of Justice
                                      Civil Division, Federal Programs Branch
9                                     20 Massachusetts Avenue NW
                                      Washington, D.C. 20530
10                                    Telephone: (202) 514-1280
                                      Facsimile: (202) 616-8470
11                                    Bailey.W.Heaps@usdoj.gov

12
                                      *Counsel for the United States of America*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28