Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (SBN 304635)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com

Andrew B. Clubok (admitted *pro hac vice*)
Susan E. Engel (admitted *pro hac vice*)
Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com

Attorneys for Defendant
*Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH DUGUID, *individually and on behalf of all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>        Defendant. | CASE NO.: 3:15-cv-00985-JST<br><br>**FACEBOOK, INC.'S RESPONSE TO THE UNITED STATES OF AMERICA'S BRIEF AS INTERVENOR**<br><br>Complaint Filed Date: March 3, 2015<br><br>Judge:       Hon. Jon S. Tigar<br>Hearing Date:  N/A<br>Time:        N/A<br>Courtroom:    Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.      THE TCPA DOES NOT PROHIBIT The ALLEGED LOGIN
NOTIFICATIONS. ........................................................................................ 3

II.     THE TCPA IS A CONTENT-BASED SPEECH RESTRICTION. ............................. 4

      A.     UNDER REED, THE TCPA IS CONTENT-BASED. ..................................... 4

             1.     THE TCPA IS "RIDDLED" WITH EXEMPTIONS THAT
REQUIRE SCRUTINY OF THE CONTENT OF SPEECH IN
ORDER TO DETERMINE LIABILITY. .................................................. 5

             2.     CONGRESS'S INTEREST IN RESTRICTING SPEECH OR
MAKING EXEMPTIONS IS IRRELEVANT IN
DETERMINING WHETHER THE TCPA IS ON ITS FACE
CONTENT-BASED. ........................................................................... 8

      B.     THE NINTH CIRCUIT HAS SUGGESTED THAT THE TCPA'S
MULTIPLE EXCEPTIONS RENDER IT CONTENT-BASED. .................... 11

      C.     THE COMMERCIAL SPEECH DOCTRINE IS INAPPLICABLE ............... 12

III.    THE TCPA CANNOT SURVIVE STRICT SCRUTINY AS APPLIED TO
THE LOGIN NOTIFICATIONS ...................................................................... 14

CONCLUSION ...................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Am. Civil Liberties Union,*
    542 U.S. 656 (2004).................................................................................................15

*Board of Trustees v. Fox,*
    492 U.S. 469 (1989).................................................................................................11

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983).............................................................................................2, 13

*Brown v. Town of Cary,*
    706 F.3d 294 (4th Cir. 2013)...................................................................................10

*Cahaly v. Larosa,*
    796 F.3d 399 (4th Cir. 2015) ..........................................................................1, 9, 17

*Carey v. Brown,*
    447 U.S. 455 (1980)...................................................................................................9

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980)...........................................................................................11, 12

*Charles v. City of Los Angeles,*
    757 F. Supp. 2d 989 (C.D. Cal. 2010) ....................................................................14

*Citizens United v. FEC,*
    558 U.S. 310 (2010).................................................................................................16

*City of Ladue v. Gilleo,*
    512 U.S. 43 (1994)...................................................................................................11

*Dana's R.R. Supply v. Attorney General,*
    807 F.3d 1235 (11th Cir. 2015) ..............................................................................12

*Flores v. Adir Int'l, LLC,*
    No. 15-cv-00076-AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015).......................3

*Foti v. City of Menlo Park,*
    146 F.3d 629 (9th Cir. 1998) ...............................................................................9, 15

*Gomez v. Campbell-Ewald Co.,*
    768 F.3d 871 (9th Cir. 2014) .................................................................2, 11, 12, 15

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., Inc.,*
    No. 14-CV-0437-CW, 2014 WL 5812294 (N.D. Cal. Nov. 7, 2014).......................14

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................................9

*Hunt v. City of Los Angeles*,
638 F.3d 703 (9th Cir. 2011) ...........................................................13

*L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*,
No. 15-CV-01257-JST, 2015 WL 4397706 (N.D. Cal. July 17, 2015) ...........14

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014) ........................................................................5

*Mims v. Arrow Fin. Servs., LLC*,
132 S. Ct. 740 (2012) ........................................................................17

*Moser v. FCC*,
46 F.3d 970 (9th Cir. 1995) ..............................................................11

*Norton v. City of Springfield*,
806 F.3d 411 (7th Cir. 2015) ........................................................1, 10

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1222, 1250–52 (N.D. Cal. 2014) ..............................14

*Pittsburgh Press Co. v. Human Relations Comm'n*,
413 U.S. 376 (1973) ..........................................................................12

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ............................................................................8

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) ................................................................*passim*

*Reed v. Town of Gilbert*,
707 F.3d 1057 (9th Cir. 2013) ............................................................9

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002) ..........................................................................16

*Republican Party of Minnesota v. White*,
416 F.3d 738 (8th Cir. 2005) ............................................................15

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991) ..........................................................................17

*Turner Broadcasting Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ..........................................................................15

*United Bhd. of Carpenters & Joinders of Am. Local 586 v. NLRB*,
540 F.3d 957 (9th Cir. 2008) ..............................................................5

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976)..................................................................................................12

*Williams v. T-Mobile USA, Inc.*,
    No. 15-CV-03384-JSW, 2015 WL 5962270 (N.D. Cal. Oct. 14, 2015)...........................3

*Yeager v. Cingular Wireless LLC*,
    673 F. Supp. 2d 1089 (E.D. Cal. 2009)...................................................................14

**Statutes**

47 U.S.C. § 227............................................................................................4, 5, 6, 17

Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584...................5, 7

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................18

**Other Authorities**

H.R. Rep. No. 102-317 (1991)..............................................................................17

*In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*,
    27 FCC Rcd. 13615 (2012)....................................................................................6

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Pro. Act of 1991*,
    7 FCC Rcd. 8752 (1992)...............................................................................4, 5, 6

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    27 FCC Rcd. 1830 (2012)......................................................................................7

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
    30 FCC Rcd. 7961 (2015)...............................................................................3, 4, 6

*Random House Webster's College Dictionary* 431 (2d ed. 2000)........................................4

S. Rep. No. 102-178, at 1 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 1968 ......................17

# <u>INTRODUCTION</u>

The government agrees that this Court should first address Facebook's two nonconstitutional arguments that the TCPA does not apply to the alleged login notifications. Because Plaintiff has not plausibly alleged that these individualized text messages were sent using an ATDS and because the texts would otherwise qualify for the emergency exception, the Court need not reach the First Amendment question. Nevertheless, if the Court adopts an interpretation of the TCPA that allows Plaintiff's claim to proceed, that interpretation is incompatible with the First Amendment, as applied to the alleged login notifications, and the Complaint should be dismissed on constitutional grounds.

In *Reed v. Town of Gilbert*, the Supreme Court held that where a statute on its face draws distinctions based on the message conveyed, it is a content-based restriction subject to strict scrutiny, however admirable the government interest behind the law. 135 S. Ct. 2218, 2228 (2015) ("[S]trict scrutiny applies ***either*** when a law is content based on its face ***or*** when the purpose and justification for the law are content based.") (emphasis added). The TCPA, with its exceptions, is such a content-based speech restriction on its face. To avoid strict scrutiny, the government attempts to cabin the impact of *Reed*. It argues that *Reed* applies only where the statute is riddled with exemptions, Gov't Br., Dkt. 44, at 11-12, only where the government exempts speech that implicates the same government interest, *id.* at 11-13, and only where the government's purpose is not the privacy interests of others, *id.* at 14-15. But *Reed* is not so limited. As both the Fourth and Seventh Circuits have recently explained, *Reed* clarified the law on content-based discrimination. *Reed* held that (1) in determining whether a statute is content-based or content-neutral on its face, "the government's justification or purpose in enacting the law is irrelevant," *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (striking down robocall statute), and (2) a statute is content-based on its face when it prohibits speech because of the topic or subject matter discussed, regardless of whether the government is seeking to make the law less restrictive, *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015) (striking down panhandling ordinance). As a result, the government's interest in making exemptions or in enacting the TCPA does not neutralize it.

Moreover, the government is wrong that the TCPA treats "all calls and texts" uniformly, except for emergency calls. Gov't Br. 12. The TCPA gives the FCC authority to exempt whatever

calls it decides do not "adversely affect" privacy interests, which the FCC has said includes, for example, calls about prescription notifications and medical appointments. The TCPA was also recently amended to exempt calls seeking to collect government (but not private) debt. These exemptions require precisely the type of careful parsing of communicative content that *Reed* held triggers strict scrutiny and is "presumptively unconstitutional." 135 S. Ct. at 2226.

Contrary to the government's flawed assertion, Gov't Br. 6, **no** court has rejected, let alone addressed, an argument like Facebook's that the TCPA's exceptions render it content-based and subject to strict scrutiny. Indeed, the Ninth Circuit in *Gomez v. Campbell-Ewald Co.* practically invited a content-based challenge premised on the TCPA's exceptions. 768 F.3d 871, 876 n.3 (9th Cir. 2014) (suggesting that the defendant could have argued that the TCPA "is no longer content neutral" based on "implementing regulations"), *cert. granted on other grounds*, 135 S. Ct. 2311. Nor is there any basis for the government's contention that Facebook's security notifications constitute "commercial speech." To get there, the government misapplies the commercial speech doctrine, claiming that the speech must be commercial because Facebook generally offers this security setting in connection with its service. This is contrary to black-letter law, which holds that alleged "economic motivation" is "clearly . . . insufficient by itself to turn" a communication "into commercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983).

The TCPA does not survive strict scrutiny if the statute is construed to ban Facebook from sending login notifications to phone numbers that people link to Facebook accounts (even if erroneously, as Plaintiff alleges). Such a construction is both underinclusive—since it excludes from liability a slew of calls that may equally disturb people's privacy (such as unwanted calls about government debt)—and overinclusive—since it bars all sorts of noncommercial, non-telemarketing communications that people want (such as notifications about account security). Congress's purpose in enacting the TCPA was to protect residential privacy from harassing telemarketing calls that are made at random and en masse. That is not what happened here. The application of the TCPA advocated by Plaintiff and the government would chill useful speech that people want from Facebook and that is a routine, ordinary occurrence in today's society where people receive safety alerts or learn that a food delivery or ride is coming by text message. If the Court reaches the

1  constitutional question, it should find that the TCPA is unconstitutional as applied to Facebook's

2  login notifications and dismiss the case with prejudice.

## ARGUMENT

**I.    THE TCPA DOES NOT PROHIBIT THE ALLEGED LOGIN NOTIFICATIONS.**

5      As a threshold matter, Facebook agrees with the government that this case need not be

6  resolved on constitutional grounds.  Gov't Br. 5.  That is because Plaintiff fails to state a claim under

7  the TCPA for two independent reasons.

8      *First*, as explained in Facebook's opening and reply briefs, Facebook Mem. in Support of

9  Mot. to Dismiss, Dkt. 24, at 7–12; Facebook Reply in Support of Mot. to Dismiss, Dkt. 31, at 2–9,

10  "the content of the message, the context in which it was received, and the existence of similar

11  messages" all weigh against an inference that the login notifications were sent using an ATDS.

12  *Flores v. Adir Int'l, LLC*, No. 15-cv-00076-AB (PLAx), 2015 WL 4340020, at *5 (C.D. Cal. July 15,

13  2015) (quotation marks omitted).  The content of each message—stating that a specific Facebook

14  account was accessed from a particular device at a particular time—was not random or impersonal,

15  but directly targeted the phone number that Plaintiff allegedly uses.  There is no plausible inference

16  that anyone else received the same message.  The context of each message was not mass marketing

17  but a desire to notify a specific Facebook user associated with that phone number (and who had

18  elected to receive such notifications) about potentially unauthorized attempts to access a Facebook

19  account.  And the fact that Plaintiff received other similar messages underscores that Plaintiff's

20  number was not called randomly.  *See Williams v. T-Mobile USA, Inc.*, No. 15-CV-03384-JSW,

21  2015 WL 5962270, at *3 (N.D. Cal. Oct. 14, 2015) (dismissing TCPA claim where plaintiff's

22  allegation suggested defendant intended to call plaintiff about a debt owed).   At bottom, Plaintiff's

23  allegations suggest human intervention, not the random or en masse dialing required for an ATDS.

24  *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30

25  FCC Rcd. 7961, 7975 (2015) ("2015 Order") ("[T]he basic functions of an autodialer are to dial

26  numbers without human intervention and to dial thousands of numbers in a short period of time."

27  (quotation marks omitted)).

28

*Second*, as also explained in Facebook's opening and reply briefs, Facebook Mot. at 12–15; Facebook Reply at 9–12, the alleged login notifications fall within the "broad exception," *In the Matter of Rules & Regulations Implementing the Tel. Consumer Pro. Act of 1991*, 7 FCC Rcd. 8752, 8778 ¶ 50 (1992) ("1992 Order"), for calls "made for emergency purposes," 47 U.S.C. § 227(b)(1)(A). They provide information about an "urgent … unexpected occurrence requiring immediate action," *Random House Webster's College Dictionary* 431 (2d ed. 2000): a potential data breach, with its concomitant risks to the security of personal information. The FCC has previously recognized the urgency and import of such messages, 2015 Order, 30 FCC Rcd. at 8025–26 ¶¶ 130, 132.

Because this case can be resolved on either of these two statutory grounds, the Court should grant Facebook's motion to dismiss without reaching the constitutional question. Nonetheless, if the Court holds that TCPA liability may be based on allegations that a social media company sent a targeted message to a phone number that a user registered in order to be warned about a specific security threat, and if the Court holds that the alleged messages are not exempt as emergency communications, then it should hold that the TCPA violates the First Amendment as applied to such speech.

## II.     THE TCPA IS A CONTENT-BASED SPEECH RESTRICTION.

The Supreme Court held unequivocally in *Reed v. Town of Gilbert* that when a statute generally prohibits a certain manner of speech but contains exceptions that "draw[] distinctions based on the message a speaker conveys," it is a content-based restriction of speech and thus subject to strict scrutiny. 135 S. Ct. 2218, 2227 (2015). A straightforward application of *Reed*'s "clear and firm rule," *id.* at 2231, requires this Court to conclude that the TCPA is a content-based restriction, because it allows some calls but bans others based on the subject matter and purpose of the message.

### A.     Under *Reed*, The TCPA Is Content-Based.

To avoid the strict scrutiny that *Reed* requires for content-based speech restrictions, the government casts the TCPA as a content-neutral statute that protects the rights of unwilling listeners and bans all calls for which consent has not been given, except "just one type of call or text" that does "not implicate the privacy interests Congress sought to protect." Gov't Br. 12. But to make

that argument, the government seriously mischaracterizes both the statute and the law: (1) the TCPA is in fact "riddled" with exemptions, *id.* at 11, just like the statute in *Reed*, and (2) *Reed* makes clear that the government's interest in restricting speech is not relevant to the threshold inquiry whether the restriction is content-based on its face.

### 1. The TCPA Is "Riddled" With Exemptions That Require Scrutiny Of The Content Of Speech In Order To Determine Liability.

The government is simply wrong that, other than calls conveying information about emergencies, "all calls and texts are treated uniformly," and that the TCPA exempts only "a narrow band of speech." Gov't Br. 12. As discussed below, in addition to emergency calls, 47 U.S.C. § 227(b)(1)(A),(B), the TCPA exempts calls the FCC determines do "not adversely affect the privacy rights" the TCPA was meant to protect, *id.* § 227(b)(2)(B)(ii)(I), (b)(2)(C), as well as calls to collect debt owed to the government, *see* Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584. Taken alone or together, these exceptions confirm that what the government seeks to present as a general regulation of the time, place, or manner of speech is in fact a regime where the government is picking and choosing what speech is desirable and what speech is not. This is the hallmark of a content-based restriction of speech. *See, e.g.*, *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (noting that a statute is content-based "if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred" (quotation marks omitted)); *United Bhd. of Carpenters & Joinders of Am. Local 586 v. NLRB*, 540 F.3d 957, 966 (9th Cir. 2008) ("We … reiterate that the examination of the content of a speaker's message is the hallmark of a content-based rule.").

In its prior briefing, Facebook Mot. at 15–18; Facebook Reply at 12–15, Facebook discussed how the exemption for "a call made for emergency purposes" is content-based. 47 U.S.C. § 227(b)(1)(A), (B). Whether a call fits within this "emergency" exception can be determined only by reviewing the content of the call and whether the message relayed information about an urgent situation. And that is what the FCC has actually done when faced with requests to exempt calls under the emergency exception. *See* 1992 Order, 7 FCC Rcd. at 8778 ¶ 51 (describing exception as applying to calls that "speed the dissemination of information regarding service interruptions or

other potentially hazardous conditions to the public," and exempting "autodialed calls" that "notify[] customers of potential power outages, maintenance, or termination"); *In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*, 27 FCC Rcd. 13615, 13628 ¶¶ 26–28 (2012) (observing that the emergency exception allows the use of autodialers to "convey emergency information, for example, the location of an automobile accident"). The content of the communication determines whether the emergency exception is triggered. That is why *Reed* emphasized that a law that "defin[es] regulated speech by its … purpose" is a law that is facially content-based and "subject to strict scrutiny." 135 S. Ct. at 2227; *see also id.* at 2231 (noting that a provision that called for assessing the "purpose[]" of a sign was "obvious[ly] content-based").[1]

While the emergency exception is a clear example in light of the login notifications alleged here, it is not the only way the TCPA draws lines based on the content of speech. The TCPA grants the FCC authority to exempt artificial or prerecorded voice calls from liability if the calls do "not adversely affect the privacy rights that this section is intended to prevent." 47 U.S.C. § 227(b)(2)(B)(I). The FCC also has authority to exempt from liability calls made to a wireless number with an ATDS if the calls "are not charged to the called party" and are "in the interest of the privacy rights this section was intended to prevent." *Id.* § 227(b)(2)(C). Again, the only way for the FCC to determine whether a call qualifies for this exemption is to weigh the content of the call against the statute's vague "privacy-promoting" standard.

And that is exactly how the FCC has interpreted Congress's direction to exclude privacy-promoting calls from TCPA liability. In the FCC's most recent order, it undertook a detailed examination of the content of certain communications that banks and healthcare providers wanted to provide, and it picked which ones to exempt based on what the message said. *See* 2015 Order, 30 FCC Rcd. at 8023 ¶ 127 (exempting calls about "(1) transactions and events that suggest a risk of

---

[1] Just like Plaintiff, the government misses the mark in claiming that the exception "turns on the context of an emergency" and not the content of the message. Gov't Br. 14 & n.4. As Facebook pointed out in its reply brief, this interpretation makes no sense. Facebook Reply at 12, n.11. The FCC's implementation of the exception makes clear that what is said, not when or where it is said, is what matters. *See, e.g.*, 1992 Order, 7 FCC Rcd. at 8778 ¶¶ 50–51. Otherwise, any message sent during an earthquake or power outage would qualify for the emergency exception, regardless of whether the message conveyed critical safety information or a joke.

fraud or identity theft; (2) possible breaches of the security of customers' personal information; (3) steps consumers can take to prevent or remedy harm caused by data security breaches; and (4) actions needed to arrange for receipt of pending money transfers" based on what is being said in the message (quotation marks omitted)); *id.* at 8030 ¶ 143 (exempting calls about "vital, time-sensitive information" healthcare patients "welcome, expect and often rely on to make informed decisions including: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post- discharge follow-up intended to prevent readmission, prescription notifications, home healthcare instructions, available payment options, insurance coverage payment outreach and eligibility, account communications and payment notifications, Social Security disability eligibility, and 'health care messages' as defined by HIPAA"). Given the malleability of the word "privacy," the FCC has even applied this exception to calls about mundane matters like payment options for medical appointments. *See id.*; *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1852–56 ¶¶ 57–65 (2012) (invoking the exception to allow certain health care-related calls). As the FCC's rulings show, this broad exception all but mandates close government examination of the content of particular speech.

That still is not all of the content-based exceptions to the TCPA, though. As the government admits in a footnote, Gov't Br. 3 n.1, Congress recently amended the TCPA to exempt from liability any call "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584.[2] This exemption plainly "draws distinctions based on the [call's] communicative content." *Reed*, 135 S. Ct. at 2228. The only way to determine whether a call qualifies is to examine what the caller said to the called party: did the caller discuss "a debt owed to or guaranteed by the United States"? In fact, it is difficult to imagine

---

[2] Facebook did not previously cite this amendment because it was enacted only after the briefing on Facebook's motion to dismiss was completed. It is nonetheless relevant, because in assessing whether the TCPA is a facially content-based speech restriction, this Court looks at the statute as it now stands, especially in light of Plaintiff's request for forward-looking injunctive relief. (Compl. at 11 (seeking "[i]njunctive relief prohibiting such violations of the TCPA by Defendant in the future").) The government's reference to this exception and refusal to defend it only underscores that it is yet another basis on which to find the TCPA is content-based.

a more blatant example of the government choosing speech that it clearly favors for naked financial reasons (debt collection calls about government-issued or government-backed debt) over speech that it does not (for example, other debt collection calls).

### 2. Congress's Interest In Restricting Speech Or Making Exemptions Is Irrelevant In Determining Whether The TCPA Is On Its Face Content-Based.

Ignoring the "privacy-promoting" and government debt exceptions, the government argues that the TCPA is content neutral because the emergency exception is purportedly "unrelated to the significant government interest at stake," Gov't Br. 12–13[3]—which the government says is the protection of "unwilling listeners inside of the home," *id.* at 15. But the Supreme Court was unequivocal in *Reed* that the threshold inquiry into whether a statute is content-based (as opposed to the application of the appropriate level of scrutiny) looks at Congress's purpose ***only*** when the statute on its face does not draw distinctions based on the content of the speech. As in *Reed*, the government here:

> skips the crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face. ***A law that is content-based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech***. . . . [I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment, and a party opposing the government need adduce no evidence of an improper censorial motive. Although a content-based purpose may be sufficient in certain circumstances to show that a regulation is content-based, it is not necessary. In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral.

---

[3] *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), does not remotely support the government's proposition that a statute is content neutral where it prohibits "a narrow band of speech … unrelated to the significant government interest at stake." Gov't Br. 12. In *R.A.V.*, the Supreme Court invalidated a regulation of unprotected speech ("fighting words") that "impose[d] special prohibitions on those speakers who express views on disfavored subjects." 505 U.S. 377, 391 (1992). It recognized, however, that when "the basis for the content discrimination" of proscribable speech (that is, speech not protected under the First Amendment) "consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists," *id.* at 388. *See also* Gov't Br. 13. But this case plainly does not involve a regulation of ***unprotected*** speech—and the government has not argued otherwise— nor does it involve a claim of viewpoint discrimination. Here, there is no "reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, [that] is also neutral enough to form the basis of distinction within the class." *Id.* at 388.

*Reed*, 135 S. Ct. at 2228 (emphasis added, quotation marks and citations omitted). The inquiry into the law's justification and purpose is reserved for laws that are "facially content-neutral" but are challenged as having a content-based purpose. *Id.* at 2228–29. And that is decidedly not this case.[4] This case involves a law that ***facially*** restricts speech on the basis of its content. Laws that do so are content-based. *See, e.g.*, *Carey v. Brown*, 447 U.S. 455, 460 (1980) (striking down picketing statute where the exemptions made the statute "discriminate[] between lawful and unlawful conduct based upon the content of the demonstrator's communication"); *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998) ("[W]hen exceptions to [a] restriction on noncommercial speech are based on content, the restriction itself is based on content." (quotation marks omitted)), *as amended on denial of reh'g* (July 29, 1998).

The government ultimately is asking this Court to ignore *Reed*'s "crucial first step,"[5] arguing that *Reed* had no meaningful impact on First Amendment law. That is wrong. As other courts have recognized, *Reed* brought needed clarity to the content neutrality analysis. In *Cahaly v. Larosa*, the Fourth Circuit struck down a statute similar to the TCPA that banned robocalls that were "'for the purpose of making an unsolicited consumer telephone call'" or were "'of a political nature . . . ,'" with certain exceptions. 796 F.3d 399, 402 (4th Cir. 2015). The Fourth Circuit recognized that *Reed* "conflicts with, and therefore abrogates, our previous description of content neutrality," under which

---

[4] The government is also wrong in describing the interests underlying the TCPA and its exemptions. The same "annoyance" that Plaintiff claims to experience when receiving a login notification that someone else requested applies equally to receiving an exempted call about a power outage relevant to someone else or a message about someone else's bank account or someone else's debt to the government or someone else's prescription. Likewise, the government's claim that the login notifications involve "unwilling listeners inside of the home" is without support. Nothing in Plaintiff's allegations, which all concern text messages to a cell phone number, suggest that he received the messages inside of the home, to the extent that matters (which it does not).

[5] In making this argument, the government relies extensively on the Supreme Court's earlier decision in *Hill v. Colorado*, which upheld as content-neutral a statute that made no reference to the content or subject matter of speech. 530 U.S. 703, 723 (2000). In contrast to the *Hill* statute, the TCPA indisputably draws distinctions on its face based on the subject matter and topic of the message. In relying on *Hill*, the government falls into the same trap that led the Ninth Circuit to be reversed in *Reed*: like the government here, the Ninth Circuit erroneously concluded that the statute was content neutral where "'Gilbert did not adopt its regulation of speech because it disagreed with the message conveyed.'" *Reed*, 135 S. Ct. at 2226 (quoting *Reed v. Town of Gilbert*, 707 F.3d 1057, 1071 (9th Cir. 2013) (citing *Hill*, 530 U.S. at 703, 707, 719–20) (quotation marks omitted)).

"'a regulation [that] is *justified* without reference to the content of regulated speech'" would have been "'deem[ed] . . . content neutral even if it facially differentiates between types of speech.'" *Id.* at 405 (quoting *Brown v. Town of Cary*, 706 F.3d 294, 303 (4th Cir. 2013) (emphasis added)). The formula the Fourth Circuit rejected is exactly the same constitutional formula the government advances here. But as the Fourth Circuit recognized, when a statute makes "facial content distinctions," *Reed* bars the court from "reach[ing] the second step to consider the government's regulatory purpose." *Id.*

Likewise, the Seventh Circuit invalidated a municipal ordinance prohibiting panhandling or oral requests for money in a downtown area, but allowing signs and oral requests for deferred donations. *See Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015). The Seventh Circuit held that "*Reed* understands content discrimination differently" than the Seventh Circuit had previously. *Id.* Instead of looking to whether a regulation "restricts speech because of the ideas it conveys" or "because the government disapproves of its message," *id.*, "*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." *Id.* The Seventh Circuit concluded that the fact that an exemption seeks to *narrow* a law "now pertains to the justification stage of the analysis rather than the classification stage" of whether a law is content neutral or content-based.[6] *Id.* at 412–13.

Both of these recent decisions foreclose the arguments the government makes here to avoid strict scrutiny. However laudable Congress's purpose behind creating carve-outs for certain types of speech, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 135 S. Ct. at 2228. Banning some calls and exempting others "may seem like a perfectly rational way to regulate [calls], but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'" *Id.* at 2231

---

[6] The Seventh Circuit also recognized that the views expressed in Justice Kagan's concurring opinion have no precedential value. *See Norton*, 806 F.3d at 412. The government, however, advances the concurrences at various points, evidencing the problems that the majority opinion poses for the government's position. Gov't Br. 10, 13.

(quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)). The government's discussion about Congress's purported purposes for the TCPA cannot alter the fact that the TCPA's exceptions render it facially content-based.

### B. The Ninth Circuit Has Suggested That The TCPA's Multiple Exceptions Render It Content-Based.

Recognizing that *Reed* is fatal to its purpose-based arguments for the TCPA's content-neutrality, the government seeks refuge in prior Ninth Circuit cases addressing First Amendment challenges to the TCPA. Gov't Br. 5–8. But the government's claim that "[t]he Ninth Circuit [h]as [a]lready [r]ejected [i]dentical First Amendment [c]hallenges to the TCPA," *id.* at 6, is incorrect. Neither the Ninth Circuit, nor any other court has ever addressed whether the TCPA's amorphous ***exceptions***, including the recently-enacted debt collection exception, render it a content-based restriction on speech. The two Ninth Circuit cases that the government relies on—*Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995), and *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), *cert granted on other grounds*, 135 S. Ct. 2311 (2015)—merely assumed, without being faced with ***any*** argument to the contrary, that the TCPA was content neutral and did not apply strict scrutiny.

In *Moser*, the court addressed a First Amendment challenge to the TCPA's restriction on artificial or prerecorded voice calls. 46 F.3d at 972. But the First Amendment argument before the court was not about whether the statute was content-based; instead, the plaintiff argued "that a selective ban on automated, commercial calls is unjustified because there is no evidence that such calls are more intrusive than either 'live' or noncommercial calls." *Id.* at 974. The Ninth Circuit disagreed, and along the way rejected the district court's determination that because "the statute itself distinguished between commercial and noncommercial calls," it should be "analyzed . . . under the test for regulation of commercial speech articulated in" *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 564 (1980), and *Board of Trustees v. Fox*, 492 U.S. 469, 480 (1989). *Moser*, 46 F.3d at 973. The Ninth Circuit instead approached the statute as a "time, place, and manner restriction" because the TCPA "regulates all automated telemarketing calls without regard to whether they are commercial or noncommercial." *Id.*

In *Gomez*, the Ninth Circuit rejected an argument "that the government's interest only extends to the protection of residential privacy, and that therefore the statute is not narrowly tailored to the extent that it applies to cellular text messages." 768 F.3d at 876. But like *Moser*, it did not address whether the increasingly sprawling exceptions to the TCPA render it a content-based restriction of speech. In fact, far from rendering Facebook's challenge "foreclosed by Circuit precedent," Gov't Br. 6, *Gomez* previewed the argument that Facebook makes. In a footnote, the Ninth Circuit expressly acknowledged both that it was not addressing an argument that the statute was content-based and that "some implementing regulations" have exceptions that "distinguish between commercial and noncommercial calls," which could render the statute not "content neutral." *Id.* at 876 n.3. The TCPA's exceptions (statutory and regulatory) slice and dice the TCPA's general ban based on the messages communicated and form the gravamen of Facebook's challenge.

## C. The Commercial Speech Doctrine Is Inapplicable

The government next attempts to duck *Reed* by arguing that this Court should uphold the TCPA as "a valid restriction of commercial speech." Gov't Br. 16. But to bring Facebook's security alerts within the ambit of the commercial speech doctrine, the government mangles the doctrine beyond recognition. Commercial speech is a "narrow category of necessarily expressive communication," *Dana's R.R. Supply v. Attorney General*, 807 F.3d 1235, 1246 (11th Cir. 2015), that is "related solely to the economic interests of the speaker and its audience," *Cent. Hudson*, 447 U.S. at 561, and "does 'no more than propose a commercial transaction,'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 385 (1973)).

It is simply not plausible to say that login notifications ***do no more*** than propose a commercial transaction—they do not propose any transaction at all: a user requests them, and they are sent for security reasons. As alleged, login notifications "send [a user] an alert each time someone logs into [that user's] account from a new place." (Compl. Ex. A (Facebook Help Center page titled "What are login notifications").) After a user registers a phone number, and elects to have login notifications sent by text, Facebook sends that number a login notification if someone tries to access the Facebook account connected with that phone number from an "unfamiliar device

or location." (*Id.*)  The text identifies where the account was accessed from and the precise time of access. (Compl. ¶ 22; *see also* Compl. Ex. D (attaching cell phone screenshots of login notifications).)  The user then can log in and "reset [the] password and secure [the] account." (Compl. Ex. A.)  The login notifications are thus a feature provided by Facebook to its users to ensure better security and safety.

Despite the absence of any proposed commercial transaction, the government claims that Facebook's login notifications are commercial speech under the three "*Bolger* factors."  Gov't Br. 17 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).  Courts have held that in close cases, where it is not clear whether speech proposes a commercial transaction, speech may still be characterized as commercial *if* "the speech is an advertisement, the speech refers to a particular product, **and** the speaker has an economic motivation."  *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011) (emphasis added, quotation marks omitted).  Yet the government admits that the first factor, whether the speech is an advertisement, is not met.  Gov't Br. 18 ("Facebook's notification messages are not advertisements in the traditional sense.").  And it concedes that the second factor, whether the speech refers to a particular product, is met "only in passing" with the reference to a "user account."  *Id.*  Even if this passing reference to a user account were somehow considered commercial speech, it would "not retain its commercial character" because "it is inextricably intertwined with otherwise fully protected speech," namely, a security message, and "can [not] be easily separated."  *Hunt*, 638 F.3d at 715.  Indeed, it is hard to understand how Facebook could notify a user about the security of an account without referring to the account.

The government is thus left with unsupported references to economic motivation.  But that single factor is insufficient, since the *Bolger* factors only "**in combination**, support[ ]" a conclusion that speech is commercial.  *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) (emphasis added; quotation omitted).  Just as a "reference to a specific product does not by itself render the pamphlets commercial speech," neither does "the fact that [defendant] has an economic motivation for [the speech]."  *Bolger*, 463 U.S. at 66-67.  Economic motivation comes into play in order to **confirm** that a message is commercial speech when the message "is an advertisement" and "the speech refers to a particular product."  *Hunt*, 638 F.3d at 715.  With a message that proposes no

commercial transaction, is not an advertisement, and references a product only because it would be impossible to send a security alert without doing so, economic motivation alone is plainly insufficient.[7]

Moreover, the government's sweeping version of the commercial speech doctrine is without any support in the law. In essence, the government argues that because the login notifications come from Facebook—a commercial entity—and have a connection with a product it offers—the Facebook service—the notifications must be commercial speech. That is far too broad. Indeed, under the government's test, it is difficult to conceive of what type of speech by a business to its customers would *not* qualify as commercial speech. A company that sends an information bulletin to its customers that encourages them to petition their legislature for tort reform or that recommends certain candidates for office? Commercial speech, the government would say, because the business "undeniably had an economic motivation for sending the messages." Gov't Br. 18. A company that wants to provide people with alerts from its news service? Commercial speech, the government would say, because it may generate interest in subscriptions. *Id.* And so on. The government articulates no limiting principle for its sprawling conception of the commercial speech doctrine.

## III. THE TCPA CANNOT SURVIVE STRICT SCRUTINY AS APPLIED TO THE LOGIN NOTIFICATIONS

As applied to Facebook's login notifications, the TCPA does not survive strict scrutiny because it is both under- and overinclusive, on the one hand excluding from liability speech based on

---

[7] The government can find no support for its boundless theory in the various district court cases it cites. Gov't Br. 18–20. In *L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*, the court held that statements *on a receipt* that was emailed following a completed transaction and that touted Uber's safety policies could plausibly be considered commercial speech under the "propose a commercial transaction" test, because they plausibly proposed a continued business relationship. No. 15-CV-01257-JST, 2015 WL 4397706, at *7-8 (N.D. Cal. July 17, 2015) (quotations omitted). Similarly, *Yeager v. Cingular Wireless LLC* involved a published pamphlet that touted a company's program for restoring service following a natural disaster and that the company admitted was functioning as an advertisement intended to generate interest in its services. 673 F. Supp. 2d 1089, 1093–94 (E.D. Cal. 2009). The remaining cases all deal with clearly commercial documents promoting specific products and designed to "propose a continued business relationship." *Heartland Payment Sys., Inc. v. Mercury Payment Sys., Inc.*, No. 14-CV-0437-CW, 2014 WL 5812294, at *6 (N.D. Cal. Nov. 7, 2014) (monthly billing statements); *see also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1250–52 (N.D. Cal. 2014) (emails encouraging people to sign up for a product); *Charles v. City of Los Angeles*, 757 F. Supp. 2d 989, 1003 (C.D. Cal. 2010) (billboard advertisement for television show).

its content that may equally disrupt privacy, and on the other hand imposing liability for speech that people actually want. Expanding the TCPA to encompass the alleged login notifications takes the Act far from its heartland of regulating telemarketing calls made with specialized telemarketing equipment and undeniably chills speech by penalizing companies like Facebook for providing information and services that people want about their accounts.

The Supreme Court recently reminded courts that content-based restrictions of speech are "presumptively unconstitutional," *Reed*, 135 S. Ct. at 2226, and subject to "the most exacting standard of review," *id.* at 2237 (Kagan, J., concurring), no matter "the government's benign motive, content-neutral justification, or lack of animus to the ideas contained in the regulated speech," *id.* at 2228 (quotation marks omitted). The TCPA cannot survive this "most exacting scrutiny," *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994), because it is not "the least restrictive means to further a compelling interest," *Foti*, 146 F.3d at 637.

Contrary to the version articulated in the government's brief, Gov't Br. 20–25, the "purpose of the [strict scrutiny] test is not to consider whether the challenged restriction has some effect in achieving Congress' goal. . . . The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005).

The TCPA, with its amorphous exceptions, cannot survive strict scrutiny. For purposes of this motion, Facebook has assumed that the government has a compelling interest in promoting "residential privacy," which is the interest the Ninth Circuit identified as a "significant interest" for purposes of intermediate scrutiny, *Gomez*, 768 F.3d at 876, and the interest cited by the government, Gov't Br. 22. The TCPA nevertheless flunks the least restrictive means prong of the strict scrutiny test for three independent reasons.

**First**, like the statute in *Reed*, the TCPA's expansive exceptions render it "hopelessly underinclusive" as applied here. 135 S. Ct. at 2231. While the government waives the banner of "residential privacy," to justify the application of the TCPA to what the government describes as "unwanted communications" from Facebook, Gov't Br. 4, 13, 23, the speech that the TCPA exempts is equally intrusive. Unwanted calls about emergencies are no greater an intrusion of privacy than unwanted calls about account information. Unwanted calls about medical appointments or prescriptions may be at least as annoying as unwanted calls about a data breach. And finally—and most obviously—unwanted calls about government debt are no less invasive than unwanted calls about private debt. The (increasing) patchwork of exceptions that pocks the TCPA causes it to fail the tailoring prong of strict scrutiny. As was the case in *Reed*, the government "cannot claim that placing strict limits on [some calls] is necessary to [promote residential privacy] while at the same time allowing unlimited numbers of other types of [calls] that create the same problem." 135 S. Ct. at 2231. "In light of this underinclusiveness, the [government] has not met its burden to prove that [the TCPA] is narrowly tailored to further a compelling government interest." *Id.* at 2232. Because a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited," *Republican Party of Minn. v. White,* 536 U.S. 765, 780 (2002), the TCPA fails strict scrutiny as applied to Facebook's login notifications.

**Second**, the application of the statute here is also overinclusive. If the point of the TCPA is to prevent people from receiving calls that they do not want, banning **all** ATDS calls—including calls that people actually do want, even if they have not offered consent ahead of time—sweeps far broader than necessary. For example, many people want to receive immediate, unprompted updates about the weather, road closures, or data breaches. Facebook's login notifications, which are a security measure designed to avert data breaches, *see* Facebook Mot. at 2–7, fall within the universe of these messages that many wish to receive unprompted. Yet the construction of the TCPA that Plaintiff advances would at best chill these types of calls. A content-based statute that sweeps in more speech than necessary to advance the government purpose is not narrowly tailored and fails strict scrutiny. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 362 (2010) (finding that campaign

finance statute failed strict scrutiny because the statute was "overinclusive" and regulated "all corporations," including corporations whose speech did not implicate the government's advanced interest); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991) (finding that New York's "Son of Sam" law was overinclusive because it covered a number of works that touched only tangentially on the author's "thoughts or recollections about his crime").

It is also overinclusive for the same reason that the Fourth Circuit concluded the South Carolina robocall statute was overinclusive in *Cahaly*: the statute sweeps far beyond the concerns that motivated its passage. 796 F.3d at 406. The TCPA was Congress's response to an outpouring of concern in the late 1980s and early 1990s over abusive practices by telemarketers, who used certain computerized equipment that would generate numbers to be called at random or in a particular sequence. *See* 47 U.S.C. § 227 note (expressing deep concern over the "proliferation of unwanted, nuisance calls to [customers'] homes . . . due to the increased use of cost-effective telemarketing techniques"); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (noting that Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology"). The TCPA sought to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home," S. Rep. No. 102-178, at 1 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1968, using particular "telecommunications equipment," H.R. Rep. No. 102-317, at 5 (1991).

But plaintiff seeks to apply the TCPA not to a telemarketer using a random or sequential number generator, but to Facebook's targeted notifications about account security. *Cahaly* recognized that this mismatch between the concerns that animated the passage of the statute and the proposed application cannot survive strict scrutiny. In that case the mismatch was between concerns about commercial calls that produced the law and the application of the statute to noncommercial calls. *See Cahaly*, 796 F.3d at 406. In fact, *Cahaly* cites the House Report on the *TCPA* as support for the holding that the South Carolina statute was overinclusive. Application of the TCPA here similarly targets calls well outside the scope of Congress's concern, such as the nonresidential, noncommercial login notifications that people want to receive.

**Third,** as the Fourth Circuit recognized in *Cahaly*, there are numerous less restrictive alternatives for "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls." 796 F.3d at 405. These "less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists." *Id.* Each of these would advance Congress's interest in promoting residential privacy without requiring the government to sift through speech to determine its worth and value.

This case involves allegations that Facebook used text messages to convey information *that people request*, namely alerts about potential account breaches. Facebook's services thrive on the instant electronic communication that the Internet makes possible. As evidenced by the login notification service at issue in this case, the people who use Facebook desire the fluid and instantaneous flow of information that is now possible thanks to the innovations of the recent decade. Yet potential TCPA liability makes the provision of legitimate, desired communications a risky activity for Facebook: engage in the frictionless communications essential to providing innovative and beneficial services to people under threat of TCPA liability or lose competitive ground. Applying the TCPA to prohibit Facebook's privacy-promoting login notifications violates the First Amendment.

**<u>CONCLUSION</u>**

For all the foregoing reasons, the Court should grant Facebook's motion to dismiss under Rule 12(b)(6) with prejudice.

Dated:  January 7, 2016

Respectfully submitted,
KIRKLAND & ELLIS LLP


*/s/ Elizabeth L. Deeley*

Elizabeth L. Deeley (SBN 230798)
Kristin Sheffield-Whitehead (SBN 304635)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com
             kristin.sheffield-whitehead@kirkland.com

Andrew B. Clubok  (admitted *pro hac vice*)
Susan E. Engel (admitted *pro hac vice*)
Carrie J. Bodner (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com
             seengel@kirkland.com
             carrie.bodner@kirkland.com

*Attorneys for Defendant Facebook, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2016, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

| | |
|---|---|
| Trinette G. Kent, Esq.<br>LEMBERG LAW LLC<br>10645 North Tatum Blvd.<br>Suite 200-192<br>Phoenix, AZ 85028<br>Tel: (855) 301-2100 ext. 5533<br>Fax: (203) 653-3424<br>Email: tkent@lemberglaw.com | Sergei Lemberg<br>Stephen Taylor<br>LEMBERG LAW LLC<br>1100 Summer Street<br>Stamford, CT 06905<br>Tel: (203) 653-2250<br>Fax: (203) 653-3424<br>Email: slemberg@lemberglaw.com<br>Email: staylor@lemberglaw.com |
| *Attorneys for Plaintiff Noah Duguid* | |
| Benjamin C. Mizer<br>Eric R. Womack<br>Bailey W. Heaps<br>Aimee Woodward Brown<br>TRIAL ATTORNEYS<br>United States Department of Justice<br>Civil Division, Federal Programs Branch<br>20 Massachusetts Avenue NW<br>Washington, D.C. 20530<br>Tel: (202) 514-1280<br>Fax: (202) 616-8470<br>Email: bailey.w.heaps@usdoj.gov<br><br>*Attorneys for the United States of America* | |

_/s/ Janaya Guerrero_