Andrew B. Clubok (*pro hac vice*)
Carrie J. Bodner (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email: andrew.clubok@kirkland.com
Email: carrie.bodner@kirkland.com

Elizabeth L. Deeley (SBN 230798)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email: elizabeth.deeley@kirkland.com

Susan E. Engel (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200
Email: susan.engel@kirkland.com

Attorneys for Defendant
*Facebook, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH DUGUID, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | CASE NO.: 3:15-cv-00985-JST<br><br>**FACEBOOK, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MEMORANDUM IN SUPPORT**<br><br>Complaint Filed: March 3, 2015<br>First Am. Compl. Filed: April 22, 2016<br><br>Judge:           Hon. Jon S. Tigar<br>Hearing Date:  September 22, 2016<br>Time:            2:00 pm<br>Courtroom:     Courtroom 9, 19th Floor |

# NOTICE OF MOTION AND MOTION

To the Clerk of the Northern District of California and all parties and their attorneys of record:

Please take notice that on September 22, 2016 at 2:00 p.m., or as soon thereafter as this matter may be heard, before the Honorable Jon S. Tigar, U.S. District Court Judge, U.S. District Court for the Northern District of California, Courtroom No. 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, defendant Facebook, Inc. ("Facebook") will and hereby does move this Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an Order dismissing plaintiff Noah Duguid's ("Plaintiff") First Amended Complaint with prejudice, for lack of standing and for failure to state a claim upon which relief may be granted.

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Declaration of Carrie J. Bodner and exhibits attached thereto, the pleadings on file with the Court, and such arguments and authorities as may be presented at or before the hearing.

# STATEMENT OF THE ISSUES

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Facebook moves to dismiss Plaintiff's claims brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii), on the following grounds:

1. Plaintiff lacks standing to bring a claim under the TCPA.

2. Plaintiff fails to plausibly allege that the alleged login messages were sent with an "automatic telephone dialing system," as defined by 47 U.S.C. § 227(a)(1), which is a necessary element of Plaintiff's TCPA claim.

3. The alleged login messages are exempt from liability under the TCPA's exception for "emergency" texts, 47 U.S.C. § 227(b)(1)(A).

4. The TCPA violates the First Amendment on its face and as applied to the login messages at issue.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION .................................................................................. ii

STATEMENT OF THE ISSUES ........................................................................................ ii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 3

STATUTORY BACKGROUND ......................................................................................... 7

ARGUMENT ................................................................................................................... 8

I.      PLAINTIFF LACKS STANDING BECAUSE HE HAS FAILED TO
        ALLEGE A CONCRETE INJURY ...................................................................... 8

II.     PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT
        DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS SHOWING
        THAT THE LOGIN MESSAGES WERE SENT USING AN ATDS .......................... 9

        A.      The Content of the Login Messages, the Context In Which They Were
                Received, and The Absence of Similar Messages Are Fatal to Plaintiff's
                Allegations of an ATDS. ....................................................................... 9

        B.      Plaintiff's Allegations Show That The Login Messages Were Not Sent
                En Masse And Involved Human Intervention. ...................................... 13

        C.      Plaintiff Has Not Adequately Alleged That Facebook Sent The Login
                Messages Using A Predictive Dialer Or Equipment That Functions Like
                A Predictive Dialer. ............................................................................ 15

        D.      Plaintiff's Computer Code Allegations Do Not Salvage His Deficient
                Claim. ................................................................................................. 16

III.    PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE
        ALLEGED LOGIN MESSAGES ARE SENT FOR EMERGENCY
        PURPOSES. ...................................................................................................... 18

IV.     THE TCPA VIOLATES THE FIRST AMENDMENT ON ITS FACE AND
        AS APPLIED TO LOGIN MESSAGES. .............................................................. 20

CONCLUSION .............................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACC Int'l v. FCC*,
    No. 15-1211 (D.C. Cir.) ........................................................................................8

*Ashcroft v. Am. Civil Liberties Union*,
    542 U.S. 656 (2004) .........................................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................17

*Cahaly v. Larosa*,
    796 F.3d 399 (4th Cir. 2015) ........................................................................3, 24

*Cent. Radio Co. v. City of Norfolk*,
    811 F.3d 625 (4th Cir. 2016) .............................................................................3

*Chesbro v. Best Buy Stores, L.P.*,
    705 F.3d 913 (9th Cir. 2012) ...........................................................................19

*Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) .........................................................................................20

*City of Ladue v. Gilleo*,
    512 U.S. 43 (1994) ...........................................................................................24

*Daniels v. ComUnity Lending, Inc.*,
    No. 13CV488-WQH-JMA, 2014 WL 51275 (S.D. Cal. Jan. 6, 2014) ........................10

*De Los Santos v. Millward Brown, Inc.*,
    No. 13-80670-CV, 2014 WL 2938605 (S.D. Fla. June 30, 2014) ................................18

*Derby v. AOL, Inc.*,
    No. 15-CV-00452-RMW, 2015 WL 3477658 (N.D. Cal. June 1, 2015) ......................13

*Destination Ventures, Ltd. v. FCC*,
    46 F.3d 54 (9th Cir. 1995) ...............................................................................22

*Duguid v. Facebook, Inc.*,
    No. 15-CV-00985-JST, 2016 WL 1169365 (N.D. Cal. Mar. 24, 2016) ............................ *passim*

*Emanuel v. Los Angeles Lakers, Inc.*,
No. CV 12-9936-GW SHX, 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013)..............................11

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984)...........................................................................................................21

*Fields v. Mobile Messengers Am., Inc.*,
No. C 12-05160 WHA, 2013 WL 6774076 (N.D. Cal. Dec. 23, 2013) .......................................15

*Flores v. Adir Int'l, LLC*,
No. CV 15-00076-AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015) ................................. *passim*

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ..................................................................................4

*Freidman v. Massage Envy Franchising, LCC*,
No. 3:12-CV-02962-L-RBB, 2013 WL 3026641 (S.D. Cal. June 13, 2013) .........................10, 19

*Glauser v. GroupMe, Inc.*,
No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015)..........................................13, 14

*Gomez v. Campbell-Ewald Co.*,
768 F.3d 871 (9th Cir. 2014) ...........................................................................................21, 22

*Gragg v. Orange Cab Co.*,
995 F. Supp. 2d 1189 (W.D. Wash. 2014)..........................................................................14, 18

*Gragg v. Orange Cab Co, Inc.*,
No. C12-0576RSL, 2013 WL 195466 (W.D. Wash. Jan. 17, 2013) ...........................................11

*Hunt v. 21st Mortg. Corp.*,
No. 2:12-CV- 2697, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013)...........................................18

*Knutson v. Reply!, Inc.*,
No. 10-CV-1267 BEN, 2011 WL 291076 (S.D. Cal. Jan. 27, 2011)...........................................11

*Marks v. Crunch San Diego, LLC*,
55 F. Supp. 3d 1288 (S.D. Cal. 2014)......................................................................12, 13, 14, 17

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014).......................................................................................................20

*McKenna v. WhisperText*,
No. 5:14-CV-00424-PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) .....................................14

*McKenna v. WhisperText*,
No. 5:14-CV-00424-PSG, 2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) ...................6, 13, 14, 15

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012) ...........................................................7, 19, 23

*Moore v. Dish Network L.L.C.*,
  57 F. Supp. 3d 639 (N.D. W. Va. 2014) ...................................16

*Moser v. FCC*,
  46 F.3d 970 (9th Cir. 1995) ...................................................22

*Norton v. City of Springfield*,
  806 F.3d 411 (7th Cir. 2015) ...............................................3, 21

*Nunes v. Twitter, Inc.*,
  No. 14-CV-02843-VC, 2014 WL 6708465 (N.D. Cal. Nov. 26, 2014) ...............15

*Oregon v. Legal Servs. Corp.*,
  552 F.3d 965 (9th Cir. 2009) .................................................7

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) .........................................4

*Pimental et al. v. Google, Inc.*,
  No. C-11-02585-YGR, 2012 WL 691784 (N.D. Cal. Mar. 2, 2012)..................11

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) .......................................................3

*Republican Party of Minn. v. White*,
  416 F.3d 738 (8th Cir. 2005) ..............................................22, 23

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002)..........................................................23

*Ryabyshchuck v. Citibank (S.Dakota) N.A.*,
  2012 WL 5379143 (S.D. Cal. Oct. 30, 2012) ................................19, 20

*Spokeo, Inc. v. Robins*,
  No. 13-1339, 2016 WL 2842447 (U.S. May 16, 2016)........................1, 8, 9

*Thompson v. Permanente Med. Grp., Inc.*,
  No. 12-CV-01301-JST, 2013 WL 1808897 (N.D. Cal. Apr. 29, 2013) ..............6

*United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*,
  540 F.3d 957 (9th Cir. 2008) ................................................21

*Williams v. T-Mobile USA, Inc.*,
  No. 15-CV-03384-JSW, 2015 WL 5962270 (N.D. Cal. Oct. 14, 2015).........2, 11, 12

*Zilveti v. Glob. Mktg. Research Servs., Inc.*,
   No. C-15-2494 MMC, 2016 WL 613010 (N.D. Cal. Feb. 16, 2016) ...........................................22

**Statutes**

47 U.S.C. § 227 ..................................................................................................................1, 23

47 U.S.C. § 227(a)(1) ......................................................................................................2, 7, 9

47 U.S.C. § 227(b)(1)(A) ...................................................................................................... *passim*

47 U.S.C. § 227(b)(1)(B) ............................................................................................................22

47 U.S.C. § 227(b)(1)(C) ............................................................................................................22

47 U.S.C. § 227(b)(2)(B) .......................................................................................................8, 21

47 U.S.C. § 227(b)(2)(C) ...................................................................................................3, 8, 21

Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584 ...................................3, 21

H.R. Rep. No. 102-317 (1991) .....................................................................................................7

S. Rep. No. 102-178 (1991) ........................................................................................................23

U.S. Const. Amend. I .........................................................................................................5, 20, 22

U.S. Const. Art. III ....................................................................................................................1, 8

**Rules**

Fed. R. Civ. P. 12(b)(1) ...........................................................................................................7, 9

Fed. R. Civ. P. 12(b)(6) ...............................................................................................................6

**Other Authorities**

FDIC, OCC and Board of Governors of the Federal Reserve's Interagency Guidance
   On Response Program For Information Security Breach, 2009 WL 2656073 ¶¶
   100-259 ............................................................................................................................19

H.R. Rep. No. 102-317 (1991) ...................................................................................................23

National Credit Union Administration's Compl. Guide for Cr. Unions, NAFCUCG 33
   Ex. 33.6 ..........................................................................................................................19

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of
1991*,
   18 FCC Rcd. 14014 (2003) ..........................................................................................7, 8, 13, 15

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
  30 FCC Rcd. 7961 (2015) ................................................................................................. *passim*

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,*
  7 FCC Rcd. 8752 (1992) ........................................................................................... 18, 20

**INTRODUCTION**

This Court dismissed Plaintiff's original complaint because Plaintiff failed to plausibly allege that Facebook sent login notification text messages using an automated telephone dialing system, or "ATDS," as the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, requires. *Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2016 WL 1169365, at *5 (N.D. Cal. Mar. 24, 2016). The Court held that Plaintiff's "allegations suggest that Facebook's login notification text messages are targeted to specific phone numbers and are triggered by attempts to log in to Facebook accounts associated with those phone numbers," not that they were sent "en masse to randomly or sequentially generated numbers." *Id.* The same reasoning requires dismissal of Plaintiff's First Amended Complaint, which again asserts a claim under the TCPA and complains about the same targeted security alerts. None of the alternative theories Plaintiff comes up with in the amended complaint provide any basis for bringing his TCPA claim, and the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, No. 13-1339, 2016 WL 2842447 (U.S. May 16, 2016), provides an additional ground for dismissal.

First, the Supreme Court held in *Spokeo* that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at *7. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* Here, Plaintiff alleges no concrete injury beyond Facebook's purported violation of the TCPA, and his amended complaint must therefore be dismissed for lack of Article III standing.

Second, Plaintiff's ATDS allegations fare no better the second time around. The login messages at issue this time are the same login notifications alleged in the original complaint, as well as "login approvals," FAC ¶¶ 15, 17-18, 20, referred to in this brief collectively as "login messages." Both are security messages sent to a single phone number that a Facebook user has associated with a specific Facebook account, warning about a specific security threat to that account from a specific browser or app at a specific date and time. Login notifications alert a Facebook user each time someone logs into that user's account from a new or unrecognized device, *id.* ¶ 16 & Ex. A; login

approvals send a Facebook user a unique security code that must be entered in order to log into a Facebook account from a new or unrecognized device, *id.* ¶¶ 18, 20. Such login messages are a far cry from the type of impersonal, en masse communications that the TCPA prohibits. Nothing in the amended complaint supports an inference that Facebook sent the login messages with equipment that has the capacity to randomly or sequentially generate phone numbers, as required by the statutory definition of an "automated telephone dialing system," or "ATDS," 47 U.S.C. § 227(a)(1). Nor do they support an inference that the equipment functions like a "predictive dialer," such that it has the capacity to dial numbers randomly or sequentially from a list, as the FCC has interpreted the TCPA. *See Duguid*, 2016 WL 1169365, at *5-6 (discussing predictive dialers). And finally, Plaintiff's allegations that he has come up with programming code that generates numbers randomly or sequentially and hypothetically "could … easily be added" to the Facebook equipment that sent him the allegedly infringing messages two years ago in 2014, FAC ¶¶ 44-50, cannot support an inference of an ATDS. No court has ever held that the theoretical possibility that code might be added to equipment (but hasn't been and its addition would serve no function except to support a TCPA claim) is enough to turn the equipment into an ATDS. To the contrary, like this Court's first decision dismissing Plaintiff's original complaint, courts have repeatedly held that targeted messages sent with human intervention to targeted numbers provide no basis for a TCPA claim. *See Flores v. Adir Int'l, LLC*, No. CV 15-00076-AB (PLAx), 2015 WL 4340020, at *1 (C.D. Cal. July 15, 2015) (dismissing TCPA claim involving targeted, customized communications); *Williams v. T-Mobile USA, Inc.*, No. 15-CV-03384-JSW, 2015 WL 5962270, at *3 (N.D. Cal. Oct. 14, 2015) (similar).

Third, login messages fall squarely within the TCPA's broad exception for any "call made for emergency purposes," 47 U.S.C. § 227(b)(1)(A), because the feature is activated by the user for the express purpose of obtaining immediate notice of a potential security breach. This conclusion is indisputable from Plaintiff's allegations, which describe login messages as an "extra security feature" provided by Facebook in recognition of the fact that users "often share private information on Facebook." FAC ¶ 14.

Fourth, if the Court does construe the TCPA as reaching individualized login messages, then the TCPA is an unconstitutional restriction of speech both on its face and as-applied. The TCPA's ban is riddled with exceptions that favor particular subject matter and give the government broad discretion to pick and choose favored speech. *See, e.g.*, Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584 (allowing calls about government debt but banning calls about private debt); *see In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Order") at 8023–31 (allowing exemptions for medical prescriptions and banking notifications, pursuant to 47 U.S.C. § 227(b)(2)(C)). As the Supreme Court recently made clear, a statute that draws such content-based distinctions is subject to strict scrutiny and presumptively unconstitutional. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (striking down a sign ordinance that on its face imposed different restrictions depending on what message the sign carried); *see also Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 634 (4th Cir. 2016) (striking down sign ordinance under *Reed*); *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015) (striking down panhandling ordinance under *Reed*); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (striking down state robocall statute under *Reed*). The TCPA cannot overcome this presumption because it is both under- and over-inclusive, and it is by no means the least restrictive means of advancing the government's purported privacy interest. For the reasons above, Plaintiff's First Amended Complaint should be dismissed for lack of standing and failure to state a claim under the TCPA.

## BACKGROUND

Facebook provides a free mobile app and website that enables people to connect, share, discover, and communicate, with well over 1.6 billion people worldwide. D.E. 53, First Am. Compl. ("FAC") ¶ 55. Because people using Facebook "often share private information," Facebook offers "extra security feature[s]" in order to protect accounts from hacking. *Id.* ¶¶ 14, 18; *see also* Bodner

Decl. Ex. 1, Sharon Profis, *Find out if someone's logging in to your Facebook account*, CNET (Dec. 10, 2011) (explaining that Facebook's login notifications allow users to "[k]eep tabs on hackers").[1]

Like the original complaint, the amended complaint concerns an optional security feature called "login notifications." FAC ¶ 14 & Ex. A. It also references another similar but distinct security feature called "login approvals." *Id.* ¶¶ 15, 17-18; *see also* Bodner Decl. Ex. 3, *Introducing Login Approvals*, https://code.facebook.com/posts/702694856412838/introducing-login-approvals (dated May 12, 2011) (cited in FAC ¶ 17); Bodner Decl. Ex. 4, *Everything You Wanted To Know and More About Facebook Security*, http://thedinfographics.com/wp-content/uploads/2011/11/facebook-security-2011-infographics.jpeg (cited in FAC ¶ 20).[2] To activate login notifications or login approvals, Facebook users must go through a multi-step process, including adding a mobile number to a Facebook account, verifying the number, navigating to the relevant section of the "Security Settings" page of the account, and click on either the "Login Notifications" or "Login Approvals" section. *See* FAC ¶¶ 16 & Ex. A (describing login notifications); *id.* ¶ 20 and Bodner Decl. Ex. 3 (cited in FAC ¶ 17) (describing login approvals). To sign up for login notifications, the user must then check the box next to the type of alerts the user wants to receive, such as text message alerts, and then click "Save Changes." FAC Ex. A. Once a user activates login notifications, if someone accesses the account from "an unfamiliar device or location," a login notification is sent to the phone number on the account; the notification identifies

---

[1] This Court has already taken judicial notice of the above-identified media report and two others in the context of Facebook's motion to dismiss Plaintiff's original complaint. *See Duguid*, 2016 WL 1169375, at *3. Accordingly, Facebook reattaches two of the same media reports as Exhibits 1 and 2 to the Declaration of Carrie J. Bodner.

[2] Paragraphs 17 and 20 of the amended complaint cite and selectively quote from two webpages that discuss Facebook's login approval and login notification features. Because Plaintiff relies on these webpages and incorporates their contents into his allegations, the complete contents of those webpages can be considered on this motion. *See, e.g., Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 795 (N.D. Cal. 2011) (taking judicial notice of webpage cited in complaint); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1205 (N.D. Cal. 2014) (on a motion to dismiss, taking judicial notice of webpages that were quoted and discussed in amended complaint where neither party disputed their accuracy); *cf. Duguid*, 2016 WL 1169375, at *3 (distinguishing webpages that were not referenced or incorporated into original complaint). Accordingly, Facebook respectfully requests the Court take judicial notice of the two webpages, attached hereto as Bodner Decl. Exhibits 3 and 4.

where the account was accessed from and the precise time of access.  *Id.* ¶¶ 14, 16, 30 & Ex. A; *see, e.g.*, *id.* ¶¶ 23, 26.  The user then can log in and "reset [the] password and secure [the] account."  *Id.* Ex. A.  Before a user can activate login approvals, the user must first "confirm that [the user] still has access to [his] phone" by entering a security code that is sent in a text message to the user's phone.  Bodner Decl. Ex. 3 at p. 2.  Once activated, a login approval text message is sent to the phone number on the account whenever someone attempts to log in to that account from a new or unrecognized device.  FAC ¶¶ 18, 20; Bodner Decl. Ex. 3 at pp. 2-3.  The login approval contains a unique security code that a user must enter in order to log in to the account from the new device. FAC ¶¶ 18, 20; Bodner Decl. Exs. 3 & 4.

This Court dismissed Plaintiff's original complaint about login notifications, holding that Plaintiff failed to adequately plead that the login notifications were sent with an ATDS.  *Duguid v. Facebook, Inc.*, No. 15-CV-00985-JST, 2016 WL 1169365, at \*6 (N.D. Cal. Mar. 24, 2016).  Reviewing the content of the messages, the alleged context in which they were received, and the existence of similar messages, *id.* at \*5, the Court held that Plaintiff's factual allegations supported an inference that the messages were *not* sent using a random and sequential number generator.  *Id.* The texts were "targeted to specific phone numbers," "triggered by attempts to log in to Facebook accounts associated with those phone numbers," and were not sent "en masse to randomly or sequentially generated numbers."  *Id*.  Because the Court concluded that Plaintiff did "not plausibl[y]" allege an ATDS, the Court declined to reach Facebook's emergency exception and First Amendment arguments.  *Id.* at \*6.  The Court gave Plaintiff leave to replead.  *Id.*

The amended complaint identifies the same allegedly infringing login notifications.  *See* FAC ¶¶ 21, 23, 25, 26 (identifying the same login notifications sent between January 2014 and November 2014); D.E. 1, Compl. ¶¶ 20, 22, 28 & Ex. D.  While Plaintiff also alleges that he received login approvals, none of the allegedly infringing text messages he identifies have the unique indicia of a login approval, FAC ¶¶ 15, 18, 23-26, namely, a unique security code.  *Id.*  Each alleged message informed Plaintiff that "Your Facebook account has been accessed" at a specific time, and most identified the browser and operating system on which the login took place.  *See, e.g., id.* ¶ 25 (Oct.

18 text message states "Your Facebook account was accessed from Chrome on Windows at 8:15 am. Log in for more info."); *see also id.* ¶ 23 (Feb. 10 text message states "Your Facebook account was accessed from an unknown browser at 3:34 pm. Log in for more info."). Plaintiff again alleges that he has no Facebook account but received the login messages before and after sending an "off" text message. *Id.* ¶¶ 21, 24-26. Plaintiff recognizes that his cell phone number may be associated with someone else's Facebook account (who elected to receive login notifications), and that he received login notifications about ***that*** account being accessed. *Id.* ¶¶ 23-26 (alleging that Plaintiff received login notifications about "[y]our Facebook account [being] accessed" but that Plaintiff "does not have a Facebook account); *id.* Ex. B (Plaintiff's email noting that he received text messages "in relation to a Facebook account that either does not exist, or does not belong to me.").

Plaintiff again purports to bring his claims on behalf of classes of persons who received text messages from Facebook, *id.* ¶ 57, but he does not allege that putative class members received the same login messages that he identifies in the amended complaint.

### STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim is facially plausible 'when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 5264750, at *2 (N.D. Cal. Sept. 9, 2015) (quoting *Iqbal*, 556 U.S. at 663). Dismissal is appropriate "where the complaint lacks . . . sufficient facts to support a cognizable legal theory." *Thompson v. Permanente Med. Grp., Inc.*, No. 12-CV-01301-JST, 2013 WL 1808897, at *2 (N.D. Cal. Apr. 29, 2013); *see also WhisperText*, 2015 WL 5264750, at *2. Moreover, "[w]hen evaluating an amended complaint, the court may also consider the prior allegations as part of its 'context-specific' inquiry based on its judicial experience and common sense to assess whether an amended complaint plausibly suggests an entitlement to relief." *WhisperText*, 2015 WL 5264750, at *3.

In addition, Rule 12(b)(1) requires dismissal when the plaintiff fails to meet its burden of establishing subject-matter jurisdiction, including the elements of standing. *See Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009). In a facial attack on a motion to dismiss, the allegations in the complaint must be sufficient on their face to invoke federal jurisdiction. *See id.*

## STATUTORY BACKGROUND

The TCPA makes it "unlawful . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A). The Act is Congress's response to an outpouring of concern in the late 1980s and early 1990s over abusive practices by telemarketers, who used certain computerized equipment that would generate numbers to be called at random or in a particular sequence. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (noting that Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology"). In light of its concern over telemarketers' use of random and sequential number generators, Congress sought to restrict the use of particular "telecommunications equipment." H.R. Rep. No. 102-317, at 5 (1991). The Act accomplished this by sharply curbing the use of what it called an "automated telephone dialing system" or ATDS.

An ATDS is not just any computerized telephone; instead, the TCPA defines an ATDS as equipment that can "store or produce telephone numbers to be called, using a random or sequential number generator . . . and . . . dial such numbers." 47 U.S.C. § 227(a)(1). The FCC has issued a number of declaratory rulings on whether particular equipment qualifies as an ATDS. One ruling concerns a predictive dialer, which "is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14091–93 (2003) ("2003 Order"); *see also* 2015 Order, 30 FCC Rcd. at 7972-73 (noting that even if a predictive dialer uses a "fixed set of numbers" at a given moment, it still has the capacity to "store or produce telephone numbers to be called, using a random or

sequential number generator") (quoting 47 U.S.C. § 227(a)(1)(A)).[3]  The FCC has also ruled that the term "call" includes text messages.  2003 Order, 18 FCC Rcd. at 14115.

The TCPA contains a number of exceptions.  ATDS and artificial or prerecorded voice calls can be made with the "prior express consent of the called party."  47 U.S.C. § 227(b)(1)(A).  Other calls are exempt based on their content.  For example, an "emergency" call is permitted without consent, *see* 47 U.S.C. § 227(b)(1)(A), as are calls about "a debt owed to or guaranteed by the United States," *id.* § 227(b)(1)(A)(iii).  The TCPA also gives the FCC authority to exempt calls that "will not adversely affect the privacy rights that this section is intended to protect."  *Id.* § 227(b)(2)(B)(ii)(I) (for artificial or prerecorded voice calls); *see also id.* § 227(b)(2)(C) (for ATDS calls "to a cellular telephone service that are not charged to the called party").

## ARGUMENT

The amended complaint should be dismissed for four independent reasons.  First, Plaintiff has not alleged any concrete injury, and thus lacks Article III standing.  Second, Plaintiff once again alleges no plausible set of facts showing that the login messages were sent using an ATDS.  Third, the alleged login messages fall within the scope of the TCPA's explicit exception for "emergency" texts.  Fourth, even if the TCPA applied to the alleged login messages, the TCPA is an unconstitutional content-based speech restriction, both on its face and as applied.

## I.   PLAINTIFF LACKS STANDING BECAUSE HE HAS FAILED TO ALLEGE A CONCRETE INJURY.

The Supreme Court recently held in a decision reversing the Ninth Circuit that a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Spokeo*, 2016 WL 2842447, at *7.  The Ninth Circuit had held that "the violation of a statutory right is usually a sufficient injury in fact to confer standing."  *Id.* at *4.  The Supreme Court disagreed, holding that "Article III standing requires a concrete injury even in the context of a statutory violation."  *Id.* at *6-7.

---

[3]  The 2015 Order is currently subject to a challenge that is pending in the D.C. Circuit.  *See ACC Int'l v. FCC*, No. 15-1211 (D.C. Cir.).  Briefing is complete, but oral argument has yet to be scheduled.

Here, Plaintiff alleges only a statutory violation. *See, e.g.*, FAC ¶¶ 69-70, 75-76. He does not allege any concrete injury from receiving login messages. While he alleges that he "incurs charges for incoming messages," *id.* ¶ 36, he does not assert that he pays for each individual message or was otherwise charged more than he would have been (for example, if he has a plan for unlimited texts or a fixed number of texts that was not exceeded in the relevant month). Those allegations are insufficient under *Spokeo*, and his claims should be dismissed under Rule 12(b)(1) for lack of standing.

## II. PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE IT DOES NOT ALLEGE ANY PLAUSIBLE SET OF FACTS SHOWING THAT THE LOGIN MESSAGES WERE SENT USING AN ATDS.

The amended complaint is again based on login messages that the Court already rejected as insufficient to state a TCPA claim. Not surprisingly then, Plaintiff's allegations about the content, context, and the absence of other similar messages again fail to give rise to an inference that Facebook sent the login messages using equipment that has the capacity to "random[ly] or sequential[ly] . . . generat[e]" phone numbers. 47 U.S.C. § 227(a)(1). The same allegations underscore that the messages were not sent en masse and were sent with human intervention. Indeed, the login approvals that Plaintiff newly cites in his complaint have unique security codes that plainly are not sent en masse but are sent to targeted Facebook account phone numbers. Neither of Plaintiff's two new theories—(i) that he has plausibly alleged an ATDS because he alleged that Facebook's equipment dials numbers from a list, and (ii) that he has plausibly alleged an ATDS because he came up with computer code that, if it had been added to the equipment Facebook used to send him messages, could have generated random or sequential numbers—saves his claim.

### A. The Content of the Login Messages, the Context In Which They Were Received, and The Absence of Similar Messages Are Fatal to Plaintiff's Allegations of an ATDS.

Plaintiff's allegations do not plausibly show "that Facebook sends text messages en masse to randomly or sequentially generated numbers," as required by the TCPA. *Duguid*, 2016 WL 1169365, at *5. What was true for the original complaint is true here: the "content" of the login messages, "the context in which [they were] received," and "the existence of similar messages" all

confirm that Plaintiff still has not alleged and cannot plausibly allege the use of an ATDS. *Duguid*, 2016 WL 1169365, at *5 (quoting *Flores*, 2015 WL 4340020, at *4).

***Content of the message***: The alleged content of the login messages again underscores the targeted nature of the messages. The content of the login notifications identifies a specific Facebook account associated with a specific phone number, informs the recipient that the account was accessed from a new device, and identifies the specific time at which the account was accessed and the specific browser and/or operating system from which the account was accessed (e.g., an "unknown browser at 2:16 pm," "Facebook for iPhone at 3:57 pm," "Chrome on Windows at 2:39 pm."). FAC ¶¶ 14, 23, 25, 26 & Ex. A. In addition, the login approvals—Plaintiff does not identify any specific login approval (as distinct from a login notification), but he alleges that he received login approval messages, *id.* ¶ 15—contain unique security codes, *id.* ¶ 18, and are thus clearly individualized and not sent en masse. In other words, the allegations in Plaintiff's amended complaint *still* describe "text messages . . . targeted to specific phone numbers and . . . triggered by attempts to log in to Facebook accounts associated with those phone numbers." *Duguid*, 2016 WL 1169365, at *5. This time, Plaintiff even ***acknowledges*** that the text messages "appear customized to the user." FAC ¶ 29.

Plaintiff tries to emphasize the use of a template, *id.* ¶¶ 27-33, but that does not suggest the use of an ATDS. If anything, a customizable, fill-in-the-blank template is strong evidence that the texts were personal and circumstance-specific. The same was true in a number of cases that held that the use of an ATDS was not plausible in the face of allegations suggesting customized messages. *See, e.g.*, *Flores*, 2015 WL 4340020, at *5 (dismissing claim where texts involved a template with a customer-specific reference number); *Daniels v. ComUnity Lending, Inc.*, No. 13CV488-WQH-JMA, 2014 WL 51275, at *5 (S.D. Cal. Jan. 6, 2014) (dismissing claim where messages were somewhat generic but also were "directed specifically toward Plaintiffs"), *appeal dismissed* (Feb. 26, 2014); *Freidman v. Massage Envy Franchising, LCC*, No. 3:12-CV-02962-L-RBB, 2013 WL 3026641, at *2 (S.D. Cal. June 13, 2013) (dismissing claim where messages were "similar in content, but differ enough to make it appear as if an ATDS was not utilized"); *cf.*

*Pimental et al. v. Google, Inc.*, No. C-11-02585-YGR, 2012 WL 691784, at *2 (N.D. Cal. Mar. 2, 2012) (allegations "plausibly suggested the use of an ATDS" where defendants "harvested phone numbers" and sent impersonal, advertisement texts "en masse").

*Context in which it was received*:  The alleged context is likewise no different from the original complaint and still does not suggest a generic marketing message.  If anything, additional allegations about other "opt-in" security features underscore that login messages are not randomly generated or impersonal, but instead are security features that ***people*** activate as part of their customizable experience on Facebook.  FAC ¶¶ 14, 16, 18, 20 & Ex. A; *see also* Bodner Decl. Ex. 4 (cited in FAC ¶ 20) (describing "ID Verification" and "One Time Passwords" as other "opt-in" security features).  Plaintiff's allegations underscore that ***human intervention*** is the trigger for sending the messages—once a user goes through multiple steps to activate login messages, someone's login or attempt to log in to the account associated with that phone number triggers a message to that specific phone number.  FAC ¶¶ 14, 16, 18, 20, 29 & Ex. A; *see also* Bodner Decl. Ex. 4 (cited in FAC ¶ 20).  The alert is the product of (1) the Facebook user's personal customization of their account and security settings, and (2) someone's login or login attempt from a particular unrecognized device.  Messages that share these indicia of individual tailoring do not plausibly suggest random or sequential number generation.  *See Gragg v. Orange Cab Co, Inc.*, No. C12-0576RSL, 2013 WL 195466, at *2 (W.D. Wash. Jan. 17, 2013) (rather than suggesting an ATDS, factual allegations gave rise to the "reasonable inference" that the text message plaintiff received was "customer-specific":  a "personal and individual response to a request for a cab"); *see also, e.g.*, *Flores*, 2015 WL 4340020, at *5 ("The context of the messages was Defendant's desire to collect on a specific debt, not mass marketing."); *Williams*, 2015 WL 5962270, at *3 (plaintiff's allegation suggested defendant intended to call plaintiff about a debt owed, "which undermine[d] the allegations of a randomly or sequentially generated call"); *Knutson v. Reply!, Inc.*, No. 10-CV-1267 BEN (WMc), 2011 WL 291076, at *2 (S.D. Cal. Jan. 27, 2011) ("There is nothing in the complaint that allows the court to infer the calls were randomly generated or impersonal."); *cf. Emanuel v. Los Angeles Lakers, Inc.*, No. CV 12-9936-GW SHX, 2013 WL 1719035, at *4 n.3 (C.D. Cal. Apr. 18,

2013) (noting that complaint "suggests that Defendant does *not* use a system that has the capacity to generate, or to sequentially or randomly dial numbers," and noting that "Plaintiff does not allege that he received the … text 'randomly' but rather in direct response to Plaintiff's initiating text.").

***Existence of similar messages***:  While Plaintiff describes the text messages as "repetitive" and "impersonal" in his amended complaint, FAC ¶ 27, he still does not allege that any other person received even one of the messages that Plaintiff purportedly received.  The existence of unique login messages—and the fact that he alleges that ***other*** messages were sent to phone numbers associated with other people's accounts, *id.* ¶ 69—is fully consistent with the other indicia of direct targeting and cuts against Plaintiff's claim that Facebook used an ATDS.

At bottom, Plaintiff tries to harness the "automatic" part of the title "automatic telephone dialing system."  *E.g.*, *id.* ¶ 20 (alleging a "fully-automated, computerized process" of sending login messages).  But simply "alleging *any measure of automation*" is not enough "to allege the *specific form of automation* necessary to sustain a claim under the TCPA."  *Flores*, 2015 WL 4340020, at *4. Because the content of the login messages, the context in which they were received, and the existence (or, here, absence) of similar messages all show direct targeting, Plaintiff's allegations that Facebook used equipment with the capacity to store and produce numbers using a random or sequential number generator remain implausible, and his claim should be dismissed.  *See Flores*, 2015 WL 4340020, at *4 (allegations of "direct targeting … is inconsistent with the sort of random or sequential number generation required for an ATDS"); *Williams*, 2015 WL 5962270, at *3 (dismissing TCPA claim where plaintiff's allegation suggested defendant intended to call plaintiff about a debt owed); *see also Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288, 1292 (S.D. Cal. 2014) (defendant's system lacked the "capacity to store or produce numbers to be called, using a random or sequential number generator," because the phone numbers "only enter[ed] the system through one of three methods," "[n]one [of which] could reasonably be termed a 'random or sequential number generator'").

### B. Plaintiff's Allegations Show That The Login Messages Were Not Sent En Masse And Involved Human Intervention.

Nor do Plaintiff's allegations support an inference that the login messages were sent en masse or without human intervention.[4]  *See* 2015 Order, 30 FCC Rcd. at 7975 ("[T]he basic functions of an autodialer are to 'dial numbers without human intervention' and to 'dial thousands of numbers in a short period of time.'") (quoting 2003 Order, 18 FCC Rcd. at 14092).  Here, as this Court held in dismissing the original complaint, Plaintiff's allegations show specific, targeted messages that were triggered by someone attempting to log in, or by someone's login, and do not suggest the login messages were sent "en masse." *Duguid*, 2016 WL 1169365, at \*5.  As the Court recognized, the login notifications were sent only after one or more individuals took a series of steps: someone signed up for Facebook, "add[ed] [the] mobile number[] to [the] account," and activated login notifications by text message, and then someone had to access that account from a new or unrecognized device in order to trigger a login message.  *Id.*; *see also* FAC ¶ 16 ("When you turn on login notifications, we'll send you an alert each time someone logs into your account from a new place."); *id.* ¶ 14 & Ex. A.  Login approvals require a similar multi-step process to activate, are sent only when someone attempts to log into that account from a new or unrecognized device, and contain a unique security code.  *See* Bodner Decl. Ex. 3 (cited in FAC ¶ 17) ("Login Approvals is a security feature that requires you to enter a code that we text to your phone when you log in from an unrecognized computer.  You can enable this feature in a few simple steps."); *id.* ("You'll need to confirm that you still have access to your phone before turning on Login Approvals.")  Each of the steps for both types of login messages involve the type of "human curation and intervention" that is inconsistent with an ATDS under any interpretation of the term.  *See Derby v. AOL, Inc.*, No. 15-CV-00452-RMW, 2015 WL 3477658, at \*4 (N.D. Cal. June 1, 2015) (ATDS inadequately alleged

---

[4] Courts have tackled the ATDS analysis in different ways.  *Flores* and this Court's decision dismissing the original complaint looked at content, context, and the existence of other messages; other decisions such as *WhisperText*, *Marks*, and *Glauser* have looked at whether the message was sent "en masse" and "without human intervention."  The two analyses ultimately both focus on whether the plaintiff's phone number was directly targeted or randomly or sequentially generated, and whether the same message was sent to many individuals at the same time.  Either way, both approaches show here that an inference that Facebook used equipment with the capacity to randomly or sequentially generate numbers is implausible.

where text "recipient's number [did] not come from a list, but rather [was] provided by the [] user who directed AOL to send the text in the first place"); *see also Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015) (no ATDS shown where defendant's equipment obtained phone numbers "through the actions of the group's creator"); *Marks*, 55 F. Supp. 3d at 1289, 1292 (similar); *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014), reconsideration denied (Feb. 28, 2014) (similar); *WhisperText*, 2015 WL 5264750, at *3-4 (similar).

*WhisperText* is instructive. In *WhisperText*, the court dismissed the complaint on the grounds that plaintiff's allegations "[made] it clear that the Whisper App [could] send SMS invitations only at the user's affirmative direction to recipients selected by the user," and "under such circumstances, the action taken is with human intervention—disqualifying the equipment at issue as any kind of ATDS." *McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728, at *3 (N.D. Cal. Jan. 30, 2015). The plaintiff then amended its complaint to remove allegations about the user's role in deciding to send messages, and added allegations that focused on the Whisper App's processes of "harvesting" phone numbers and transmitting text messages—processes which plaintiff alleged were "automated and performed without any human intervention." *WhisperText*, 2015 WL 5264750, at *2. While the court found it plausible that WhisperText used "automatic processes" in harvesting numbers and transmitting text messages, it concluded that such allegations neither denied nor contradicted the earlier allegations, which showed that "human intervention . . . is necessary to set those processes in motion." *Id.* at *3. This makes sense—the definition of an ATDS does not encompass any equipment that can dial numbers automatically. That would include **every electronic telephone in the country.**

Here, too, in response to this Court's finding of direct targeting, Plaintiff's amended complaint "strives mightily to direct attention to [Facebook's alleged] automated processes, and discusses them as if they were completely detached from any user direction." *Id.* While Plaintiff may claim that "Facebook's system includes a computerized protocol for creating automated text messages programmed to appear customized to the user," FAC ¶ 29, it is clear from the amended

complaint that the text messages are in fact, customized to a particular user and to a specific login or login attempt to the user's account from an unrecognized device. *See, e.g.*, *id.* ¶ 23 (informing Plaintiff that "Your Facebook account was accessed by Facebook for iPhone at 3:57 pm" on January 25th); *id.* ¶ 18 (security approvals require user to enter unique security code sent in text message "whenever you log into Facebook from a new or unrecognized computer."). It is undeniable that multiple instances of human intervention are necessary for each and every login message to be sent. Accordingly, Plaintiff's factual allegations describe a system that does not possess the "basic functions" of an ATDS under the FCC's definition, and Plaintiff's amended complaint should be dismissed with prejudice. *See WhisperText*, 2015 WL 5264750 at *5 ("[I]t is clear the complaint cannot be saved by amendment, given [Plaintiff's] prior allegations about the need for human intervention.").

### C. Plaintiff Has Not Adequately Alleged That Facebook Sent The Login Messages Using A Predictive Dialer Or Equipment That Functions Like A Predictive Dialer.

Plaintiff cannot belatedly salvage his case by invoking the FCC's rulings on predictive dialers. As in the original complaint, Plaintiff has not alleged any facts suggesting that Facebook is using a predictive dialer, *i.e.*, "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *Duguid*, 2016 WL 1169365, at *5-6 (quoting 2003 Order, 18 FCC Rcd. at 14091). Nor could he— predictive dialers are specialized *tele*marketing equipment involving live phone calls, not text messages. Nor has he alleged that Facebook used equipment that "functions like a predictive dialer." *Id.* at *6. While he alleges in conclusory fashion that Facebook stored Plaintiff's number in "a database of phone numbers on its computers" and then "transmit[ted] alert text messages to *selected* numbers from its database using its automated protocol," FAC ¶ 19 (emphasis added), that is insufficient, as the adjective "selected" suggests. Plaintiff's number was "selected" because of human intervention, not randomly or sequentially. That distinguishes this case from both *Nunes v. Twitter, Inc.*, No. 14-CV-02843-VC, 2014 WL 6708465, at *1 (N.D. Cal. Nov. 26, 2014), and *Fields v. Mobile Messengers Am., Inc.*, No. C 12-05160 WHA, 2013 WL 6774076, at *3 (N.D. Cal. Dec.

23, 2013)—both involved allegations that equipment functioned like a predictive dialer because it dialed numbers from a list *without human intervention*.

In its predictive dialer rulings, the FCC did not read the phrase "random and sequential number generator" out of the statutory definition of an ATDS. While the rulings are not models of clarity, the FCC has subsequently suggested that the reason a predictive dialer may qualify as an ATDS is because "even if it is not presently used for that purpose" when dialing from a list, a predictive dialer may still have the *capacity* to "store or produce telephone numbers to be called, using a random or sequential number generator." 2015 Order, 30 FCC Rcd. at 7972-73 ("We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers."). The FCC ruling has also been construed to mean that equipment can be an ATDS if it *dials* a list of numbers randomly or sequentially, as a predictive dialer does in dialing numbers automatically in the order they are delivered to the hardware. *See Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639, 654 (N.D. W. Va. 2014) (holding that equipment is a predictive dialer where it stores lists of numbers and transfers the lists to dialer hardware without human intervention, and the dialer hardware automatically dials "each record contained in the list in the order that they are delivered to the hardware"). Neither interpretation helps Plaintiff, because there was nothing random or sequential about Plaintiff's phone number, and his allegations do not suggest equipment with the capacity to send login messages en masse randomly or sequentially.

### D. Plaintiff's Computer Code Allegations Do Not Salvage His Deficient Claim.

Plaintiff falls back in his amended complaint on a new theory about the "capacity" of the equipment used to send login messages. He first says that even if Facebook did not generate his number randomly or sequentially, its system had the present capacity to do so just "[l]ike any other computer system," and so therefore is an ATDS. FAC ¶¶ 40-43. But Plaintiff misses the point of this Court's decision dismissing the original complaint. As discussed above, the nature of the texts at issue here suggests a level of customization and human intervention that is wholly inconsistent

with a system that generates and dials random or sequential numbers (even if that function was not used). That was the reason the Court granted the motion to dismiss—Plaintiff did not plausibly allege equipment that had the capacity to randomly or sequentially generate numbers. Plaintiff's conclusory allegations about present capacity are entitled to no weight, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and in any event, they do not (and cannot) alter the nature of the texts at issue.

Without a viable path forward under the statute and FCC rulings, Plaintiff starts grasping at straws. In particular, he alleges that "[i]n the unlikely event that Facebook's system does not already have the capacity to generate random or sequential numbers, that capacity can be ***trivially added***." FAC ¶ 44 (emphasis added). To support this claim, Plaintiff comes up with some computer code that allegedly would cause a telephone to generate numbers randomly or sequentially and could theoretically be added to a computerized telephone. *Id.* ¶¶ 44-50. But Plaintiff's hastily-assembled code is a smokescreen. In reality, Plaintiff's theory boils down to this: a plaintiff can allege the use of an ATDS simply by alleging that the defendant used a computerized telephone. After all, a computer can be modified to perform a task with new software. Plaintiff's theory would sweep within the reach of the TCPA not just messages that users opt to receive like the security alerts at issue here, but even text messages to family and friends that are sent with an iPhone. According to Plaintiff's theory, iPhone texts count as ATDS calls because they involve a computer and an app developer could develop an app to call numbers randomly or sequentially that could be installed on the iPhone. If an iPhone user misdials a call, or calls a number that has been reassigned, then not only has the caller used an "automated telephone dialing system," but it has also violated the TCPA.

This is absurd and is so far removed from the concerns that animated Congress that it is no wonder no court has ever embraced it. Instead, courts have refused to endorse a theory of an ATDS that would sweep in every computerized telephone. *See Marks*, 55 F. Supp. 3d at 1291 ("Because these modern-day devices are easily programmable, anyone who uses a computer or smartphone would be subject to the TCPA. . . . It seems unlikely that Congress intended to subject such a wide swath of the population to a law designed to combat unwanted and excessive telemarketing.");

*Gragg*, 995 F. Supp. 2d at 1192-93 ("Adopting plaintiff's broad interpretation . . . would capture many of contemporary society's most common technological devices within the statutory definition."); *De Los Santos v. Millward Brown, Inc.*, No. 13-80670-CV, 2014 WL 2938605, at *6 (S.D. Fla. June 30, 2014) (rejecting similar construction with the statute because "[o]therwise, the term autodialer would have no 'outer limit,' for '[v]irtually every telephone in existence, given a team of sophisticated engineers working doggedly to modify it, could possibly store or produce numbers using a random or sequential number generator'") (quoting *Hunt v. 21st Mortg. Corp.*, No. 2:12-CV- 2697, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013)).

## III.  PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM BECAUSE THE ALLEGED LOGIN MESSAGES ARE SENT FOR EMERGENCY PURPOSES.

Plaintiff's claims fail for the independent reason that the alleged login messages fall squarely within the TCPA's broad exception for calls "made for emergency purposes."  47 U.S.C. § 227(b)(1)(A); *see In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8778 ¶ 51 (1992) ("1992 Order") (noting the TCPA's "broad exemption for emergency calls").  Plaintiff again alleges in conclusory fashion that the login messages "were not placed for 'emergency purposes.'"  FAC ¶ 37.  But that assertion is belied by Plaintiff's own allegations, which explain that login messages are "extra security feature[s]" to protect accounts from hacking.  *Id.* ¶¶ 14, 18 & Ex. A; *see also id.* ¶¶ 23-26 (informing Plaintiff of the various times and locations from which "[y]our Facebook account" was suspiciously accessed by unrecognized devices).); Bodner Decl. Ex. 4 (listing Facebook's numerous security features, including login notifications, and stating that "[a]t Facebook, we take the privacy and safety of the people who use our site very seriously" and "Facebook works to eliminate security threats and spam to keep your information secure").  As Facebook explained in its motion to dismiss Plaintiff's original complaint, login messages quickly send important security messages and serve a similar function as prerecorded calls do for public utility companies, which "speed the dissemination of information regarding service interruptions or other potentially hazardous conditions to the public," and which the FCC has already ruled fall within the emergency exception.  *See* 1992 Order, 7 FCC Rcd. at 8778.

The FCC has recognized that messages about possible breaches of customers' information warrant protection from TCPA liability. In a 2015 ruling, the FCC agreed with the American Bankers Association ("ABA") that messages about "a risk of fraud or identity theft" or "possible breaches of the security of customers' personal information" deserve protection from TCPA liability because they "address exigent circumstances in which a quick, timely communication with a consumer could prevent considerable consumer harms from occurring." 2015 Order, 30 FCC Rcd. at 8023-25 ¶¶ 127, 132. Other federal agencies have similarly explained that calls made to warn consumers of potential identity theft fall within the TCPA's emergency exception. *See* FDIC, OCC and Board of Governors of the Federal Reserve's Interagency Guidance On Response Program For Information Security Breach, 2009 WL 2656073 ¶¶ 100-259; National Credit Union Administration's Compl. Guide for Cr. Unions, NAFCUCG 33 Ex. 33.6

Common sense also dictates that login messages are not within the scope of the invasive calls Congress sought to curtail. The courts in this circuit "broadly recognize that not every text message or call constitutes an actionable offense; rather, the TCPA targets and seeks to prevent 'the proliferation of intrusive, nuisance calls.'" *Ryabyshchuck v. Citibank (S.Dakota) N.A.*, 2012 WL 5379143, at *2 (S.D. Cal. Oct. 30, 2012) (quoting *Mims*, 132 S. Ct. at 744). Accordingly, these courts have declared that "[c]ontext is indisputably relevant to determining whether a particular call is actionable under the TCPA," *Ryabyshchuck*, 2012 WL 5379143 at *3, and that application of statutory liability for any given call or text must be done with a "'common sense' approach." *Freidman*, 2013 WL 3026641, at *4 (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

As Plaintiff's own pleading makes clear, login messages are designed to ***prevent*** invasions of privacy and security breaches. *See, e.g.*, FAC ¶ 14; Bodner Decl. Ex. 4 (cited in FAC ¶ 20).[5] Just

---

[5] Indeed, in 2015, Slate reported that Venmo, a popular application that links users' bank accounts and allows them to quickly send money to one another, has experienced problems with hackers. One user reportedly became aware that his account was hacked only when his financial institution sent him a notification that his account "had a pending transaction involving a large sum of money. *See* Bodner Decl. Ex. 2, Alison Griswold, *Venmo is Trendy, Easy to Use, and Growing Fast. But are Its Mobile Payments Safe?*, Slate (Feb. 25, 2015, 8:10 PM).

like the information conveyed by financial institutions, login messages protect against "fraud or identity theft" or "possible breaches of the security of customers' personal information" and are "intended to address exigent circumstances in which a quick, timely communication with a consumer could prevent considerable consumer harms from occurring." 2015 Order, 30 FCC Rcd. at 8023-25 ¶¶ 127, 132. Facebook's login messages are a "normal, expected, and desired business communication," with the urgent purpose of warning people that their financial instruments and personal information may be at risk and rapid action required. They do not include any solicitations or advertisements; they provide expedited, valuable information—that consumers have affirmatively requested—aimed at protecting consumers' privacy. Construing Plaintiff's allegations about login messages as stating a claim would fly in the face of the TCPA's "broad" emergency exception, 1992 Order, 7 FCC Rcd. at 8778, and produce an "absurd and unforeseen result" that Congress did not intend. *Ryabyshchuck*, 2012 WL 5379143 at *4.

## IV. THE TCPA VIOLATES THE FIRST AMENDMENT ON ITS FACE AND AS APPLIED TO LOGIN MESSAGES.

If the Court concludes that the TCPA reaches the speech at issue here, it should hold that the TCPA violates the First Amendment as a content-based restriction of speech that cannot survive strict scrutiny. The First Amendment prevents Congress from passing laws "abridging the freedom of speech." U.S. Const. Amend. I. A restriction of speech is "content-based" on its face when it "draws distinctions based on the message a speaker conveys." *Reed*, 135 S. Ct. at 2227. As the Supreme Court recently reiterated, content-based restrictions of speech are "presumptively unconstitutional," *id.* at 2226 and subject to "the most exacting standard of review," *id.* at 2237 (Kagan, J., concurring), no matter "the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech," *id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

The TCPA is plainly content-based on its face because it is riddled with exceptions that "draw[] distinctions based on the message a speaker conveys," and that allow the government to pick and choose what speech is desirable and what speech is not—the hallmarks of a content-based restriction of speech. *Reed*, 135 S. Ct. at 2227; *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2531

(2014) (a statute is content-based "if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred") (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)); *United Bhd. of Carpenters & Joiners of Am. Local 586 v. NLRB*, 540 F.3d 957, 966 (9th Cir. 2008) ("We . . . reiterate that the examination of the content of a speaker's message is the hallmark of a content-based rule."). For example, as recently amended, the TCPA exempts from liability a call "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584; *see* 47 U.S.C. § 227(b)(1)(A)(iii). It is difficult to imagine a more blatant example of the government distinguishing speech that it clearly favors for naked financial reasons (debt collection calls about government-issued or government-backed debt) from speech that it does not (any other debt collection call). The TCPA also broadly exempts any "call made for emergency purposes." 47 U.S.C. § 227(b)(1)(A), (B). And the statute empowers the FCC to exempt calls made to a wireless number with an ATDS if the calls "are not charged to the called party" and are "in the interest of the privacy rights this section [was] intended to prevent." *Id.* § 227(b)(2)(C); *see also id.* § 227(b)(2)(B)(ii)(I) (similar for artificial or prerecorded voice calls to residential lines). The FCC has applied this malleable "privacy" exception to calls about such matters as medical appointment reminders. *See* 2015 Order, 30 FCC Rcd. at 8030-31 ¶¶ 145-46 (considering the content of the messages, and granting exemption only with respect to calls "that have a healthcare treatment purpose," including appointment reminders and confirmations). These exceptions plainly "distinguish[] one kind of speech from another by reference to its meaning," and under *Reed*, "require[] a compelling justification. *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015) (discussing *Reed*).

In *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 874 (9th Cir. 2014), *cert. granted on nonrelevant issue*, 135 S. Ct. 2311 (2015), *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016), the Ninth Circuit assumed that the automated call provision of the TCPA was content-neutral because it does not distinguish between commercial and noncommercial speech—it regulates both. However, the Ninth Circuit observed that the defendant in that case had "not argue[d]" that **exceptions** to the

automated call provision made it a content-based regulation, and the Ninth Circuit noted that like the junk-fax provision of the TCPA, 47 U.S.C. § 227(b)(1)(C), the automated call provision in fact has content-based exceptions. *See Gomez*, 768 F.3d at 876 n.3 (citing *Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995), which held that the junk-fax provision is content-based). *Gomez* thus previewed the argument that Facebook makes here. Although some courts have addressed First Amendment challenges to the TCPA, *see, e.g.*, *Zilveti v. Glob. Mktg. Research Servs., Inc.*, No. C-15-2494 MMC, 2016 WL 613010, at *3 (N.D. Cal. Feb. 16, 2016) (rejecting First Amendment argument that the TCPA impermissibly constitutes a blanket ban on political speech), no court has ever addressed whether the TCPA's exceptions render it a content-based restriction of speech that can survive strict scrutiny. This is a question of first impression and one of critical importance in light of the proliferation of TCPA lawsuits.[6]

Because it is content-based, the TCPA is subject to strict scrutiny. The "purpose of the [strict scrutiny] test is not to consider whether the challenged restriction has some effect in achieving Congress' goal. . . . The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004). "A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005). Even if the government's interest in promoting privacy is a compelling one, the TCPA, with its amorphous exceptions, still flunks the strict scrutiny test for three independent reasons.

---

[6] The Ninth Circuit had previously rejected the argument that the artificial prerecorded message provision of the TCPA, 47 U.S.C. § 227(b)(1)(B), is content-based, but again it did so only on the ground that that provision does not "distinguish between commercial and noncommercial speech." *Moser v. FCC*, 46 F.3d 970, 973 (9th Cir. 1995). The parties in that case did not raise, and the Ninth Circuit has never addressed, whether any exception renders that provision content-based.

First, the TCPA's expansive exceptions render it "hopelessly underinclusive." While Plaintiff complains about supposedly unwanted login messages from Facebook, the speech that the TCPA exempts is no different. Unwanted calls about emergencies are no greater an intrusion of privacy than unwanted calls about account information. Unwanted calls about medical appointments or prescriptions may be at least as annoying as unwanted calls about a data breach. And finally— and most obviously—unwanted calls about government debt are no less invasive than unwanted calls about private debt. The (increasing) patchwork of exceptions that pocks the TCPA causes it to fail the tailoring prong of strict scrutiny. As was the case in *Reed*, the government "cannot claim that placing strict limits on [some calls] is necessary to [promote privacy] while at the same time allowing unlimited numbers of other types of [calls] that create the same problem." 135 S. Ct. at 2231. A "'law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Republican Party,* 416 F.3d. at 763 (quoting *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002)).

*Second*, the statute is also overinclusive because it sweeps far beyond the concerns that motivated its passage. The TCPA was Congress's response to telemarketing abuse involving certain computerized equipment that would generate numbers to be called at random or in a particular sequence. *See* 47 U.S.C. § 227 note (expressing deep concern over the "proliferation of unwanted, nuisance calls to [customers'] homes . . . due to the increased use of cost-effective telemarketing techniques"); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012) (noting that Congress passed the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology"). The TCPA sought to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home," S. Rep. No. 102-178, at 1 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 1968, using particular "telecommunications equipment," H.R. Rep. No. 102-317, at 5 (1991).

But Plaintiff seeks to apply the TCPA not to a telemarketing call made to a randomly or sequentially generated number, but to a targeted login message offered as an optional, "extra security

feature" to alert a participating Facebook user to a potential hacking. In striking down a South Carolina robocall statute, the Fourth Circuit in *Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015), recognized that a mismatch between the concerns that animated the passage of a statute and its proposed application means that statute cannot survive strict scrutiny. In that case the mismatch was between the concerns about commercial calls that led to the statute's creation (similar to the TCPA) and the application of the statute to noncommercial calls. *See id.* at 406. In fact, *Cahaly* cited the House Report on the TCPA as support for the holding that the South Carolina statute was overinclusive. *Id.* Application of the TCPA here similarly targets messages well outside the scope of Congress's concern, such as security notifications that people who signed up for those accounts actually want to receive.

***Third*,** as the Fourth Circuit recognized in *Cahaly*, there are numerous less restrictive alternatives for "protect[ing] residential privacy and tranquility from unwanted and intrusive robocalls," *id.* at 405, which are the governmental interests at stake with the TCPA. These "less restrictive alternatives include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists." *Id.* Each of these would advance Congress's interest in promoting privacy without requiring the government to sift through speech to determine its worth and value.

Banning some calls and exempting others "may seem like a perfectly rational way to regulate [calls], but a clear and firm rule governing content neutrality is an essential means of protecting the freedom of speech, even if laws that might seem 'entirely reasonable' will sometimes be 'struck down because of their content-based nature.'" *Reed*, 135 S. Ct. at 2231 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)). This case involves allegations that Facebook used text messages to convey information that people request, namely alerts about potential account breaches. As evidenced by the login messages at issue in this case, the people who use Facebook desire a flow of information that is now possible thanks to the innovations of the recent decade. Yet potential TCPA liability makes the provision of legitimate, desired communications a risky activity for Facebook. If construed to reach the login messages at issue here, the TCPA would reach so broadly that it is unconstitutional both on its face and as applied.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.


Dated:  May 26, 2016                     Respectfully submitted,
                                           KIRKLAND & ELLIS LLP


*/s/ Andrew B. Clubok*

Andrew B. Clubok  (*pro hac vice*)
Carrie J. Bodner (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-6460
Email:  andrew.clubok@kirkland.com
Email:  carrie.bodner@kirkland.com

Elizabeth L. Deeley (SBN 230798)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500
Email:  elizabeth.deeley@kirkland.com

Susan E. Engel (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200
Email: susan.engel@kirkland.com

*Attorneys for Defendant Facebook, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

　　　　　　　　　　　　　　 /s/ *Andrew B. Clubok*　　　　　
　　　　　　　　　　　　　　 Andrew B. Clubok