SERGEI LEMBERG
Lemberg Law, LLC
1100 Summer Street
Stamford, CT  06905
Telephone:  (203) 653-2250
Facsimile:  (203) 653-3424
E-mail: slemberg@lemberglaw.com

TRINETTE G. KENT (State Bar No. 222020)
10645 North Tatum Blvd., Suite 200-192
Phoenix, AZ 85028
Telephone:  (480) 247-9644
Facsimile:  (480) 717-4781
E-mail: tkent@lemberglaw.com

Attorneys for Plaintiff,
Noah Duguid

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Noah Duguid, *on behalf of himself and all others similarly situated* <br><br> Plaintiff, <br><br> vs. <br><br> Facebook, Inc., <br><br> Defendant. | Case No.:  3:15-cv-00985-JST <br><br> **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** <br><br> Hearing Date:  September 22, 2016 <br> Time:  2:00 PM <br> Court:  Courtroom 9 <br> Judge:  Hon. Jon S. Tigar |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .........................................................................................2

    I.    Plaintiff Received Illegal Automated Text Messages from Facebook .2

    II.   Facebook's Text Messages Were Sent From an Automatic Telephone Dialing System Without Human Intervention ......................................4

STANDARD OF REVIEW ........................................................................................4

ARGUMENT .........................................................................................................5

    I.    Plaintiff Alleges Concrete Injury and Has Standing............................5

    II.   Plaintiff Plausibly Alleges Facebook's Use of an ATDS .....................8

        A.    Plaintiff Plausibly Alleges Facebook's Use of an ATDS...........8

        B.    The Messages' Content Supports ATDS Use .........................13

        C.    The Messages' Context Supports ATDS Use, Not Human Intervention..............................................................................15

        D.    Plaintiff Plausibly Alleges Facebook's Use of Equipment which has the Capacity to Sequentially and Randomly Dial .............17

    III.   Facebook's Messages Address No Emergency Situation and are Not Exempt From TCPA Liability ...........................................................19

        A.    Binding Ninth Circuit Precedent Requires this Court to Uphold the TCPA .....................................................................................23

        B.    Supreme Court Precedent Supports the Ninth Circuit's Rulings24

        C.    Congress's 2015 TCPA Amendment Cannot Render the Entire TCPA Unconstitutional ...........................................................26

CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................................4, 5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................................4

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S. Ct. 2794 (1985) .................27

*Campbell-Ewald v. Gomez*, 768 F.3d 871 (9th Cir. 2014) ................................... passim

*CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443 (7th Cir. 2010) ...........18

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 108 S. Ct. 2138 (1988)27

*Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 104 S. Ct. 3065 (1984)....24

*Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242 (9th Cir. 1990) 5

*Cunningham v. Kondaur Capital*, No. 3:14-1574, 2014 WL 8335868 (M.D. Tenn. Nov. 19, 2014) ............................................................................................................9

*Derby v. AOL, Inc.*, No. 15-cv-00452-RMW, 2015 WL 3477658 (N.D. Cal. June 1, 2015) ........................................................................................................................16

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ...............................................................24

*Dominguez v. Yahoo, Inc.*, 629 Fed. App'x 369 (3d Cir. 2015)............................12, 13

*Duguid v. Facebook, Inc.*, 3:15-cv-00985-JST, 2016 WL 1169365 (N.D. Cal. Mar. 24, 2016) .................................................................................................1, 8, 9, 11

*Flores v. Adir Int'l, LLC*, No. CV 15-00076-AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015) ..................................................................................................................14

*Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015) ........................................................................................................................18

*Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014) ..............16

*Gragg v. Orange Cab Co., Inc.*, No. C12-0576RSL, 2013 WL 195466 (W.D. Wash. Jan. 17, 2013).............................................................................................................8

*Hernandez v. Collection Bureau of America, Ltd.*, No SACV 13-01626-CJC(DFMx), 2014 WL 4922379 (C.D. Cal. Apr. 16, 2014).........................................................18

*Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125 (W.D. Wash. 2012)...........................9

*Hill v. Colorado*, 530 U.S. 703, 120 S. Ct. 2480 (2000) ........................................24, 25

*Hovila v. Tween Brands, Inc.*, No. C09-0491RSL, 2010 WL 1433417 (W.D. Wash. Apr. 7, 2010) ..............................................................................................................25

*In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012) 9

*King v. Time Warner Cable*, 113 F. Supp. 3d 718 (S.D.N.Y. 2015)..............................6

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........................................................5

*Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. App'x 444 (6th Cir. 2013).......18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992).....................5, 6

*Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) .............18

*Martin v. Pioneer Credit Recovery, Inc.*, No. 2:15-cv-02099-CSB-EIL (C.D. Ill. Jan. 4, 2016) ......................................................................................................................7

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014).......................................................24, 26

*McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015)...............................................................................................13, 16, 17

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) ...................5

*Meyer v. Portfolio Recovery*, 707 F.3d 1036 (9th Cir. 2012)........................................8

*Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639 (N.D.W. Va. 2014)....................10

*Moser v. F.C.C.*, 46 F.3d 970 (9th Cir. 1995) ..............................................22, 23, 26

*Nack v. Walburg*, 715 F.3d 680 (8th Cir. 2013) .........................................................18

*Neptune v. Whetstone Partners, LLC*, 34 F. Supp. 3d 1247 (S.D. Fla. 2014)...............9

*Nunes v. Twitter, Inc.*, No. 14-cv-02843-VC, 2014 WL 6708465 (N.D. Cal. Nov. 26, 2014) ................................................................................................................. passim

*Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015)..........................................................................................................7

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) .......................................................26

*Regan v. Time, Inc.*, 468 U.S. 641, 104 S. Ct. 3262 (1984) ......................................27

*Robbins v. Coca-Cola-Co.*, No. 13-CV-132-IEG (NLS), 2013 WL 2252646 (S.D. Cal. May 22, 2013)...............................................................................................................8

*Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014) ...................................................5

*Ryabyshchuck v. Citibank (S. Dakota) N.A.*, No. 11-CV-1236-IEG (WVG), 2012 WL
    5379143 (S.D. Cal. Oct. 30, 2012) ...........................................................................21

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...........8, 18, 25, 26

*Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012)...............6, 7, 12

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...................................................1, 5, 6, 7

*Vivid Entm't, LLC v. Fielding*, 774 F.3d 566 (9th Cir. 2014) .....................................27

*Ward v. Rock Against Racism*, 491 U.S. 781, 109 S. Ct. 2746 (1989)...................23, 24

**Statutes**

28 U.S.C. 2342(1) ..............................................................................................................18

47 U.S.C. § 227 notes § 2 ...................................................................................................8

47 U.S.C. § 227(a)(1) ................................................................................................1, 9, 17

47 U.S.C. § 227(b)(1) ..........................................................................................................8

47 U.S.C. § 227(b)(1)(A)........................................................................................... passim

47 U.S.C. § 227(b)(1)(B) ...................................................................................................23

**Rules**

Fed. R. Civ. P. 8(a)(2)..........................................................................................................4

**Regulations**

47 C.F.R. § 64.1200(f)(4) ....................................................................................19, 21, 25

**Other**

https://www.fcc.gov/guides/wireless-emergency-alerts-wea .......................................20

*In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of
    2012*, 27 F.C.C.R. 13615 (2012) ..............................................................................22

*Rules and Regulations Implementing the Telephone Consumer Protection Act of
    1991*, CG Docket No. 02–278, Report and Order, 18 FCC Rcd. 14014 (2003) ...6, 9,
    10

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
Declaratory Ruling and Order, CG Docket No. 02-278, FCC 15-72 (July 10, 2015)
................................................................................................................... passim

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
Report and Order, 7 F.C.C.R. 8752 (1992) ........................................................20, 25

Warning, Alert and Response Network ("WARN") Act, H.R. 5556, 109th Cong.
(2006) ................................................................................................................20

**Legislative History**

137 Cong. Rec. 30,821-30,822 (1991) ...........................................................................7

Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584 .............26

On March 24, 2016, this Court granted Defendant Facebook Inc.'s ("Facebook") Motion to Dismiss because the Complaint did not plausibly allege Facebook's use of an 'automatic telephone dialing system' ("ATDS") under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(a)(1). The Court found that ATDS "encompass any equipment that stores telephone numbers in a database and dials them without human intervention," *Duguid v. Facebook, Inc.*, 3:15-cv-00985-JST, 2016 WL 1169365, at *5 (N.D. Cal. Mar. 24, 2016), however the Court held that Plaintiff's complaint pursued a different theory of ATDS, *id.* at *6 ("But Duguid has not alleged that Facebook uses . . . equipment that functions like a predictive dialer.")), and thus was not plausible.

Plaintiff's Amended Complaint remedies the deficiency head-on. Plaintiff alleges, with factual specificity, that Facebook (1) stored telephone numbers in a database, including Plaintiff's, and then (2) sent those numbers template-based 'login notification' text messages automatically without any human intervention. (Doc. No. 53 ("FAC") ¶¶ 13-33).

Plaintiff also alleges, consistent with the Federal Communications Commission's ("FCC") 2015 TCPA Order, that Facebook's system has the *capacity* to sequentially and randomly dial, or that the capacity could be added. (FAC ¶¶ 40-50). Facebook asks the Court to expressly defy the FCC's 2015 Order and rule that its system cannot be an ATDS if it cannot *currently* dial sequentially or randomly. Under the Hobbs doctrine, the District Court must follow the FCC and find that Plaintiff has sufficiently pled Facebook's computer-based system's *capacities* as an ATDS.

Facebook argues Plaintiff has failed to allege a concrete harm and thus lacks standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). That is not so. Plaintiff alleges being "frustrated with [Facebook's] text message bombardment." (FAC ¶ 25; *see also* FAC ¶ 34). Plaintiff further alleges that Facebook committed

"extreme invasions into the privacy of American consumers," including himself. (FAC ¶¶ 55-56). Finally, Plaintiff alleges economic harm in the form of used-up and interfered-with cellular telephone services for which he pays. (FAC ¶ 36). Any one of these three harms satisfies *Spokeo*.

Facebook next argues its errant text messages are of such dire importance as to qualify for the "emergency purposes" exception of the TCPA. The emergency purposes exception is reserved for life-threatening emergencies like natural disasters and Amber alerts, or select, condition-laden messages from financial institutions and healthcare providers. Facebook's text messages at issue here do not qualify.

Finally, Facebook argues that the TCPA provisions at issue here violate the First Amendment. The Ninth Circuit has twice held that they do not. The United States has already defended the constitutionality of the TCPA here and is expected to do so again. The constitutionality of the 2015 TCPA amendment is irrelevant because even if it were unconstitutional, it would be severed from the rest of the TCPA (the part the Ninth Circuit has found constitutional, twice).

## STATEMENT OF FACTS

### I. Plaintiff Received Illegal Automated Text Messages from Facebook

Plaintiff has never had a Facebook account and never provided his cell phone number to Facebook. (FAC ¶ 13). Nonetheless, in January, 2014, Facebook began placing automated text messages to Plaintiff's cellular telephone. (FAC ¶ 21). Facebook's messages were sent from number 326-65 (spelling FBOOK), an abbreviated telephone number known as an SMS short code licensed and operated by Facebook or one of its agents on its behalf. (FAC ¶ 22). The messages followed the same pre-loaded template, stating: "Your Facebook account was accessed from [_BROWSER_] at [_TIME_]. Log in for more info." (FAC ¶¶ 23-30).

Plaintiff repeatedly requested that the text messages stop. In response to the text messages, Plaintiff responded "Off." Facebook responded that the texts "are now off," yet the texts continued:





(FAC ¶¶ 25-26).  By email, Plaintiff told Facebook that he was receiving unwanted messages and could not make them stop. (FAC ¶ 34).  Facebook did not honor Plaintiff's request or respond in any meaningful manner.  Instead, Facebook sent Plaintiff an email telling him how to report unwanted content on a Facebook page. (FAC ¶ 35).  As Plaintiff told Facebook, the stock, automated email response "missed the point of [Plaintiff's] original abuse report entirely." (FAC ¶ 35, Ex. B).

Facebook provides instructions on its website to deactivate the login notification feature by accessing the subject Facebook account and changing the account settings. (FAC ¶ 52).  These instructions are irrelevant to consumers like Plaintiff who do not have access to a Facebook account.  Facebook offers no solution for these consumers. (FAC ¶ 58 (class members either (1) did not provide Facebook their number, or (2) were unsuccessful in opting out by responding to Facebook's text messages).  In sum, Facebook's automated system is broken, does not offer the protections *required* by the FCC, and provides no way for Plaintiff and similarly situated consumers to stop its aggravating and invasive automated text messages.

## II. Facebook's Text Messages Were Sent From an Automatic Telephone Dialing System Without Human Intervention

Facebook services over a billion Facebook accounts worldwide. (FAC ¶ 55). Facebook does not send personalized, human-initiated login notifications for this large number of Facebook accounts. Instead, it relies on fully automated computer systems to send text messages to telephone numbers it has stored in databases. The messages are automatically sent when the subject Facebook account is accessed from an unknown device. (FAC ¶ 14-20, Ex. A).

The messages' content is compiled using pre-loaded templates. (FAC ¶¶ 23-30). The templates are automatically filled with the browser and date of a particular login attempt using computer coding, not humans. (FAC ¶¶ 29-32). Thus, what appear to be customized messages are, in fact, created through a computer algorithm with no human involvement. (FAC ¶ 33). No one is writing a text message, no one is pressing send, and no one is deciding to send any specific message. (FAC ¶ 39).

Moreover, Facebook's computer system is capable of dialing telephone numbers randomly or sequentially. If the system does not have the current capacity to generate random or sequential phone numbers, this capability could be trivially added to Facebook's computer system. (FAC ¶¶ 40-50). Facebook's system, which already automatically dials from a database of telephone numbers (FAC ¶¶ 14-20), could also automatically dial those sequentially or randomly generated phone numbers (FAC ¶ 43).

## STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

If a motion to dismiss is granted, a court should normally grant leave to amend unless it determines that the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## ARGUMENT

### I. Plaintiff Alleges Concrete Injury and Has Standing

Facebook first argues Plaintiff lacks standing under the Supreme Court's recent *Spokeo* decision because "he has failed to allege a concrete injury." (Doc. No. 65 p. 16:18). However, Plaintiff does clearly plead multiple concrete injuries cognizable under *Spokeo*, requiring denial of Facebook's motion on this basis.

Standing consists of three elements: an injury in fact, fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision. *Spokeo*, 136 S. Ct. at 1547 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)). To establish injury in fact, Plaintiff must show that he suffered an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent." *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). A concrete injury must be *de facto*, *i.e.* it must "actually exist." *Id.*

In *Spokeo*, the Ninth Circuit held that the mere violation of a statutory right is a sufficient injury in fact to confer standing, regardless of actual harm. *Robins v. Spokeo, Inc.*, 742 F.3d 409, 412 (9th Cir. 2014). The Supreme Court vacated, ruling

that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*

To guide the concrete injury inquiry, the Supreme Court distilled several "general principles" from its prior cases. First, concrete injuries need not be "tangible." *Id.* at 1549-50. Second, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* at 1549. Accordingly, if the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," the plaintiff will have suffered a concrete, redressable injury. *Id.* Moreover, "Congress is well positioned to identify intangible harms that meet minimum Article III requirements," thus its judgment in elevating previously inadequate injuries is "instructive and important." *Id.* (citing *Lujan*, 504 U.S. at 578).

Here, Plaintiff alleges tangible and intangible harms cognizable under *Spokeo*. Plaintiff alleges economic harm in the form of used-up and interfered-with cellular telephone services for which he pays. (FAC ¶ 36). *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02–278, Report and Order, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003) (the "2003 TCPA Order") ("The [FCC] has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used."); *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639 (7th Cir. 2012) (identifying as actual harms "the cost of airtime minutes and . . . listen[ing] to a lot of useless voicemail"); *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 728 (S.D.N.Y. 2015) ("The legislative history of the TCPA makes clear that the provision against

autodialing was drafted to protect consumers who pay additional fees for cellular phones, pagers, or unlisted numbers [and] are inconvenienced and even charged for receiving unsolicited calls from automatic dialer systems." (internal quotation marks omitted)); *see also Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015) (finding "concrete and personalized injury in the form of the occupation of [plaintiff's] fax machine for the period of time required for the electronic transmission of the data").

Moreover, Plaintiff alleges being "frustrated with [Facebook's] text message bombardment" (FAC ¶ 25; *see also* FAC ¶ 34), a harm clearly 'elevated' by Congress and recognized by courts. *See* 137 Cong. Rec. 30,821-30,822 (1991) (Statement of Sen. Hollings) (labeling robocalls "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall."); *see also Soppet*, 679 F.3d at 639 (identifying having to "listen to a lot of useless voicemail" as a harm); *Martin v. Pioneer Credit Recovery, Inc.*, No. 2:15-cv-02099-CSB-EIL (C.D. Ill. Jan. 4, 2016) ("Unlike the plaintiff in *Robins*, Plaintiff's Complaint alleges an actual harm: the unauthorized phone calls he received from Defendant in violation of the TCPA."). Indeed, not only did Plaintiff endure the unpleasantness of receiving Facebook's unwanted and entirely irrelevant text messages (they were not for him—he is not a Facebook user), he wasted time and energy asking Facebook to stop the messages, which Facebook ignored. (FAC ¶¶ 25-26, 34-35).

Finally, Plaintiff alleges that Facebook committed "extreme invasions into the privacy of American consumers," including himself. (FAC ¶¶ 55-56 (consumers complaining of text messages from Facebook "at all hours of the night")). Invasion of privacy "has traditionally been regarded as providing a basis for a lawsuit in . . . American courts," *Spokeo*, 136 S. Ct. at 1549, and Congress sought to elevate invasions of privacy committed via consumers' phones with autodialers, *see* 47

U.S.C. § 227 notes § 2 ("The Congress finds that: . . . [b]anning automated or prerecorded telephone calls . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion."); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) ("The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy. . . . [A] voice message or a text message are not distinguishable in terms of being an invasion of privacy."). Accordingly, Plaintiff has alleged concrete harms and has standing.

**II.  Plaintiff Plausibly Alleges Facebook's Use of an ATDS**

A. Plaintiff Plausibly Alleges Facebook's Use of an ATDS

Seeking to turn the motion to dismiss into one for summary judgment, Facebook argues that its system cannot be an ATDS because "the messages were not sent en masse and were sent with human intervention." (Doc. No. 65 p. 17:15-16). At the pleading stage, "a plaintiff must allege that '(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent.'" *Duguid*, 2016 WL 1169365, at *4 (quoting *Meyer v. Portfolio Recovery*, 707 F.3d 1036, 1043 (9th Cir. 2012)); 47 U.S.C. § 227(b)(1). The bar for alleging ATDS is low, especially in the case of text messages, where the only facts are as to the receipt of the messages themselves:

> Plaintiffs alleging the use of a particular type of equipment under the TCPA are generally required to rely on indirect allegations, such as the content of the message, the context in which it was received, and the existence of similar messages, to raise an inference that an automated dialer was utilized. Prior to the initiation of discovery, courts cannot expect more.

*Robbins v. Coca-Cola-Co.*, No. 13-CV-132-IEG (NLS), 2013 WL 2252646, at *3 (S.D. Cal. May 22, 2013) (quoting *Gragg v. Orange Cab Co., Inc.*, No. C12-0576RSL, 2013 WL 195466, at *2 n.3 (W.D. Wash. Jan. 17, 2013)); *see Duguid*, 2016 WL 1169365, at *4 ("Because it may be difficult for a plaintiff to identify the

specific type of dialing system used without the benefit of discovery, courts have allowed TCPA claims to proceed beyond the pleading stage where a plaintiff's allegations support the inference that an ATDS was used."); *see, e.g.*, *Cunningham v. Kondaur Capital*, No. 3:14-1574, 2014 WL 8335868, at *6 (M.D. Tenn. Nov. 19, 2014) (finding plaintiff sufficiently alleged use of ATDS where alleged "[text] messages were repeated within a short span of time and consisted of the same content"); *Neptune v. Whetstone Partners, LLC*, 34 F. Supp. 3d 1247, 1250 (S.D. Fla. 2014) (finding plaintiff sufficiently alleged use of ATDS where he "describe[d] the generic content of the messages, *i.e.*, a prerecorded voice reminding Plaintiff that his payment was due"); *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012) (plaintiff stated a claim where alleged "that Voxer transmit[ted] automated text messages to lists of cell phone numbers that Voxer [was] given access to," and "the generic form of the message"); *In re Jiffy Lube Intern., Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1260 (S.D. Cal. 2012) (class action plaintiffs sufficiently alleged use of ATDS where plaintiffs "stated that they received a text message from an SMS short code and that the message was sent by a machine with the capacity to store or produce random telephone numbers").

Plaintiff far surpasses the required threshold. The TCPA defines ATDS as "equipment which has the capacity—(A) to store **or** produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added). This definition contemplates "autodialing equipment that either stores or produces numbers." 2003 TCPA Order, at ¶ 132. Thus, as acknowledged by this Court, equipment is an ATDS if it "stores telephone numbers in a database and dials them without human intervention." *Duguid*, 2016 WL 1169365, at *5 (quoting *Nunes v. Twitter, Inc.*, No. 14-cv-02843-VC, 2014 WL 6708465, at *1 (N.D. Cal. Nov. 26, 2014)). Moreover, the FCC has repeatedly rejected ATDS definitions "that fit only a narrow set of circumstances in favor of broad definitions which best reflect[] legislative intent by accommodating the full

range of telephone services." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, CG Docket No. 02-278, FCC 15-72, at ¶ 16 (July 10, 2015) (the "2015 TCPA Order") (internal quotation marks omitted). "The basic functions of an autodialer are to dial numbers without human intervention and to dial thousands of numbers in a short period of time." 2015 TCPA Order, at ¶ 17 (internal quotation marks omitted). "Human intervention," in turn, means significant human involvement in the *dialing* of a number, and any human involvement with phone number compilation is irrelevant. *See* 2003 TCPA Order, at ¶ 132 ("The basic function of [ATDS], however, has not changed—the capacity to *dial* numbers without human intervention.") (emphasis added and omitted); *Moore v. Dish Network L.L.C.*, 57 F. Supp. 3d 639, 654 (N.D.W. Va. 2014) ("[I]t is irrelevant under the FCC's definition of a predictive dialer that humans are involved in the process of creating the lists that are entered into the Campaign Manager software.").

Plaintiff plausibly alleges Facebook's use of powerful automated equipment that stores and dials thousands of numbers in short periods of time without human intervention. First, Plaintiff alleges that Facebook *stores* telephone numbers in a database. Plaintiff alleges, and Facebook acquiesces, that Facebook acquires telephone numbers when consumers sign up for a Facebook account. (FAC ¶¶ 14, 19, 38; Doc. No. 65 p. 21:8-11 ("As the Court recognized, the login messages were sent only after one or more individuals took a series of steps: someone signed up for Facebook, "add[ed] [the] mobile number[] to [the] account," and activated login notifications by text message . . . ." (alterations in original))). Facebook then stores these telephone numbers in a database, to be dialed when "someone . . . access[es] that account from a new or unrecognized device." (Doc. No. 65 p. 21:11-12; *see also* FAC ¶ 16). Accordingly, Facebook *stores* the telephone numbers to be called.

Second, Plaintiff alleges that Facebook called Plaintiff *without human intervention*, *i.e.* no human being is involved in the sending of Facebook's login

-10-

notifications. "Facebook established an automated 'login notification' process through which it sends automated, computer-generated text messages to cellular telephones when a Facebook account is accessed from a new device . . . ." (FAC ¶¶ 14, 16, Ex. A). In Facebook's own words, Facebook's automated login notifications must be "activated" by adjusting settings on a Facebook account. (Doc. No. 65 p. 21:10). Facebook's login notifications are then "trigger[ed]" when "someone . . . access[es] that account from a new or unrecognized device." (Doc. No. 65 p. 21:12). This does not describe a Facebook employee observing the new login attempt, picking up a device, and messaging Plaintiff. This describes a sophisticated automated system which messages stored phone numbers automatically upon a Facebook account being accessed. Again, Plaintiff need not prove these capacities—he must plausibly allege them. Plaintiff's allegations of a predictive dialer-like system fall in line with those in *Nunes*, 2014 WL 6708465 (alleging equipment which stores then dials numbers without human intervention), acknowledged in the Court's March 24, 2016 Order. *Duguid*, 2016 WL 1169365, at *5.

Third, Facebook's automated messaging system is powerful, capable of extreme invasions into consumers' lives, and fits within the broad-definition/ common-sense approach compelled by the FCC. Facebook services over a billion Facebook accounts. (FAC ¶ 55). The login notifications are sent regarding every Facebook account for which they are activated. (FAC ¶ 14; Doc. No. 65 p. 21:8-12). Plaintiff himself received numerous login notification text messages, supposedly regarding a single Facebook account. (*See* FAC ¶¶ 23-26; Doc. No. 65 p. 21:9-11). It is therefore more than plausible, and indeed highly likely, that no Facebook employee is triggering (never mind writing) each and every one of what must be millions of login notification text messages. They are, as the Amended Complaint pleads, sent automatically, without human invervention.

Moreover, the broad-definition/common-sense approach supports the plausibility of an ATDS, where Facebook utterly failed to set up a reasonable means

for consumers to opt out of its errant computer-generated messages (as expressly required by the FCC), and thus continued to message consumers after they specifically requested the messages 'stop' or be turned 'off.' "[A] called party may revoke consent at any time and through any reasonable means. A caller may not limit the manner in which revocation may occur." 2015 TCPA Order, at ¶ 47. "Consumers may revoke, for example, . . . directly in response to a call initiated or made by a caller. . . . [C]onsumers **must** be able to respond to an unwanted call—using either a reasonable oral method or a reasonable method in writing—to prevent future calls." 2015 TCPA Order, at ¶ 64 (emphasis added). Here, Plaintiff reasonably requested that Facebook cease by responding to Facebook's messages: "Off." (FAC ¶ 25). Facebook immediately responded via an automated message: "Facebook texts are now off. Reply on to turn them back on." (FAC ¶ 26). However Facebook's messages were not off—they continued to come in just as they had before Plaintiff's request. (FAC ¶ 26). Plaintiff is not alone—other consumers report having the same issue. (FAC ¶ 54 ("I have tried texting 'Off' 'OFF' 'off' "STOP' 'Stop'. NONE of them have stopped the text messages.")). Accordingly, under the broad-definition approach compelled by the FCC, this Court should not hesitate to find that Plaintiff has pled that Facebook's system is the exact type of automated equipment capable of extreme invasions of privacy which was targeted by Congress and which is prohibited by the TCPA. *See Soppet*, 679 F.3d at 639 ("But [ATDS] lack human intelligence and, like the buckets enchanted by the Sorcerer's Apprentice, continue until stopped by their true master.").

The Third Circuit's decision in *Dominguez v. Yahoo, Inc.*, 629 Fed. App'x 369 (3d Cir. 2015), overturning summary judgment for the defendant on the ATDS issue, strongly supports Plaintiff's argument that ATDS has been plausibly pled. There, the plaintiff acquired a new cell phone number and began receiving text messages regarding the number's former user's Yahoo email account. *Id.* at 370. Here, Plaintiff is not a Facebook user and received text messages on his cell phone regarding

someone else's Facebook account. (FAC ¶¶ 13, 21). There, Yahoo's text messages were triggered each time a new email reached the subject email inbox. *Dominguez*, 629 Fed. App'x at 370. Here, Facebook's text messages were supposedly triggered upon the subject Facebook account being accessed from a new location or device. (Doc. No. 65 p. 21:9-11). There, the plaintiff responded "stop" and "help" to some of the text messages, and sought help from Yahoo's customer service, all to no avail. *Dominguez*, 629 Fed. App'x at 370-71. Here, Plaintiff responded "Stop" to Facebook's text messages. Facebook responded "Facebook texts are now off," but the texts continued. (FAC ¶¶ 25-26). Plaintiff also emailed Facebook, also to no avail. (FAC ¶¶ 34-35). The Third Circuit held that material facts remained and overturned summary judgment for Yahoo. *Dominguez*, 629 Fed. App'x at 372-73. This Court should hold that Plaintiff's pleading plausibly states a claim and deny Facebook's motion.

### B. The Messages' Content Supports ATDS Use

Facebook argues that its system used to send login notifications cannot possibly be an ATDS because no two messages to Plaintiff were completely identical (Doc. No. 65 pp. 18-19) and, putting it another way, it did not send the same exact message "en masse" (Doc. No. 65 pp.21-22). That Facebook's system does not send text message spam en masse, but instead sends slightly varied messages from templates using a set of algorithms, does not mean the system is not an ATDS. Indeed, the term "*en masse*" appears to have been introduced into TCPA vernacular by the unsuccessful plaintiff in *McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728, at *2 (N.D. Cal. Jan. 30, 2015). No requirement exists in the TCPA or FCC regulations or orders that an ATDS send the same exact message 'en masse.' *See* 2015 TCPA Order, at ¶ 16 (rejecting ATDS definitions "that fit only a narrow set of circumstances in favor of broad definitions which best reflect[] legislative intent by accommodating the full range of telephone services.").

Rather, the true test is whether equipment can "dial numbers without human intervention" and "dial thousands of numbers in a short period of time." 2015 TCPA Order, at ¶ 17. The TCPA does not require that the same message be sent en masse. As pled, Facebook used a template for the messages in the following form:

> "Your Facebook account was accessed from [__BROWSER__] at [__TIME__]. Login for more info."

(FAC ¶ 24-30). Indeed, all of the (primary) text messages received by Plaintiff (the ones complained of here) followed this exact format. (*See* FAC ¶¶ 24-26). The browser and time information was then filled automatically using computerized protocol with the browser and time data of the unrecognized login attempt. (FAC ¶¶ 29-30). As argued above, the Amended Complaint pleads that no human was observing login attempts across the over-a-billion Facebook accounts and then writing text messages including each login attempt's browser and time stamp. The browser and time stamp were automatically filled by computers. The process the Amended Complaint describes is automated by definition, not the reverse.

Facebook cites *Flores v. Adir Int'l, LLC*, No. CV 15-00076-AB, 2015 WL 4340020 (C.D. Cal. July 15, 2015) as support for its 'content' argument. The plaintiff there pled no similar facts regarding the scope and origin of the defendant's text messages. There, the plaintiff alleged that a debt collector had sent him text messages in Spanish using an ATDS. As to the content of the messages, the plaintiff pled only that "none of the text messages mention[ed] Plaintiff directly and appear[ed] to be scripted and generic." *Id.* at *2. However, as the court found, the messages contained a reference number specific to the plaintiff, suggesting individualization.

Plaintiff's allegations here go far beyond those in *Flores*. First, the mere scope of Facebook (over a billion users, FAC ¶ 55), and that it is a technology company, suggest automation. Second, Plaintiff alleges the specific template used by Facebook

to send messages to Plaintiff and the class, and that Facebook's computers filled in the browser and time information. There is nothing implausible about Facebook setting up a system whereby browser and time of login attempts (data readily available to Facebook) is inputted into a text template and sent to consumers' cell phone numbers (which Facebook has already collected and stored). It is implausible that human Facebook employees input browser and time-stamp information for each and every login notification, direct it to specific cell phone numbers, and then hit send, millions or billions of times over. *Flores* differed, where the defendant was a small-time debt collector and the text messages included a reference number specific to the plaintiff, a debtor from whom the defendant sought to collect.

### C. The Messages' Context Supports ATDS Use, Not Human Intervention

Facebook next argues that it did not use an ATDS because of the "context in which [its messages] w[ere] received." (Doc. No. 65 p. 19:4). The 'context' in which Plaintiff and the classes received Facebook's messages was (1) after specifically asking Facebook to stop, or (2) despite never having provided Facebook a cell phone number to message in the first place. (FAC ¶ 58 (stating class definitions)). This context supports liability. *See* 47 U.S.C. § 227(b)(1)(A); s*ee, e.g.*, *Nunes*, 2014 WL 6708465, at *2 (rejecting defendant's argument that it had consent to autodial).

Facebook argues the context is that some person, somewhere, attempted to log into some unknown person's Facebook account, triggering Facebook's messages, and qualifying as 'human invervention.' (Doc. No. 65 p. 19). But the 'trigger' fact pattern is not developed through discovery—Plaintiff pleads only that he received text messages from Facebook, and that Facebook has a 'login notification' system in place. There is no proof at this juncture that any human attempting to log into a Facebook account caused the messages to be sent to Plaintiff. In fact, Plaintiff's experience indicates a malfunctioning system, where Facebook continued to send Plaintiff text messages after Facebook responded that it would stop. Who is to say,

before discovery, that Facebook's system was not also malfunctioning as to when its messages were 'triggered'? Fact determinations cannot be made at the pleading stage.

Second, even if Facebook's 'trigger' theory is factually accurate, that is <u>not</u> human intervention under the law. Under all case precedent, human intervention means a human consciously decides to send each message. *See Derby v. AOL, Inc.*, No. 15-cv-00452-RMW, 2015 WL 3477658, at *3 (N.D. Cal. June 1, 2015) ("[T]his case involves personalized text messages, composed by individual AIM users, sent to numbers chosen and manually inputted by the users."); *McKenna*, 2015 WL 428728, at *3 ("McKenna's allegations make clear that the Whisper App can send SMS invitations only at the user's affirmative direction to recipients selected by the user."); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1193 (W.D. Wash. 2014) ("In order for a text dispatch notification to be sent to a customer, the customer must have first provided some amount of information to the dispatcher, the dispatcher must have pressed 'enter' to transmit that information to both the TaxiMagic program and the nearest available driver, and the driver must have pressed 'accept' on his or her Mobile Data Terminal."); *Glauser*, 2015 WL 475111, at *6 (group text messages at issue "were either sent by group members themselves, and merely routed through defendant's application, or in the case of the Welcome Texts, triggered by the group creator's addition of plaintiff to the group.").

Here, it is not the case that a person decides to send the message (or any message) to Plaintiff's number, or even that a human's entering of a phone number prompts a template text message. Rather, under Facebook's theory, the numbers are stored and then automatically "triggered" when some person, somewhere, attempts to access from a new location a Facebook account for which "login notifications" are turned on. (Doc. No. 65 p. 21:12). This is not the conscious decision-making to send a text messages that has been previously adjudicated 'human invervention.' Indeed, the person allegedly triggering the message—the login attempter—has no intention of sending anyone a text message. This is especially true of the login attempter

-16-

1 attempting to commit "fraud" or "identity theft" as anticipated by Facebook, as in that
2 case, a message being sent is against the login attempter's direct interest—undetected
3 hacking. (Doc. No. 65 p. 28:1-2). Here, it is clearly <u>Facebook itself</u> that is robotically
4 <u>sending</u> the text messages. No human intervention is occurring in the actual sending
5 of the message.

6      Facebook relies on *WhisperText* to support its human intervention theory. The
7 system there is clearly distinguishable. In *WhisperText*, "[w]henever a new user
8 download[ed] the Whisper app from WhisperText, the message 'Whisper will text
9 your friends for you' appear[ed] on the screen automatically." 2015 WL 428728, at
10 *2. The user then <u>chose</u> whether or not to upload contacts to Whisper's database. By
11 selecting contacts, the user affirmatively indicated that those contacts should be
12 messaged. *Id.* A third party then took the contacts and sent the contacts text
13 messages. The plaintiff was such a contact, *i.e.* he received a text message when
14 some person with his contact selected his number as one to be messaged. *Id.*

15      The analysis here is inapposite. Here, no person decided to send Plaintiff any
16 message. Nobody hit 'send.' Some speculated and unknown person's login attempt
17 to an unknown Facebook account, with no intent for anyone to be sent any message,
18 is a far cry from someone selecting Plaintiff's contact information as a person to be
19 messaged. Facebook's human intervention theory does not jibe with established case
20 law.

21      D. <u>Plaintiff Plausibly Alleges Facebook's Use of Equipment which has the</u>
22         <u>Capacity to Sequentially and Randomly Dial</u>

23      Whether or not Facebook's system functions like a predictive dialer, its system
24 is still an ATDS under the TCPA, because it has the capacity to sequentially and
25 randomly dial. 47 U.S.C. § 227(a)(1); *see Nunes*, 2014 WL 6708465, at *2 ("[T]he
26 complaint contains a secondary theory about how Twitter's equipment qualifies as an
27 [ATDS]. In paragraph 61, Nunes alleges that . . . the equipment ha[s] the capacity to
28 'generate' numbers at random or sequentially (rather than merely pulling and dialing

numbers from a database without human intervention) . . . .").  "[A] system need not actually store, produce, or call randomly or sequentially generate telephone numbers, it need only have the capacity to do it." *Satterfield*, 569 F.3d at 951.  Moreover, "the capacity of an [ATDS] is not limited to its current configuration but also includes its potential functionalities." 2015 TCPA Order, at ¶ 16.[1]

Here, as in *Nunes*, Plaintiff has alleged that Facebook's system, like Twitter's, can randomly or sequentially generate numbers to be dialed. (FAC ¶ 40).  Plaintiff adds factual support above and beyond that alleged in *Nunes*.  Facebook's system is computer-based and "involves many computer servers equipped with multiple software applications," and thus "has the capacity to generate random numbers" through use of a "pseudorandom number generator." (FAC ¶ 40).  The system can also generate sequential numbers. (FAC ¶ 42).  If the system does not have the current ability to randomly or sequentially generate numbers, that capacity can be trivially added with minimal computer coding, *i.e.* within potential functionality. (FAC ¶¶ 44-

---

[1] This Court is without power to ignore the FCC's 2015 TCPA Order. *See Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *5 (N.D. Cal. Feb. 4, 2015) ("[T]he FCC has issued regulations . . . and under the Hobbs Act, the court is bound by those FCC rulings."); *Hernandez v. Collection Bureau of America, Ltd.*, No SACV 13-01626-CJC(DFMx), 2014 WL 4922379, at *3 (C.D. Cal. Apr. 16, 2014) (quoting 28 U.S.C. 2342(1)) ("Under the Administrative Orders Review Act, known more informally as the Hobbs Act, the Court of Appeals is vested with 'exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—all final orders of the [FCC] made reviewable by section 402(a) or title 47.'"); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110 (11th Cir. 2014) (overruling district court's holding that it had jurisdiction to review 2008 FCC ruling); *Leyse v. Clear Channel Broadcasting, Inc.*, 545 Fed. App'x 444, 454-455 (6th Cir. 2013) (finding that FCC's 2003 TCPA Order required deference under Hobbs Act); *Nack v. Walburg*, 715 F.3d 680, 685-86 (8th Cir. 2013) (FCC regulation required deference under Hobbs Act); *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 446-47 (7th Cir. 2010) (holding district court lacked jurisdiction to consider FCC's regulation of TCPA regarding "established business relationship" defense).

50).  Facebook does not even dispute Plaintiff's factual pleading, as Twitter did in *Nunes*. *See* 2014 WL 6708465, at *2 ("Twitter argues that . . . [its] equipment would need to be dramatically reconfigured . . . .").[2]  As in *Nunes*, Plaintiff's pleading raises "an evidentiary matter that cannot be resolved at the pleading stage," *id.*, and Facebook's motion must be denied.

**III.** **Facebook's Messages Address No Emergency Situation and are Not Exempt From TCPA Liability**

Facebook argues its unwanted messages qualify for the "emergency purposes" exception to the TCPA. *See* 47 U.S.C. § 227(b)(1)(A) (outlawing the making of "any call (*other than a call made for emergency purposes* or made with the prior express consent of the called party) using any [ATDS] or an artificial or prerecorded voice") (emphasis added).  The emergency purposes exception neither applies to nor justifies Facebook's failure to heed consumers' requests to simply stop its text messages.

The FCC defines "emergency purposes" as "calls made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4).  In its original 1992 ruling implementing the TCPA, the FCC ruled that the emergency exception could apply to utility companies' calls to customers regarding service outages and interruptions:

> Service outages and interruptions in the supply of water, gas or electricity could in many instances pose significant risks to public health and safety, and the use of prerecorded message calls could speed the dissemination of information regarding service interruptions or other potentially hazardous conditions to the public.

---

[2] Instead it argues that *Nunes* unfairly expands the definition of ATDS, as Congress could not possibly have sought to hold it liable for the calls placed to Plaintiff and the classes. (Doc. No. 65 p.25).  As argued in Section II.A. *supra*, Facebook's system is the *exact* type of invasive system from which Congress sought to protect the American public: (1) it calls consumers who have not provided their number or who have asked Facebook to cease, (2) it does so "at all hours of the night" (FAC ¶ 55), (3) it does not provide consumers like Plaintiff (without access to the triggering Facebook account) *any* way to stop the calls short of filing a lawsuit.

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 F.C.C.R. 8752, 8777-78 ¶ 51 (1992) (the "1992 TCPA Order"). In 2012, the FCC ruled that calls made pursuant to the Warning Alert and Response Network ("WARN") Act are made for "emergency purposes" and meet the exemption. 2012 TCPA Order, at ¶ 17. Congress established WARN as a "unified national hazard alert system" to "alert the public to any imminent threat that presents a significant risk of injury or death to the public." *See* Warning, Alert and Response Network ("WARN") Act, H.R. 5556, 109th Cong. § 2(b)(1) (2006) (enacted).[3] Messages sent pursuant to WARN include Wireless Emergency Alerts ("WEA") used to "send emergency alerts regarding public safety emergencies, such as evacuation orders or shelter in place orders due to severe weather, a terrorist threat or chemical spill." *See* https://www.fcc.gov/guides/wireless-emergency-alerts-wea (last visited June 4, 2015). WEA covers "only critical emergency situations" and are sent only as (1) alerts "issued by the President," (2) "alerts involving imminent threats to safety or life," or (3) AMBER alerts. *Id.*

Conversely in 2012, the FCC refused to exclude non-telemarketing, informational-only calls from TCPA liability:

> None of our actions change requirements for prerecorded messages that that are nontelemarketing, informational calls, such as calls by or on behalf of tax-exempt non-profit organizations, calls for political purposes, and calls for other noncommercial purposes, including those that deliver purely informational messages such as school closings. Such calls continue to require some form of prior express consent under the TCPA and the Commission's rules, if placed to wireless numbers and other specified recipients.

2012 TCPA Order, at 1831 ¶ 3. The FCC's ruling affirmed that automated calls are subject to the TCPA even if they have a hypothetical usefulness to consumers.

---

[3] This document was previously filed for the Court's convenience. (Doc. No. 30-2).

In 2015, the FCC "exempt[ed] from the TCPA's consumer consent requirements, <u>with conditions</u>, certain pro-consumer messages about time-sensitive <u>financial</u> and <u>healthcare</u> issues." 2015 TCPA Order, at ¶ 125. These exemptions apply only to messages sent from a "financial institution" or "healthcare provider." *Id.* at ¶¶ 138, 147. Messages may only be sent to numbers provided by a sender's customers/patients. *Id.* at ¶¶ 138, 147. Moreover, the exemption is conditioned on the provision of "a mechanism for recipients to easily opt out of future calls" and that the financial institution or healthcare provider "honor opt-out requests immediately." *Id.* at ¶¶ 137-38, 147. Finally, the calls cannot be charged or counted against the recipient's phone plan in any way. *Id.* at ¶¶ 139, 148.

Here, Facebook's login notification text messages were non-telemarketing, informational calls subject to TCPA liability. Far from addressing a "situation affecting the health and safety of consumers," Facebook's messages were supposedly meant to notify consumers when access to their Facebook account was attempted from a new location. Important here, the messages at issue failed this purpose, and were not "necessary" by any stretch. 47 C.F.R. § 64.1200(f)(4). Indeed, Plaintiff has no Facebook account, thus the messages were not only unnecessary, they were completely irrelevant and harassing. The same is true for the class members, who, like Plaintiff, received Facebook's messages despite (1) never giving Facebook their cell phone number, or (2) specifically requesting that Facebook's messages stop. (FAC ¶ 58). Thus the calls at issue are the exact type of "intrusive, nuisance calls" targeted by Congress. (*See* Doc. No. 65 p. 27:15-16 (citing *Ryabyshchuck v. Citibank (S. Dakota) N.A.*, No. 11-CV-1236-IEG (WVG), 2012 WL 5379143, at *2 (S.D. Cal. Oct. 30, 2012)).

Nor does Facebook qualify for the financial institution/healthcare provider exemption. Facebook is not a financial institution or healthcare provider.[4] The messages gave no express opt-out, as required for that exemption to apply. (*See* FAC ¶¶ 23-26). And when Plaintiff and others requested "Stop," Facebook ignored the requests. (FAC ¶ 26, 54).

The FCC has "emphasize[d] the limited nature of this [emergency purposes] exception," and stated its intention to "be vigilant in monitoring and taking enforcement action against [ATDS operators] who attempt to use it for calls that are not for emergency purposes." *In the Matter of Implementation of the Middle Class Tax Relief & Job Creation Act of 2012*, 27 F.C.C.R. 13615, 13628–29 ¶ 28 (2012).[5] The few circumstances affirmatively ruled by the FCC to trigger the emergency purposes—power outages, alert from the President, alerts of terrorist attacks, AMBER alerts—demonstrate that Facebook's messages do not belong in this discussion.

## IV.    The TCPA Does Not Violate the First Amendment

Facebook, a company that has historically unprecedented access into U.S. consumers' homes, computers, and cell phones, argues the TCPA, a statute passed on concerns for U.S. consumers' privacy, violates its constitutional right to free speech. Facebook makes this argument although the Ninth Circuit has repeatedly held that the TCPA is a constitutional content-neutral time/place/manner speech restriction passing intermediate scrutiny. *See Campbell-Ewald v. Gomez*, 768 F.3d 871 (9th Cir. 2014), *cert. granted*, 135 S. Ct. 2311 (2015), and *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016); *Moser v. F.C.C.*, 46 F.3d 970 (9th Cir. 1995).

---

[4] Facebook likens itself to Venmo. (Doc. No. 65 p. 27 n.5). The comparison is not well taken. Facebook cites no financial harm that could be suffered through a Facebook account hack. Moreover, Plaintiff did not even have a Facebook account, thus its continued messages served no purpose at all.

[5] This document was previously filed for the Court's convenience. (Doc. No. 30-4).

A. <u>Binding Ninth Circuit Precedent Requires this Court to Uphold the TCPA</u>

Ninth Circuit precedent requires this Court to uphold the TCPA—or at least the pre-2015 amendment TCPA—as a valid content-neutral restriction. In *Moser*, 46 F.3d 970, the Ninth Circuit rejected a First Amendment challenge to the TCPA's 47 U.S.C. § 227(b)(1)(B), which makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." Like § 227(b)(1)(A), at issue here, that section contains an exception for a "call [that] is initiated for emergency purposes." The court of appeals held that § 227(b)(1)(B) is a content-neutral time, place, and manner restriction because it "regulates all automated telemarketing calls without regard to whether they are commercial or noncommercial." *Moser*, 46 F.3d at 973. Applying intermediate scrutiny, as directed by Supreme Court precedent, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989), the Ninth Circuit held that this provision is consistent with the First Amendment.

In *Campbell-Ewald*, 768 F.3d 871, the Ninth Circuit reaffirmed its reasoning in *Moser* and upheld the constitutionality of § 227(b)(1)(A), the very provision at issue here. The court recognized that *Moser* had rightly treated the TCPA as a content-neutral time, place and manner restriction, emergency exception included, 768 F.3d at 876, and further concluded that the Act serves a significant government interest in protecting privacy, *id.* at 876–77. The *Campbell-Ewald* court also found § 227(b)(1)(A) to be narrowly tailored and to leave open ample alternative channels for the communication of information. *Id.* Rejecting appellant's contention that "the government's interest only extends to the protection of residential privacy, and that therefore the statute is not narrowly tailored to the extent that it applies to cellular text messages," the court observed that "there [wa]s no evidence that the government's interest in privacy ends at home," but that, "to whatever extent the government's significant interest lies exclusively in residential privacy, the nature of cell phones

renders the restriction of unsolicited text messaging all the more necessary to ensure that privacy." *Id.* at 876.[6]  Accordingly, the Ninth Circuit has held that the TCPA—inclusive of its emergency exception—is constitutional, and this Court must follow suit.

### B. Supreme Court Precedent Supports the Ninth Circuit's Rulings

The Ninth Circuit got it right.  "[T]he government may impose reasonable restrictions on the time, place, or manner of protected speech, provided that the restrictions 'are justified without reference to the content of the restricted speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065 (1984)); *see also Doe v. Harris*, 772 F.3d 563, 577-78 (9th Cir. 2014) (citing *Ward*).  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill v. Colorado*, 530 U.S. 703, 719, 120 S. Ct. 2480 (2000) (quoting *Ward*, 491 U.S. at 791).  Far from regulating the dissemination of any particular viewpoint or ideal, the TCPA outlaws making "**any call** (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice." 47 U.S.C. § 227(b)(1)(A) (emphasis added); *see also McCullen v. Coakley*, 134 S. Ct. 2518, 2532 (2014) ("The broad reach of a statute can help confirm that it was not enacted to burden a narrower category of disfavored speech.").  Indeed, Congress passed the TCPA for the content-neutral purpose of protecting consumers'

---

[6] District courts nationwide have likewise found the TCPA constitutional. *See Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380 (N.D. Ga. 2013); *Strickler v. Bijora, Inc.*, 2012 WL 5386089, at *5–6 (N.D. Ill. Oct. 30, 2012); *Abbas v. Selling Source, LLC*, 2009 WL 4884471, at *7–8 (N.D. Ill. Dec. 14, 2009).

privacy. *See Satterfield*, 569 F.3d at 954 ("The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy."); *see also Hovila v. Tween Brands, Inc.*, No. C09-0491RSL, 2010 WL 1433417, at *9 & n.3 (W.D. Wash. Apr. 7, 2010) (stating privacy purpose and listing Congress' findings).

Facebook argues the TCPA's "emergency purpose" exception renders the TCPA a content-based restriction on speech. Facebook's argument conflates the content of an automated call with the purpose for which it is made. "The term *emergency purposes* means calls made necessary in any <u>situation</u> affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4) (underline added). Thus it is the situation in which a message is sent that determines whether the exception applies, and the actual content of the speech is not determinative.

To illustrate, faced with power outages, a utility company might send automated messages to its customers stating: "Power outages expected for the next 2 days." The utility company would not be liable for this message because it would have been sent to its customers to address an emergency situation affecting the health and safety of consumers. *See* 1992 TCPA Order, at ¶ 51. Meanwhile, if Facebook sent this very same message through its login notification system, unrelated to any actual power outage, the emergency purpose exception would certainly not apply. Conversely, if the utility company, again faced with power outages, attempted to send the same emergency warning but through some error sent nonsensical, indecipherable automated messages, the utility company would not be liable because the messages would still have been sent for emergency **purposes**. Thus, liability is not a function of the content of the message, but rather the overall context in which that message is sent. The TCPA thus exempts emergency calls based on the **purpose** for which the calls are made, not on **content**, and is therefore a content-neutral restriction. *See, e.g.*, *Hill*, 530 U.S. at 730 (statute deemed content-neutral because it applied not based on the speech's content, but whether the speech was made "within 100 feet of a health

care facility"); *McCullen*, 134 S. Ct. at 2530 (statute content-neutral because its application depended not on *what* was said, but whether it was said at a "reproductive health care facility"); *cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (holding unconstitutional town ordinance controlling size and appearance of roadside signs—non-commercial speech—based on the content of signs' message, *i.e.* ideological sign vs. political signs had different size restrictions).

Not only is the TCPA (1) content-neutral, it is also (2) "narrowly tailored to serve a significant governmental interest" and (3) "leave[s] open ample alternative channels for communication of the information.'" *Campbell-Ewald Co.*, 768 F.3d at 876. The significant governmental interest is the protection of consumers' privacy. *Satterfield*, 569 F.3d 954; *Moser*, 46 F.3d at 974. The TCPA is narrowly tailored to decrease automated call intrusions. *Moser*, 46 F.3d at 974-975. Finally, the TCPA leaves open ample alternative channels for communication—indeed it only prohibits automated calls made without the called party's consent. 47 U.S.C. § 227(b)(1)(A); *see also Moser*, 46 F.3d at 975 ("The restrictions . . . leave open many alternative channels of communication, including the use of taped messages introduced by live speakers or taped messages to which consumers have consented, as well as all live solicitation calls. That some companies prefer the cost and efficiency of automated telemarketing does not prevent Congress from restricting the practice."). As such, the TCPA is a constitutional content-neutral time/place/manner restriction on speech.

C. Congress's 2015 TCPA Amendment Cannot Render the Entire TCPA Unconstitutional

The Bipartisan Budget Act of 2015 amended the TCPA to exempt automated calls "made solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015 § 301(a), Pub. L. No. 114-74, 129 Stat. 584. Facebook cites this amendment as a blatant content-based distinction triggering strict scrutiny and a determination that the TCPA is unconstitutional. The constitutionality of the 2015 amendment is a moot issue, and Plaintiff makes no argument one way or the

other, because (1) the amendment does not apply to the facts here, and (2) even if the amendment were found unconstitutional, the 25-year old remainder of the TCPA would be 'severed,' remain in force, and hold Facebook liable.

Courts must "avoid nullifying an entire statute when only a portion is invalid." *Vivid Entm't, LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014) (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502, 105 S. Ct. 2794 (1985)). Accordingly, under the "doctrine of severability . . . 'the same statute may be in part constitutional and in part unconstitutional, and . . . if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected.'" *Id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772, 108 S. Ct. 2138 (1988)). "Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability." *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S. Ct. 3262 (1984). Courts should sever unconstitutional provisions "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Id.*

The 2015 amendment is clearly severable. The TCPA was enacted in 1991. It was in force and withstood constitutional scrutiny for 24 years before the 2015 amendment. *See, e.g.*, *Campbell-Ewald*, 768 F.3d at 876. Thus, the pre-amendment TCPA is not only *capable* of independence from the amendment, it was independent. Likewise, Congress not only *would* have enacted the TCPA minus the amendment; it did, and kept it that way for 24 years. Accordingly, the pre-amendment TCPA will remain in force regardless of whether the 2015 amendment is unconstitutional, Facebook's liability here cannot be affected, therefore the amendment should not enter the Court's consideration.

## CONCLUSION

For the foregoing, Plaintiff respectfully requests the Court deny Facebook's Motion to Dismiss.

DATED: June 27, 2016

By: _/s/ Sergei Lemberg_
SERGEI LEMBERG
Lemberg Law, LLC
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile: (203) 653-3424
slemberg@lemberglaw.com

TRINETTE G. KENT (State Bar No. 222020)
10645 North Tatum Blvd., Suite 200-192
Phoenix, AZ 85028
Telephone: (480) 247-9644
Facsimile: (480) 717-4781
E-mail: tkent@lemberglaw.com

*Attorneys for Plaintiff, Noah Duguid*

# CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2016, a true and correct copy of the foregoing document was electronically filed with the Clerk of the United States District Court of the Northern District of California by using the CM/ECF system, which will send notice of such filing to all counsel of record.

Elizabeth L. Deeley
Kristin I Sheffield-Whitehead
Kirkland & Ellis LLP
555 California Street, Suite 2700
San Francisco, CA 94104
Tel: (415) 439-1400
Tel: (415) 439-1420
Fax: (415) 439-1500
edeeley@kirkland.com
kwhitehead@kirkland.com

Andrew B. Clubok
Carrie J Bodner
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
Tel: (212) 446-5912
Fax: (212) 446-6460
Andrew.clubok@kirkland.com
Carrie.bodner@kirkland.com

Susan E. Engel
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
Tel: (202) 879-5000
seengel@kirkland.com

                                        /s/ Sergei Lemberg
                                        Sergei Lemberg